1  LIEFF CABRASER HEIMANN
   & BERNSTEIN, LLP
2  Michael W. Sobol (SBN 194857)
   msobol@lchb.com
3  David T. Rudolph (SBN 233457)
   drudolph@lchb.com
4  Melissa Gardner (SBN 289096)
   mgardner@lchb.com
5  Jacob H. Polin (SBN 311203)
   jpolin@lchb.com
6  Nabila Abdallah (SBN 347764)
   nabdallah@lchb.com
7  275 Battery Street, 29th Floor
   San Francisco, CA 94111-3339
8  Telephone: 415.956.1000
   Facsimile: 415.956.1008
9
   CARNEY BATES & PULLIAM, PLLC
10 Joseph Henry (Hank) Bates, III (SBN 167688)
   hbates@cbplaw.com
11 Allen Carney (*pro hac vice* forthcoming)
   acarney@cbplaw.com
12 Courtney E. Ross (*pro hac vice* forthcoming)
   cross@cbplaw.com
13 519 W. 7th St.
   Little Rock, AR, 72201
14 Telephone: 501.312.8500
   Facsimile: 501.312.8505
15
16 *Counsel for Plaintiff and the Proposed Class*

17 **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**

18 *San Francisco Division*

19

20

21 MIKHAIL GERSHZON,
   on behalf of himself and
22 all others similarly situated,

23              Plaintiff,

24 v.

25 META PLATFORMS, INC.,
                Defendant.

26

27

28

Case No.    3:23-cv-83

**CLASS ACTION COMPLAINT**

DEMAND FOR JURY TRIAL

Plaintiff Mikhail Gershzon ("Plaintiff"), individually and on behalf of a Class of all other similarly situated persons, brings this action against Meta Platforms, Inc. (formerly known as Facebook) ("Meta" or "Defendant") for its violations of the Driver's Privacy Protection Act, 18 U.S.C. § 2721-2725 ("DPPA") and the California Invasion of Privacy Act, Cal. Penal Code § 631 ("CIPA").

**<u>NATURE OF THE CASE</u>**

1.      This is a privacy class action against Meta for knowingly obtaining statutorily protected personal information, including names, disability information, and e-mail addresses, as well as confidential communications, from the California Department of Motor Vehicles (herein, "DMV") in violation of the DPPA and the CIPA.

2.      Meta employs hidden tracking code, known as the Meta "Pixel," which sends to Meta time-stamped, personally-identifiable records of Plaintiff and Class members' personal information, activities and communications on the DMV website.  Through the Pixel's surveillance, Meta obtains vast quantities of protected data on a daily basis from the DMV, including the first names of anyone who clicks into their "MyDMV" portal page; the identities of persons with disabilities who start disabled parking placard applications on the DMV website; the e-mail addresses belonging to users who check the status of pending applications; and the personally identifying contents of communications between users and the DMV.  Meta combines this personal information with other information about each user gathered from other sources and uses it for unauthorized purposes. DMV website users are not advised about Meta's collection of their personal information, and Meta does not have their consent.  This conduct is expressly prohibited by both the DPPA and the CIPA.

3.      The DPPA prohibits Meta from knowingly obtaining personal information (such as "name," "disability information," and other information that identifies individuals, such as e-mail addresses) from motor vehicle records, including information from the DMV.  Meta knowingly and without authorization has obtained such information regarding all members of the proposed Class.  Pursuant to 18 U.S.C § 2724, Plaintiff seeks, on behalf of himself and each member of the proposed Class, statutory damages in the amount of $2,500, reasonable attorney's

fees and other litigation costs reasonably incurred, and such other equitable relief as the court determines appropriate, including removal of the Meta Pixel from the DMV website.

4.      CIPA prohibits Meta from learning the contents of Plaintiff's and Class members' electronic communications from and to DMV without the consent of all parties, including communication regarding their names, disability information, other private data, and/or information that identifies individuals.  Meta has intruded without consent upon such communications between the DMV and all members of the proposed Class.  Pursuant to Cal. Penal Code § 637.2, Plaintiff seeks, on behalf of himself and each member of the proposed Class, damages in an amount no less than all available statutory damages, injunctive relief and such other equitable relief as the court determines appropriate, including removal of the Meta Pixel from the DMV website.

## PARTIES

5.      Plaintiff Mikhail Gershzon is a resident of San Francisco County, California.

6.      Defendant is a Delaware Corporation with its headquarters in Menlo Park, California.  Meta's offices are located in San Mateo County, California.

## JURISDICTION

7.      This Court has personal jurisdiction over Meta because it is incorporated and has its principal place of business in California.

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises from violations of the DPPA.  This Court may also exercise supplemental jurisdiction over Plaintiff's CIPA claims pursuant to 28 U.S.C. § 1367(a), because they are so related to the DPPA claims (within the Court's original jurisdiction) that they form part of the same case or controversy under Article III of the United States Constitution.  This case does not present novel or complex issues of state law that predominate over claims for which this Court has original jurisdiction, and there are no compelling reasons for declining supplemental jurisdiction over those of Plaintiff's claims that do not arise under the DPPA.

9.      This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because it is a class action with more than $5,000,000 in controversy where at least one Class

1    member is a citizen of a state of which Defendant is not a citizen.

2                                    **DIVISIONAL ASSIGNMENT**

3            10.    Venue is appropriate in this Court because Meta resides in this District.

4            11.    This action is properly assigned to the San Francisco Division under N.D. Cal.

5    Civil Local Rule 3-2(d) because Meta is headquartered in San Mateo County.

6                                  **COMMON FACTUAL ALLEGATIONS**

7    **I.      Background of the DPPA and CIPA**

8            12.    In enacting the DPPA in 1994, Congress created a specially protected class of data,

9    i.e., "personal information" provided to State DMVs.  The DPPA safeguards this personal

10   information from disclosure by state DMVs or acquisition by a third party for any purpose other

11   than the limited permissible purposes expressly delineated in the DPPA.  In creating special

12   protections for data in this particular context, the DPPA responded to at least two concerns over

13   the personal information in State motor vehicle records.  The first of these concerns was a threat

14   from stalkers and criminals who could acquire personal information from DMVs.  The second

15   concern related to the misuse of information that had been acquired through the coercive power of

16   the State, which was exemplified by States' common practice of selling consumer data to

17   businesses engaged in consumer marketing and solicitation.

18           13.    Personal information protected by the DPPA "means **information that identifies**

19   **an individual**," which may "include[e] an individual's photograph, social security number, driver

20   identification number, **name**, address (but not the 5-digit zip code), telephone number, **and**

21   **medical or disability information** . . . " that is obtained "in connection with a motor vehicle

22   record." 18 U.S.C § 2725(3) (emphasis added); 18 U.S.C § 2721(a)(1).  "Motor vehicle record" is

23   defined to include "any record that pertains to a motor vehicle operator's permit, motor vehicle

24   title, motor vehicle registration, or identification card issued by a department of motor

25   vehicles[.]" 18 U.S.C § 2725(1).  Pursuant to 18 U.S.C § 2724, "[a] person who knowingly

26   obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not

27   permitted under this chapter shall be liable to the individual to whom the information pertains. . .

28   ." When enacting the DPPA, Senator Mark Warner said "[t]his amendment would place

safeguards on the privacy of the driver and vehicle owners by prohibiting release of personal information to anyone without a specific business-related or government-related reason for obtaining the information . . . . Easy access to personal information makes every driver in this Nation vulnerable and infringes on their right to privacy."[1]

14.     The CIPA is a California state privacy law, which the California legislature enacted in 1967 to "protect the right of privacy of the people of this state" by, among other things, ensuring that communications would not be intercepted or recorded without consent from every party thereto.  Cal. Penal Code § 630.  CIPA prohibits "any person" from "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained."  Cal. Penal Code § 631.

## II.     Background of Meta's Platform and the Meta Pixel

15.     **The Meta Platform.**  Meta is an advertising company which sells advertising space on the social media platform it operates.  Meta's advertising is based on sophisticated user-categorizing and targeting capabilities that are fueled by the personal data of users of the social media platform and other Internet users.[2]  Meta's targeting abilities are exceptional because Meta surveils users' online activities, both on and off Meta's own websites and apps.[3]  This expansive tracking enables Meta to make highly personal inferences about users, such as about their "interests," "behavior," and "connections."[4]  Meta compiles information it obtains and infers about Internet users and uses it to identify personalized "audiences" likely to respond to particular advertisers' messaging.  Access to such audiences is extremely valuable to Meta's advertising

---

[1] 103 Cong Rec S15735, S15745-75 (1993).

[2] Meta Business Help Center, *Why advertise on Facebook, Instagram and other Meta technologies*, https://www.facebook.com/business/help/205029060038706.

[3] Meta Business Help Center, *About Meta Pixel*, https://www.facebook.com/business/help/742478679120153?id=1205376682832142; Meta, *Facebook Core Audience Targeting*, https://www.facebook.com/business/news/Core-Audiences.

[4] Meta, *Ad Targeting: Help your ads find the people who will love your business*, https://www.facebook.com/business/ads/ad-targeting.

clients.  In 2021, Meta generated approximately $114.93 billion, nearly 98% of its revenue, through advertising.

16.     **The Meta Tracking Pixel.**  The Meta Pixel, originally called the Facebook Pixel, was first introduced in 2015.[5]  It is now a primary means through which Meta acquires personal information to create customized audiences for its advertising business, although Meta's public-facing descriptions of the Pixel obscure and minimize this fundamental purpose of the tracking code.  Instead, Meta characterizes the Pixel as a simple "snippet of JavaScript code" that helps website owners keep track of user activity on their websites.[6]  Meta emphasizes that website managers can set up a Pixel easily, without any help from their web developer. "You only need to place a single pixel across your entire website."[7]  The Pixel is installed on an estimated 30 percent of popular internet websites.[8]

17.     The Meta Pixel sends Meta volumes of information about each visit to each website where it is embedded.  Regardless of the purpose (if any) a website owner may have for allowing the Meta Pixel to function on its webpages, the code is configured to capture a substantial amount of information by default.  Since 2015 when it was introduced, the Pixel has transmitted HTTP header information, including the URL of each page visited on a website, by default.  In 2017, Meta quietly modified the Pixel code to transmit additional information automatically, including "microdata" (details about the website and substance of what it offers), other "contextual information" (including details about the structure of a particular webpage), and "SubscribedButtonClick" information (details about buttons available to click on each page including the text), which fires each time a user clicks on a hyperlink or button on the webpage.[9]

---

[5] Cecile Ho, Meta, *Announcing Facebook Pixel* (Oct. 14, 2015), https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

[6] Meta for Developers, *Meta Pixel*, https://developers.facebook.com/docs/meta-pixel/; Meta, *Retargeting: Inspire People to Rediscover What They Love About Your Business*, https://www.facebook.com/business/goals/retargeting (Meta Pixel "tracks the people [who visit your website] and the type of actions they take.")

[7] *Announcing Facebook Pixel*, *supra* n.5.

[8] Surya Mattu et al., The Markup, *How We Built a Meta Pixel Inspector* (Apr. 28, 2022), https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector ("Blacklight, our real-time web privacy inspector, found that more than 30 percent of popular websites embed the Meta Pixel.").

[9] PixelYourSite, *Automatic Facebook Pixel Events*, https://www.pixelyoursite.com/major-

Meta made these changes to learn more about website users for advertising purposes.[10]  Since 2017, the Pixel has been configured to gather all such information indiscriminately and by default without intervention from the website owner requesting the information be tracked.

18.     In 2018, Meta again modified the default operation of the Pixel to maximize the private information it transmits.  Meta introduced a "first-party cookie option" for the Pixel, to circumvent improvements in how web browsers block third-party cookies (a primary means by which Facebook historically tracked people across the web).  Being embedded in websites as a first-party cookie, rather than as a third-party cookie, causes users' browsers to treat that Pixel as though it is offered by the website they are visiting, rather than by Meta, a third party.  When the Pixel is embedded in a website as a first-party cookie, the third-party cookie blocking functions of modern web browsers do not inhibit the Meta Pixel's collection of data.  Operating similarly to, and with the same privacy exemptions applicable to, a first party cookie became another default Pixel setting in or around October 2018. [11]

19.     In short, circumventing privacy measures designed to protect users' information, the Meta Pixel consistently captures HTTP headers, Pixel-specific data, and Button Click data on every visit to every website through its default operation.  Meta acknowledges that the Pixel is configured to collect this information, and can collect the following non-exhaustive categories of information from the webpages where it is embedded:

> **Http Headers** – Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer and person using the website.

> **Pixel-specific Data** – Includes Pixel ID and the Facebook Cookie.

facebook-pixel-update-automatic-facebook-pixel-events; Carey-Simon, George, WeRSM, *Facebook Pixel is about to Get a Bit Smarter* (Apr. 28, 2017), https://wersm.com/facebook-pixel-get-little-smarter/.

[10] David Berry, Dynamo, *Major Update to The Facebook Pixel—Here's what You Need to Know* (May 23, 2017), https://dbdynamo.com/blog/2017/5/23/major-update-to-the-facebook-pixel-heres-what-you-need-to-know; Facebook Business, *What's changing with the Facebook pixel*, https://web.archive.org/web/20170810034608/https://www.facebook.com/business/help/1292598407460746.

[11] Sergiu Gatlan, Softpedia News, *Facebook to Circumvent Cross-Site Tracking Block with New First-Party Cookie* (Oct. 6, 2018), https://news.softpedia.com/news/facebook-to-circumvent-cross-site-tracking-block-with-new-first-party-cookie-523089.shtml.

**Button Click Data** – Includes any buttons clicked by site visitors, the labels of those buttons and any pages visited as a result of the button clicks.

**Optional Values** – Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.

**Form Field Names** – Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.[12]

20.     In all websites where the Pixel operates, when a user exchanges information with the host of that site, Meta's software script surreptitiously directs the user's browser to send a separate message to Meta's servers.  This second, secret transmission contains the original request sent to the host website, ("GET request"), along with additional data that the Pixel is configured to collect ("POST request").[13]  GET and POST requests are communications that contain contents from both the user and from servers associated with the website they are visiting.  These transmissions are initiated by Meta code and concurrent with the communications to and from the host website.

21.     Meta associates the information it obtains via the Meta Pixel with other information regarding the user, using personal identifiers that are transmitted concurrently with other personal information the Pixel is configured to collect.  For Facebook account-holders, these identifiers include the "c_user" IDs, which allow Meta to link data to a particular Facebook account, and "xs" cookies associated with a browsing session.  For both Facebook account-holders and users who do not have a Facebook account, these identifiers also include cookies that Meta ties to their browser, such as "datr" and "fr" cookies.[14]

---

[12] *Meta Pixel*, *supra* n.6; *see also* Meta for Developers, *Meta Pixel: Advanced*, https://developers.facebook.com/docs/facebook-pixel/advanced/; Meta Business Help Center, *Best practices for Meta Pixel setup*, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; Meta for Developers, *App Events API*, https://developers.facebook.com/docs/marketing-api/app-event-api/; Meta for Developers, *Meta Pixel: Get Started*, https://developers.facebook.com/docs/meta-pixel/get-started.

[13] *How We Built a Meta Pixel Inspector*, *supra*, n.8.

[14] Meta, *Cookies Policy* (Oct. 5, 2022), https://www.facebook.com/policy/cookies.

**III.    Meta's Use of Pixel-Derived Data for Advertising**

22.    Meta feeds the vast quantities of information obtained from Meta Pixels into its advertising systems, using it to identify users and their personal characteristics, categorize them for Meta's business purposes, and target them with marketing messages from its advertising clients.

23.    Meta acknowledges this use of data acquired through Meta's Pixel tracking code. For example, Meta refers to the Meta Pixel as one of Meta's "Business Tools," and to websites with the Pixel embedded as "Partners."  Meta explains in its Privacy Policy, among other places, that Meta uses "[i]nformation from Partners," expressly including information about "[w]ebsites you visit and cookie data, like through . . . the Meta Pixel," "to provide a personalized experience to [users], including ads."[15]

24.    One of the ways that Meta uses data obtained via the Pixel for advertising is by using it to define "audiences" customized for particular advertisers.  Meta sells access to three types of tailored audiences.  Advertisers can purchase access to "Core Audiences," composed of individuals with specified traits and characteristics.  Meta assigns users to Core Audiences based on data it has learned or inferred (including via data from Meta Pixels) about a range of their personal qualities, including users' location, age, gender, education, job title, connections to other Facebook users or pages, interests and hobbies, and behavior such as prior purchases and device usage. [16]

25.    Meta also sells access to "Custom Audiences," meaning the ability to reach "people who have already shown interest in [an advertiser's] business, whether they're loyal customers or people who have used [their] app or visited [their] website." [17] Meta assigns users to Custom Audiences based on information from the Meta social media platform, and/or information the advertiser discloses about those users, such as e-mail subscriber lists, and activity tracked on the advertiser's website(s), including via the Meta Pixel. [18]

---

[15] Meta Privacy Center, *Privacy Policy*,  https://www.facebook.com/privacy/policy.

[16] *Ad targeting*, *supra* n.4.

[17] *Id.*

[18] Meta Business Help Center, *Create a customer List Custom Audience*,

1    26.    Meta also sells access to "Lookalike Audiences," a Meta feature that "leverages

2  information such as demographics, interests and behaviors from your source audience [i.e., a

3  Custom Audience tailored from the advertiser's records] to find new people who share similar

4  qualities" with existing customers or Custom Audiences.[19] To generate Lookalike Audiences,

5  Meta uses data it has obtained from across the web, including from Meta Pixels embedded in

6  third-party websites that have no relationship with the advertiser requesting access to a Lookalike

7  Audience.

8  **IV.    Meta Obtains Protected Information From the DMV**

9    27.    The DMV operates the website www.dmv.ca.gov, where users can access and

10  manage their data on file with the DMV, book virtual or in-person appointments, and prepare

11  applications for DMV services, such as driver's licenses and disabled parking placards.

12    28.    The DMV strongly encourages Californians to use its "virtual" agents and

13  offices,[20] and usage of DMV services online has climbed steadily in recent years.  The DMV

14  reported a record number of online transactions (23 million) in 2020, the most in DMV history.[21]

15  That figure grew throughout the COVID-19 pandemic, during which the DMV created and

16  promoted new online options for users, allowing, for example, online driver's testing and license

17  renewals that typically required an office visit.[22]

18

19

---

20  https://www.facebook.com/business/help/170456843145568?id=2469097953376494; *see also*
21  Adespresso, *Facebook Custom Audiences 101: The Complete Guide for Marketers* (Mar. 23,
   2021), https://adespresso.com/blog/facebook-ads-custom-audiences-guide/.
22  [19] Meta Business Help Center, *About lookalike audiences*,
   https://www.facebook.com/business/help/164749007013531?id=401668390442328.
23  [20] California Department of Motor Vehicles, *Online Services*,
   https://www.dmv.ca.gov/portal/dmv-online/; California Department of Motor Vehicles, *Virtual*
24  *Office*, https://www.dmv.ca.gov/portal/dmv-virtual-office.
25  [21] California Department of Motor Vehicles, *Millions of Californians Taking Advantage of DMV*
   *Services Without Visiting Office* (May 3, 2021), https://www.dmv.ca.gov/portal/news-and-
26  media/millions-of-californians-taking-advantage-of-dmv-services-without-visiting-office/.
   [22] *Id.* ("DMV offices cannot run at full capacity while [health] protocols remain in place, further
27  underscoring the importance of using alternate service channels whenever possible"); *see also*
   California Department of Motor Vehicles, *Homepage*, https://www.dmv.ca.gov/portal ("From
28  renewing vehicle registration to changing your address, or driver's license renewal (and much
   more), we're continually adding new online services to meet your needs.").

1       29.     The Meta Pixel is embedded on and throughout the DMV website, and transmits

2    extensive information from the DMV to Meta in accordance with the Meta Pixel's default

3    configuration.

4       30.     Meta assigns a unique numerical identifier to each Meta Pixel and maintains

5    records associating each Pixel with the data it transmits and the website where it is embedded.

6    The numerical identifiers associated with the Meta Pixels which currently operate on the DMV

7    website are 527056364702737 and 2694966390513894.  Accordingly, Meta knows that the Meta

8    Pixel operates on the DMV site and knows that information and communications exchanged

9    between users and the DMV are transmitted to Meta by the Pixel.

10      31.     Meta intentionally obtains information that identifies an individual including

11   "personal information" protected by the DPPA such as names, disability information, and e-mail

12   addresses, as well as confidential communications subject to the protections of CIPA between the

13   DMV and its customers.  Meta acquires this personal data from the DMV without a "permissible

14   use" within the meaning of § 2721(b) of the DPPA, and therefore Meta's acquisition of this data

15   violates the DPPA.  Meta imbeds its Pixel on the DMV website as it would any other website, in

16   disregard for the specially protected status of the personal information that is communicated on

17   the DMV website.  The Meta Pixel operates indiscriminately, capturing all available personal

18   information in a manner not tailored to any "permissible use" set forth in § 2721(b) of the DPPA.

19       **A.**      **Meta Obtains Users' Names from the DMV**

20      32.     By its default operation, the Meta Pixel on the DMV website transmits to Meta the

21   first name of each person who accesses their online account with the DMV.

22      33.     Most services available from the DMV website require an online account, which

23   the DMV calls "MyDMV."  For example, the very first instruction provided on the DMV's

24   Driver's License/ID Card Application page is "Be prepared to create a DMV online account."[23]

25   In order to create an online account with the DMV, a user is required to provide their name

26   through a registration portal.  In the portal, the DMV advises users to "use the name that will

27

28    [23] California Department of Motor Vehicles, *Driver's License / ID Card Application*,
https://www.dmv.ca.gov/portal/driver-licenses-identification-cards/dl-id-online-app-edl-44/.

appear on your driver's license or identification card."[24]  All of the personal information that users provide in the account registration process is saved to the DMV database.[25]

34.    After a user creates a MyDMV account, the DMV uses the first name in its database for the account as the button to access their MyDMV portal.  To illustrate, the button to access the MyDMV account of a logged-in account-holder named John appears as follows:



35.    The Meta Pixel is active within each user's MyDMV account.  After logging in, each time an account-holder clicks the button to access MyDMV, the Meta Pixel treats this as a "SubscribedButtonClick" event, and transmits the account-holder's name to Meta, along with other personal information.  To illustrate, when John clicks into his MyDMV account, Meta obtains, in real time and along with other identifiers and descriptive data,[26] a record that he accessed his MyDMV account, when and from what browser, and that his name is John.  Below is an image showing such network traffic being transmitted to Meta:

---

[24] California Department of Motor Vehicles, *Account Registration: Step 3 of 5* (*see* section titled "Which name should I use?").

[25] California Department of Motor Vehicles, *Conditions of Use*, https://www.dmv.ca.gov/portal/conditions-of-use/ ("If you choose to submit information to us, the information will be transmitted through secure lines to our database.")

[26] The preceding information is coupled with identifiers tied to the user's browser including the datr cookie and the Meta "c_user" ID.



**B.** **Meta Obtains Users' Disability Information from the DMV**

36.      By its default operation, the Meta Pixel transmits to Meta information identifying each person who applies online for a disabled person parking placard (DP Placard) or disabled person license plate (DP Plate) in California.

37.     In order for disabled persons in California to lawfully use disabled parking

accommodations, they must possess a valid DP Placard or Plate.  Permanent placards are renewed

every 2 years; temporary disability placards every 6 months.

38.     The DMV makes the application to order or renew a DP Placard available online,

where it advises that users are eligible only if they meet one of the following criteria: (a) "You

have lost the use of one or more lower extremities, or both hands"; (b) "You have a diagnosed

disease that substantially impairs or interferes with mobility"; (c) "You are unable to move

without the aid of an assistive device"; (d) "You have specific, documented visual problems,

including lower-vision or partial-sightedness."[27] The Meta Pixel is embedded on this page.

39.     Meta uses the Meta Pixel embedded on this page to identify each person who

begins an application for a DP Placard.

40.     To illustrate, the DMV makes the application to order or renew a DP Placard

available online through a button labeled "Start DP application."[28]

Request an original or replacement Disabled
Person Parking Placard (DP).

Start DP Application

41.     Users who click on the "Start DP Application" button thereby send a GET request

to the DMV servers for the online application form, communicating to the DMV that they meet

the criteria for applying, *i.e.*, that they have a disability.  The DMV responds by providing users

with the form maintained in its database, at the URL https://www.dmv.ca.gov/portal/dmv-virtual-

---

[27] California Department of Motor Vehicles, *Disabled Person Parking Placards & Plates*, https://www.dmv.ca.gov/portal/vehicle-registration/license-plates-decals-and-placards/disabled-person-parking-placards-plates/.
[28] California Department of Motor Vehicles, *Disabled Person Parking Placard Application*, https://www.dmv.ca.gov/portal/dmv-virtual-office/dpp-application/.

1   office/dpp-application/dpp-application-form/.  The Meta Pixel simultaneously transmits those

2   communications to Meta.

3       42.     Similarly, the DMV offers an online form for renewing DP Placards, accessible

4   through a button labeled "Start Renewal" at the URL https://www.dmv.ca.gov/portal/dmv-virtual-

5   office/dpp-renewal/.  When clicked, the Start Renewal button directs users to the URL

6   https://www.dmv.ca.gov/portal/dmv-virtual-office/dpp-renewal/dpp-renewal-form/.  The Meta

7   Pixel simultaneously transmits those communications to Meta.

8       43.     With this information, Meta is able to identify every person who starts a renewal

9   or application for disabled parking from the DMV.  In so doing, Meta also obtains other

10  information about the applicant including details on how long they spent with the application and

11  unique identifiers like the c_user ID, datr, xs, and fr cookies.  Below is an image showing such

12  network traffic being transmitted to Meta:

13



**C.**   **Meta Obtains Other Information that Identifies Individuals from the DMV**

44.     In addition to DMV visitors' names and disability status, Meta surveils and derives other personal and private information from communications between the DMV and users of its website.  Through these intrusions, Meta obtains certain users' email addresses, data concerning their phone and address information on file with the DMV, and the personally identifiable contents of private browsing histories and other communications.

**1.**   **Email Addresses**

45.     By its default operation, the Meta Pixel transmits to Meta the e-mail address provided by users who submit online applications for DP Placards, as well as other applications.

46.     To illustrate, users cannot proceed past the first page of the DP Placard application without providing an e-mail address for the application, which the DMV saves to its database. Shortly after a user submits their application, the DMV refers to information associated with that application and sends a confirmation e-mail to the applicant.  The e-mail from the DMV contains the user's application "case number" and a link to a personalized "status checker" portal on the DMV website, which the DMV hosts at https://www.dmv.ca.gov/portal/dmv-virtual-office/case-status/.

47.     Below is an example of such a confirmation e-mail from the DMV:



48.     The Meta Pixel is present on the DMV's status checker portal.  At or around the time a user loads their personalized case status link in their browser, the Meta Pixel transmits the full URL to Meta.  This URL contains the e-mail address on file with the DMV, and the case number assigned to a particular application, in the format "https://www.dmv.ca.gov/portal/dmv-virtual-office/case-status/?cn=[*numerical case number*]&email=[***e-mail address provided in application***]."  Below is an image showing such network traffic being transmitted to Meta through Pixel No. 527056364702737:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20



21      49.     Below is an image showing such network traffic being transmitted to Meta

22   through Pixel No. 2694966390513894:

23

24

25

26

27

28



50. On information and belief, Meta also obtains users' e-mail address in this way, *i.e.* from the URL that applicants receive from the DMV to check the status of a submission, for other online forms on the DMV website, including without limitation the motor carrier permit renewal application, the Driver's License/ID Card Application, and the replacement of standard license plates form.

### 2.   Other Identifying Information

51. Active at all times on nearly every page of the DMV website, the Meta Pixel also broadly transmits to Meta other information from the DMV that identifies website users. This

includes information concerning users' interests, phone and address status, health and disability status, immigration status, and concerns, all of which are personally identifying in themselves, and in combination, and made even more so by Meta's use of unique identifiers tied to the transmissions.  Meta learns, for example, when someone takes the DMV's self-assessment for driving with impaired vision,[29] or researches the DMV's procedures for licensing people suffering from dementia.[30]  Meta also learns when someone accesses MyDMV to update their physical address or phone number, transfer a title, or renew their vehicle registration.

52.     To illustrate one of innumerable examples in detail, if a user asks the DMV to show the page for updating a phone number on the DMV site, Meta intercepts a time-stamped record of the request while it is in transit to the DMV, including unique identifiers for the user, and intercepts the URL transmitted back to the user by the DMV.  When a user logs into their MyDMV account, as they must to update their phone number, Meta intercepts a record that the user logs in and successfully completes two-factor authentication, then is presented with hyperlinks or buttons including one to "Change Phone Number." When a user tells the DMV what they would like to do by clicking that hyperlink, Meta learns that the link "Change Phone Number" is clicked, and obtains the descriptive URL that the DMV presents next, namely https://www.dmv.ca.gov/portal/update-your-phone-number/.  This page explains the process for updating one's phone number with the DMV, and a presents button to "Start" the process.  When a user clicks the "Start" button, Meta learns that the button "Start" was clicked on that page, and obtains the URL that the DMV presents next, for account verification, and so on.  In short, Meta secretly watches every step of the process, and intercepts any and all communications between users and the DMV for its own purposes and its own use.

53.     Meta also learns the contents of any and all communications MyDMV users send the DMV through the search bar on the DMV website.  For example, if a user asks a question in

---

[29] California Department of Motor Vehicles, *Vision Conditions*, https://www.dmv.ca.gov/portal/driver-education-and-safety/medical-conditions-and-driving/vision-conditions/. Whenever a user visits this URL, the Meta Pixel sends that information to Meta.

[30] California Department of Motor Vehicles, *Dementia*, https://www.dmv.ca.gov/portal/driver-education-and-safety/medical-conditions-and-driving/dementia/. Whenever a user visits this URL, the Meta Pixel sends that information to Meta.

1  the DMV search bar, such as "I am a domestic violence victim, can my address be private?; Can I

2  drive as an undocumented immigrant?, or What are the rules for driving with dyslexia?," Meta

3  intercepts those communications word for word through the Pixel as part of the URL returning

4  search results and answers.  A user who asks the DMV "How do I renew a disabled parking

5  placard?" has their disability information transmitted to Meta within the URL

6  "https://www.dmv.ca.gov/portal/?s=how+do+I+renew+disabled+parking+placard," in addition to

7  the transmission that occurs upon starting the renewal application.

8  **V.    Meta's Conduct is not Authorized**

9           54.     Plaintiff and members of the proposed Class did not authorize Meta to obtain

10  information concerning them from the DMV.  Plaintiff and members of the proposed Class did

11  not authorize Meta to obtain, review, or use their personal information from, or communications

12  with, the DMV for advertising or any other purpose.  Meta's wide-ranging and near-constant

13  acquisition of personal information from the DMV is inconsistent with any purpose authorized by

14  the DPPA.

15           55.     DMV customers are provided no indication that Meta obtains their information.

16  The DMV website states that the DMV does *not* collect personal information for marketing,

17  advertising, or similar purposes.[31]

18  **TOLLING, CONCEALMENT, AND ESTOPPEL**

19           56.     The statutes of limitation applicable to Plaintiff's claims are tolled as a result of

20  Meta's knowing and active concealment of its conduct alleged herein.

21           57.     Among other things, Meta affirmatively hid its true actions and knowingly

22  permitted the DMV to make statements that were misleading and concealed the true nature of

23  Meta's conduct and operation.  The circumstances of Meta's conduct on and with respect to the

24  DMV website would lead reasonable users to believe Meta was not collecting their personal

25  information.

26  _____

27  [31] *DMV Conditions of Use*, *supra* n.25 ("Any distribution of 'electronically collected personal information' will be solely for the purposes for which it was provided to us."); *see also* California Department of Motor Vehicles, *How Information is Protected or Disclosed,*

28  https://www.dmv.ca.gov/portal/driver-education-and-safety/educational-materials/fast-facts/how-your-information-is-shared-ffdmv-17/.

1      58.     Moreover, Plaintiff was ignorant of the information essential to pursue his claims,

2  without any fault or lack of diligence on his own part.

3      59.     Furthermore, under the circumstances Meta was under a duty to disclose the true

4  character, quality, and nature of its activities to Plaintiff.  Meta therefore is estopped from relying

5  on any statute of limitations.

6      60.     All applicable statutes of limitation also have been tolled by operation of the

7  discovery rule.  Specifically, Plaintiff and other Class members could not have learned through

8  the exercise of reasonable diligence of Meta's conduct as alleged herein.

9                     **PLAINTIFF SPECIFIC ALLEGATIONS**

10      61.     Plaintiff Mikhail Gershzon is a resident of San Francisco County, California.  Mr.

11  Gershzon has an online account with the DMV, which he opened in or around 2019 at which time

12  he provided his full name, email address, and telephone number to the DMV.  He has used the

13  website approximately 2 times per year since that time.  Mr. Gershzon has had a Facebook and/or

14  Meta account since approximately 2010.

15      62.     While using the DMV website in or around 2020, Mr. Gershzon started an

16  application for a disabled person placard, communicating to the DMV that he is disabled.

17  Subsequent to submitting his application, Mr. Gershzon received an email from the DMV with a

18  hyperlink to check the status of his application, and clicked on the link.  Meta intercepted the

19  content of Mr. Gershzon's communications to and from the DMV and obtained his personal

20  information without his consent.

21      63.     Each time Defendant obtained Mr. Gershzon's personal information, including his

22  name, e-mail address, and disability information from the DMV without consent, it violated Mr.

23  Gershzon's rights under the DPPA and the CIPA.

24                       **CLASS ALLEGATIONS**

25      64.     Plaintiff brings this lawsuit under Rules 23(a) and (b) of the Federal Rules of Civil

26  Procedure on behalf of the following Class:

27          All persons who accessed their MyDMV account on the California
             DMV website or viewed the status of a pending application to the
28          California DMV by clicking on the "status checker" link in

electronic correspondence from the California DMV.

65.     Excluded from the Class are Defendant, any controlled person of Defendant, as well as the officers and directors of Defendant and the immediate family members of any such person.  Also excluded are any judge who may preside over this cause of action and the immediate family members of any such person.  Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

66.     **Numerosity.**  The Class consists of at least hundreds of individuals, making joinder impractical.

67.     **Commonality and Predominance.**  Common questions of law and fact exist with regard to the claim and predominate over questions affecting only individual Class members.  Questions common to the Class include:

    a.  Whether Meta knowingly obtained Plaintiff's and Class members' personal information from the DMV website;

    b.  Whether Meta's conduct violates the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721-2725;

    c.  Whether Meta obtained express consent to its conduct;

    d.  Whether Meta's conduct violates the California Invasion of Privacy Act, Cal. Penal Code § 631; and

    e.  Whether Meta should be enjoined from obtaining Plaintiff's and Class members' personal information from the DMV website.

68.     **Typicality.**  Plaintiff's claims are typical of the claims of the Class members in that Plaintiff, like all Class members, has been injured by Meta's misconduct in obtaining consumers' personal information from the DMV.

69.     **Adequacy of Representation.**  Plaintiff will fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy-protection cases.  Plaintiff does not have any interests antagonistic to those of the Class.

70.     **Superiority.**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Class-wide damages are essential to induce Meta to comply with state and federal law.  Moreover, because the amount of each individual Class member's claim is small relative to the complexity of litigation, and because of Meta's financial resources, Class members are unlikely to pursue legal redress individually for the violations detailed in this complaint.  A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

71.     **Injunctive Relief.**  Plaintiff also satisfies the requirements for maintaining a class under Rule 23(b)(2).  Defendant acted on grounds that apply generally to the proposed Class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

72.     **Particular Issues.**  Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(c)(4).  Their claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

**<u>FIRST CAUSE OF ACTION</u>**
**Driver's Privacy Protection Act**
**18 U.S. Code §§ 2721-2725**

73.     Plaintiff incorporates and realleges the above factual allegations by reference.

74.     Plaintiff brings this Count individually and on behalf of the members of the Class.

75.     The DPPA, 18 U.S. Code §§ 2721 *et. seq.*, prohibits knowingly obtaining, using, or disclosing "personal information [obtained] from a motor vehicle record" for any purpose and through any means not specifically permitted by 18 U.S.C. § 2721(b).

76.     Meta knows that the Meta Pixel on the DMV website sends personal information to Meta, and knowingly collects that information from the DMV.

77.     The names and disability information Meta obtains from the DMV via the Meta Pixel are "personal information" expressly referenced in 18 U.S.C. § 2725(3).  The e-mail addresses and other information that Meta obtains from the DMV via the Meta Pixel, as alleged

herein, constitute "personal information" under 18 U.S.C. § 2725(3) because they are information that identifies an individual.

78.     The names, disability information, e-mail addresses, and other information that Meta obtains from the DMV via the Meta Pixel, as alleged herein, come from a "motor vehicle record" because they derive from the DMV database.

79.     Meta obtains Plaintiff's and Class members' personal information from the DMV in a manner that is not consistent with any permissible purpose under 18 U.S.C. § 2721(b). On information and belief, Meta uses the personal information it obtains from the DMV for purposes that are prohibited, including for purposes of profiling, categorizing, and deriving "insights" about consumers, including through "Core Audiences," "Lookalike audiences," and "Custom Audiences"; targeting and serving advertisements to Meta platform users and non-users; improving Meta's profiling and categorizing algorithms; improving Meta platforms; and competing with other advertising companies, without express consent of the individuals to whom the information pertains.

80.     As a proximate result of Meta's violations of the DPPA, pursuant to 18 U.S.C. § 2724, Plaintiff and each Class member are entitled to recover actual damages, but not less than liquidated damages in the amount of $2,500.

81.     Finally, inasmuch as Meta continues to illegally obtain, use, and/or disclose personal information from motor vehicle records, the Court should enter an injunction prohibiting such conduct.

**SECOND CAUSE OF ACTION**
**California Invasion of Privacy Act**
**Cal. Penal Code §§ 630-638**

82.     Plaintiff incorporates and realleges the above factual allegations by reference.

83.     Plaintiff brings this Count individually and on behalf of the members of the Class.

84.     The California Invasion of Privacy Act is codified at Cal. Penal Code §§ 630 to 638. The Act begins with its statement of purpose: "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy

1    resulting from the continual and increasing use of such devices and techniques has created a

2    serious threat to the free exercise of personal liberties and cannot be tolerated in a free and

3    civilized society."

4        85.    Cal. Penal Code § 631(a) provides that:  "Any person who, by means of any

5    machine, instrument, or contrivance, or in any other manner … willfully and without the consent

6    of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or

7    to learn the contents or meaning of any message, report, or communication while the same is in

8    transit or passing over any wire, line, or cable, or is being sent from, or received at any place

9    within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to

10   communicate in any way, any information so obtained, or who aids, agrees with, employs, or

11   conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the

12   acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand

13   five hundred dollars ($2,500)."

14       86.    At all relevant times, Meta tracked and intercepted Plaintiff's and Class members'

15   internet communications exchanged with the DMV through the DMV website.

16       87.    Meta intercepted these communications without consent from all parties to the

17   communications.

18       88.    Meta intended to learn, and did learn, some meaning of the content in the

19   communications including without limitation in the URLs, search queries, and other content

20   exchanged between Class members and the DMV on the DMV website.

21       89.    The following items constitute "machine[s], instrument[s], or contrivance[s]"

22   under the CIPA, and even if they do not, the Meta Pixel falls under the broad catch-all category of

23   "any other manner":

24           a.    The computer codes and programs Meta used to track Plaintiff's and the

25   Class members' communications while they were navigating the DMV website;

26           b.    The Plaintiff's and Class members' browsers;

27           c.    The Plaintiff's and Class members' computing and mobile devices;

28           d.    Meta's web and ad servers;

1            e.      The web and ad servers from which Meta tracked and intercepted the

2    Plaintiff's and Class members' communications while they were using a web browser to access or

3    navigate the DMV website;

4            f.      The computer codes and programs used by Meta to effectuate its tracking;

5    and

6            g.      Interception of the Plaintiff's and Class members' communications while

7    they were using a browser to visit the DMV website.

8         90.     The plan Meta carried out to effectuate its tracking and interception of the

9    Plaintiff's and Class members' communications while they were using a web browser or mobile

10   application to visit Defendant's websites originated in and was executed in California.

11        91.     Plaintiff and Class members have suffered loss by reason of Meta's violations,

12   including, but not limited to, violations of their rights of privacy, loss of value in their personally-

13   identifiable information, and the inequity of Meta's enrichment by means identifying information

14   pertaining to Plaintiff and Class members without authorization or consent.

15        92.     Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class members have been

16   injured by the violation of Cal. Penal Code § 631 and each seek damages for the greater of $5,000

17   or three times the actual amount of damages, as well as injunctive relief.

18                                         **PRAYER FOR RELIEF**

19        WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated,

20   respectfully requests that the Court:

21        93.     Certify this case as a class action, and appoint Plaintiff as Class Representative and

22   the undersigned attorneys as Class Counsel;

23        94.     Enter judgment in favor of Plaintiff and the Class;

24        95.     Enjoin Meta from obtaining Plaintiff's and Class members' personal information

25   from the California DMV;

26        96.     Award Plaintiff and Class members statutory damages they are entitled to under

27   the DPPA;

28

1    97.    Award Plaintiff and Class members statutory damages they are entitled to under

2    the CIPA;

3    98.    Award Plaintiff and Class members pre- and post-judgment interest as provided by

4    law;

5    99.    Award Plaintiff and Class members reasonable litigation expenses and attorneys'

6    fees as permitted by law; and

7    100.    Award such other and further relief as the Court deems necessary and appropriate.

8    **<u>DEMAND FOR JURY TRIAL</u>**

9    Plaintiff demands a trial by jury of all issues triable as of right.

10    Dated:  January 6, 2023                        Respectfully submitted,

11                                                        */s/ Michael W. Sobol*
                                                        Michael W. Sobol (SBN 194857)
12                                                        msobol@lchb.com
                                                        David T. Rudolph (SBN 233457)
13                                                        drudolph@lchb.com
                                                        Melissa Gardner (SBN 289096)
14                                                        mgardner@lchb.com
                                                        Jacob H. Polin (SBN 311203)
15                                                        jpolin@lchb.com
                                                        Nabila Abdallah (SBN 347764)
16                                                        nabdallah@lchb.com
                                                        LIEFF CABRASER HEIMANN
17                                                        & BERNSTEIN, LLP
                                                        275 Battery Street,
18                                                        29th Floor San Francisco,
                                                        CA 94111-3339
19                                                        Telephone: 415.956.1000
                                                        Facsimile: 415.956.1008
20
                                                        Joseph Henry (Hank) Bates, III (SBN
21                                                        167688)
                                                        hbates@cbplaw.com
22                                                        Allen Carney (pro hac vice forthcoming)
                                                        acarney@cbplaw.com
23                                                        Courtney E. Ross (pro hac vice forthcoming)
                                                        cross@cbplaw.com
24                                                        CARNEY BATES & PULLIAM, PLLC
                                                        519 W. 7th Street
25                                                        Little Rock, AR 72201
                                                        Telephone: 501.312.8500
26                                                        Facsimile: 501.312.8505

27                                                        *Counsel for Plaintiff and the Proposed Class*

28