1   LIEFF CABRASER HEIMANN
    & BERNSTEIN, LLP
2   Michael W. Sobol (SBN 194857)
    msobol@lchb.com
3   David T. Rudolph (SBN 233457)
    drudolph@lchb.com
4   Melissa Gardner (SBN 289096)
    mgardner@lchb.com
5   Jacob H. Polin (SBN 311203)
    jpolin@lchb.com
6   Nabila Abdallah (SBN 347764)
    nabdallah@lchb.com
7   275 Battery Street, 29th Floor
    San Francisco, CA 94111-3339
8   Telephone: 415.956.1000
    Facsimile: 415.956.1008
9
    CARNEY BATES & PULLIAM, PLLC
10  Joseph Henry (Hank) Bates, III (SBN 167688)
    hbates@cbplaw.com
11  Allen Carney (*pro hac vice*)
    acarney@cbplaw.com
12  Courtney E. Ross (*pro hac vice*)
    cross@cbplaw.com
13  519 W. 7th St.
    Little Rock, AR, 72201
14  Telephone: 501.312.8500
    Facsimile: 501.312.8505
15
16  *Counsel for Plaintiff and the Proposed Class*

17              UNITED STATES DISTRICT COURT

18            NORTHERN DISTRICT OF CALIFORNIA

19                SAN FRANCISCO DIVISION

20

21  MIKHAIL GERSHZON, on behalf of        Case No. 3:23-cv-00083-SI
    himself and all others similarly situated,
22                                          **PLAINTIFF'S OPPOSITION TO
                                            DEFENDANT META PLATFORMS,
23              Plaintiff,                  INC.'S MOTION TO DISMISS**

    v.
24
    META PLATFORMS, INC.,
25
                Defendant.
26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

ARGUMENT ...................................................................................................................... 5

I.     Plaintiff's Driver's Privacy Protection Act claim is well-pled. ......................................... 5

     A.     Plaintiff's name, email address, disability and other information are protected because they are "information that identifies an individual." ................ 6

     B.     Meta obtained Plaintiff's information "from a motor vehicle record." ............... 11

     C.     Meta's alleged transmissions satisfy no "permissible" DPPA purpose. .............. 14

          1.     Plaintiff's allegation of "a purpose not permitted" states a claim. ........... 15

          2.     Meta's defenses dispute well-pled facts and misconstrue the law. .......... 16

     D.     Plaintiff pleads the requisite scienter. ................................................................... 18

II.    Plaintiff's California Invasion of Privacy Act claim is well-pled. .................................... 20

     A.     Plaintiff pleads the requisite willfulness. ............................................................... 21

     B.     Meta does not carry its burden to prove Plaintiff's consent. ............................... 22

     C.     Meta's indiscriminate harvesting of communications intercepted "contents." ............................................................................................................. 23

III.   The Court should not "narrow" Plaintiff's well-pled claims. .......................................... 25

CONCLUSION .................................................................................................................. 25

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00083-SI

1

## TABLE OF AUTHORITIES

2

Page

3

**Cases**

4

*Akkawi v. Sadr*,
  No. 20-01034, 2021 WL 3912151 (E.D. Cal. Sept. 1, 2021)....................................................... 16

5

*Andrews v. Sirius XM Radio Inc.*,
  932 F.3d 1253 (9th Cir. 2019).......................................................................................... 5, 11, 13

6

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................................... 5

7

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001) ............................................................................................................. 21

8

*BBL, Inc. v. City of Angola*,
  809 F.3d 317 (7th Cir. 2015) ................................................................................................. 25

9

10

*Calhoun v. Google LLC*,
  526 F. Supp. 3d 605 (N.D. Cal. 2021) ................................................................................... 22

11

*Campbell v. Facebook, Inc.*,
  951 F.3d 1106 (9th Cir. 2020) ............................................................................................... 20

12

*Ctr. for Individual Rts. v. Chevaldina*,
  No. 16-20905, 2018 WL 1795470 (S.D. Fla. Feb. 21, 2018) .................................................. 20

13

*Dahlstrom v. Sun-Times Media, LLC*,
  777 F.3d 937 (7th Cir. 2015)............................................................................................ 7, 8, 9

14

15

*Dancel v. Groupon, Inc.*,
  949 F.3d 999 (7th Cir. 2019).................................................................................................... 8

16

*Dinan v. SanDisk LLC*,
  No. 18-05420, 2020 WL 364277 (N.D. Cal. Jan. 22, 2020) ............................................. 22, 25

17

*Dobruck v. Borders*,
  No. 16-1869, 2016 WL 7157557 (M.D. Fla. Dec. 8, 2016)..................................................... 15

18

*Downing v. Globe Direct LLC*,
  682 F.3d 18 (1st Cir. 2012) .................................................................................................... 17

19

20

*Enslin v. The Coca-Cola Co.*,
  136 F. Supp. 3d 654 (E.D. Pa. 2015), *aff'd*, 739 F. App'x 91 (3d Cir. 2018) ........................ 20

21

*Fox v. Ethicon Endo-Surgery, Inc.*,
  35 Cal. 4th 797 (2005) ........................................................................................................... 25

22

*Garey v. James S. Farrin, P.C.*,
  35 F.4th 917 (4th Cir. 2022) ............................................................................................ 11, 13

23

24

*Gomez v. City of Torrance*,
  311 F. App'x 967 (9th Cir. 2009) .......................................................................................... 25

25

*Gordon v. Softech Int'l, Inc.*,
  726 F.3d 42 (2d Cir. 2013)............................................................................................... 14, 20

26

*Graham v. Noom, Inc.*,
  533 F. Supp. 3d 823 (N.D. Cal. 2021) ................................................................................... 24

27

*Hammerling v. Google LLC*,
  615 F. Supp. 3d 1069 (N.D. Cal. 2022) ................................................................................. 24

28

**TABLE OF AUTHORITIES**
(continued)

Page

*Hatch v. Demayo*,
  No. 16-925, 2021 WL 231245 (M.D.N.C. Jan. 22, 2021), *aff'd*, 35 F.4th 917 (4th Cir. 2022)  12

*Heglund v. Aitkin Cnty.*,
  871 F.3d 572 (8th Cir. 2017)...................................................................................... 6

*Howard v. Crim. Info. Servs., Inc.*,
  654 F.3d 887 (9th Cir. 2011)...................................................................................... 19

*In re Facebook, Inc. Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020)............................................................................... 5, 24

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
  806 F.3d 125 (3d Cir. 2015)........................................................................................ 24

*In re Google RTB Consumer Priv. Litig.*,
  606 F. Supp. 3d 935 (N.D. Cal. 2022)......................................................................... 24

*In re Google RTB Consumer Priv. Litig.*,
  No. 21-2155, 2022 WL 2165489 (N.D. Cal. June 13, 2022).................................... 24

*In re Meta Pixel Healthcare Litig.*,
  No. 22-03580, 2022 WL 17869218 (N.D. Cal. Dec. 22, 2022).............................. 23

*In re Nickelodeon Consumer Priv. Litig.*,
  827 F.3d 262 (3d Cir. 2016)........................................................................................ 24

*In re Rubber Chemicals Antitrust Litig.*,
  504 F. Supp. 2d 777 (N.D. Cal. 2007) ...................................................................... 25

*In re Zappos.com, Inc.*,
  888 F.3d 1020 (9th Cir. 2018)..................................................................................... 8

*Jablon v. Dean Witter & Co.*,
  614 F.2d 677 (9th Cir. 1980)...................................................................................... 25

*Javier v. Assurance IQ, LLC*,
  No. 20-02860, 2023 WL 114225 (N.D. Cal. Jan. 5, 2023)..................................... 21

*Javier v. Assurance IQ, LLC*,
  No. 21-16351, 2022 WL 1744107 (9th Cir. May 31, 2022).................................... 22

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018)............................................................................. 5, 22, 23

*Knowlton v. City of Wauwatosa*,
  No. 20, 2023 WL 2951425 (E.D. Wis. Apr. 14, 2023)..................................... 18, 20

*Lake v. Neal*,
  585 F.3d 1059 (7th Cir. 2009)..................................................................................... 14

*Maracich v. Spears*,
  570 U.S. 48 (2013)............................................................................................. passim

*Matera v. Google Inc.*,
  No. 15-04062, 2016 WL 8200619 (N.D. Cal. Aug. 12, 2016) ................................ 21

*McDonough v. Anoka Cnty.*,
  799 F.3d 931 (8th Cir. 2015)...................................................................................... 14

*Nayab v. Cap. One Bank*,
  942 F.3d 480 (9th Cir. 2019)...................................................................................... 18

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00083-SI

**TABLE OF AUTHORITIES**
(continued)

Page

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014)...................................................................... 22

*Ortega v. Santa Clara Cnty. Jail*,
No. 19-17547, 2021 WL 5855066 (9th Cir. Dec. 9, 2021)....................... 25

*Pavone v. L. Offs. of Anthony Mancini, Ltd.*,
205 F. Supp. 3d 961 (N.D. Ill. 2016) ...................................................... 11

*People v. Buchanan*,
26 Cal. App. 3d 274 (Ct. App. 1972)....................................................... 21

*Perkey v. Dep't of Motor Vehicles*,
42 Cal. 3d 185 (1986) ....................................................................... passim

*Pichler v. UNITE*,
542 F.3d 380 (3d Cir. 2008)............................................................. 15, 19

*Rand v. Travelers Indem. Co.*,
No. 21-10744, 2022 WL 15523722 (S.D.N.Y. Oct. 27, 2022).............. 12, 19

*Reno v. Condon*,
528 U.S. 141 (2000) ................................................................................ 15

*Ribas v. Clark*,
38 Cal. 3d 355 (1985) ............................................................... 20, 21, 22

*Rine v. Imagitas, Inc.*,
590 F.3d 1215 (11th Cir. 2009)............................................................... 17

*Rollins v. City of Albert Lea*,
79 F. Supp. 3d 946 (D. Minn. 2014) ...................................................... 15

*Senne v. Vill. of Palatine, Ill.*,
695 F.3d 597 (7th Cir. 2012).................................................... 14, 16, 19

*Sistrunk v. TitleMax, Inc.*,
No. 14-628, 2016 WL 9450445 (W.D. Tex. Aug. 26, 2016).................... 16

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) ............................................................... 23

*Svenson v. Google Inc.*,
65 F. Supp. 3d 717 (N.D. Cal. 2014) ..................................................... 24

*Tavernetti v Superior Court*,
22 Cal. 3d 187 (1978) ............................................................... 20, 21

*Tison v. Arizona*,
481 U.S. 137 (1987) ................................................................................ 19

*United States v. Chi Tong Kuok*,
671 F.3d 931 (9th Cir. 2012).................................................................. 19

*United States v. Hastie*,
854 F.3d 1298 (11th Cir. 2017)......................................................... passim

*Wilcox v. Swapp*,
330 F.R.D. 584 (E.D. Wash. 2019) ........................................................ 19

*Wiles v. Worldwide Info., Inc.*,
809 F. Supp. 2d 1059 (W.D. Mo. 2011) ................................................ 16

1

2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) ..................................................................... 22

4

**Statutes**

5

139 Cong. Rec. S15745-01 (Nov. 16, 1993), 1993 WL 470986 ...................................... 5, 6, 9, 10

6

18 U.S. Code §§ 2721-2725 .......................................................................................... passim

Cal. Civ. Code § 1798.140 ............................................................................................... 8, 11

7

Cal. Penal Code § 631 ................................................................................................. 1, 20, 21

8

Cal. Veh. Code § 1656.5 ..................................................................................................... 17

9

Cal. Veh. Code § 1801.2(b) .................................................................................................. 8

Cal. Veh. Code § 1808.47 .................................................................................................. 16

10

Cal. Veh. Code § 1808.5 ................................................................................................. 9, 14

11

Cal. Veh. Code § 1810.2 ..................................................................................................... 17

12

Cal Gov. Code § 11015.5 ..................................................................................................... 3

**Rules**

13

Fed. R. Civ. Proc. 12(b)(6) ............................................................................................. 5, 25

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2    Plaintiff's Class Action Complaint (Dkt. 1) alleges that the "Meta Pixel" software code

3    invaded the "zone of personal anonymity" that state and federal law establish for interactions with

4    the California DMV ("DMV").  On the DMV's website, the Meta Pixel invisibly surveils drivers'

5    communications with the DMV, harvesting statutorily protected information for Meta's

6    advertising business.  The Pixel does this on Meta's behalf, consistent with default settings that

7    Meta sets and controls.

8    Through the Pixel, Meta has watched Plaintiff conduct his affairs with the state of

9    California, persistently and indiscriminately monitoring communications relating to those affairs.

10   Plaintiff's DMV interactions occurred pursuant to state law, which requires Plaintiff to disclose

11   his personal information to the agency in order to exercise his rights to drive and access

12   accommodations for drivers with a disability.  As alleged in the Complaint, Meta's actions are a

13   direct violation of privacy rights codified in the Driver's Privacy Protection Act, 18 U.S. Code

14   §§ 2721-2725 ("DPPA") and the California Invasion of Privacy Act, Cal. Penal Code § 631

15   ("CIPA").  Meta's motion to dismiss (Dkt. 31) provides no basis for dismissal.

16   The overarching infirmities of Meta's motion are twofold.  First, Meta presents its own

17   version of the "facts" at the pleadings stage, reaching beyond the Complaint to draw and rely on

18   inferences in its own favor from materials that are not properly before the Court.  *See* Response to

19   Request for Judicial Notice, filed herewith.  The Court should reject Meta's arguments premised

20   on disputed inferences from these materials, such as that the DMV does not "maintain" the

21   information on its website; that Meta acted "on behalf of" the DMV; or conversely, did not act

22   "knowingly" in using its own technology to obtain information as alleged.  Meta's disputes with

23   Plaintiff's well-pled factual allegations also underlie all of its consent-based affirmative defenses,

24   and its request to "narrow" Plaintiff's claims.  These are matters for discovery.

25   Second, Meta misconstrues the DPPA and CIPA throughout its briefing.  Meta misreads

26   the statutes when it argues that "personal information" excludes first names and disability status,

27   or depends on a case-by-case review of a person's actual name, email address, and disability; that

28   information transmitted by web browsers cannot come from "motor vehicle records" or contain

"contents" of communications; that having a lawful purpose for accessing some information creates a free pass under the DPPA's exceptions; that Meta did not "know" it was accessing "personal information" in "motor vehicle records" as the DPPA defines those terms; that Meta did not "inten[d] to wiretap" under CIPA; and that documents and Policies on Meta's website can establish legally valid consent in this context.  Meta's request to narrow Plaintiff's claims also seeks relief unavailable under Rule 12(b)(6).

The crux of this case is not that Meta said one thing in its policies and did another, although a reasonable fact-finder could find that it did.  This case is about a hard limit, in one context, for the ever-encroaching presence of advertising and technology companies in our daily lives.  To deprive people of privacy and anonymity at the DMV—especially on the colossal scale of the Meta Pixel—requires express, written, prior consent.  Congress and the State of California recognize that without such protective measures, even the illusion of "choice" disappears in interactions mandated by state law.  "Personal information" at the DMV, which Plaintiff alleges here, is categorically protected by the DPPA: *observing* it for unauthorized purposes is a violation.  CIPA's protections against non-consensual surveillance, too, are forceful in this context.  The unauthenticated and incomplete extraneous materials that Meta proffers to support its misguided defenses raise, at most, questions of fact that should not be resolved on the pleadings.  Meta's motion should be denied.

## BACKGROUND

Plaintiff is a California resident who holds a registered online account with the DMV and has used its website approximately twice per year since 2019 to conduct his affairs with the agency, including to apply for a disabled parking placard in 2020.  Dkt. 1 ¶¶ 61-62.  Meta is an advertising company which, since 2015, has made its Meta Pixel tracking code available to third-party websites to harvest consumer data for Meta's marketing business.  *Id.* ¶¶ 15, 22-26.  Meta publishes tutorials for website owners to embed it, and has unilaterally expanded the Pixel code over time to collect more information without notice to website owners.  *Id.* ¶¶ 16-18 & n.6.

The Pixel is embedded on the website that the DMV uses to communicate with individuals about matters pertaining to their driver's licenses, vehicle registrations, and other

information on file with the DMV.  *Id.* ¶¶ 27-30.  On the DMV site, the Meta Pixel acts like a

dragnet that indiscriminately pulls in communications and personal information and links it to

identifying cookies.  The Pixel code is hidden and invisible to website visitors.  *Id.* ¶¶ 2, 16.

The Pixel on the DMV site uses default configurations that Meta sets and controls.  *Id.*

¶¶ 16-20; 32, 36, 45.  Since at least 2018, on all websites where it is embedded, the Pixel accesses

and transmits the following categories of information by default: "Http Headers," showing the

documents or webpages the user views; a "Pixel ID" identifying the website for Meta; and

"Button Click Data," which includes "any buttons clicked by site visitors," and details regarding

each page and message returned after users click a button or a link.  *Id.*  ¶¶ 18-19, 30.  The Meta

Pixel also tags visitors and their browsers with identifying codes such as "c_user" IDs (which

associate data to a person's Facebook account) and "datr" cookies in order to link Pixel

transmissions to them so Meta can target advertisements based on their communications, even if

that person has no account with any Meta service.  *Id.* ¶¶ 21-26, 35, 43.

Through this default configuration, the Pixel obtains statutorily protected information

from DMV databases, including the first name of any user who clicks into their password

protected "MyDMV" account (which is necessary for most DMV interactions).  *Id.* ¶¶ 27-35.  It

includes the email address and application "case number" of users who click a "status checker"

link where they (and now Meta) can check the status of a pending disabled parking placard

application, and other information about the application itself.  *Id.* ¶¶ 36-49.  Meta monitors, and

uses for advertising purposes, communications between users and the DMV including searches

that users perform, all of which is identifying, in itself and in combination, and by virtue of the

personal identifiers Meta ties to the data through the Pixel.  *Id.* ¶¶ 21-53.

The DMV makes no mention of the Meta Pixel on its website.  *Id.* ¶ 53 & n.31.  Instead,

the DMV assures users that "electronically collected personal information"[1] is not linked to them,

and will not be shared without consent: "[W]e make no attempt to link other websites with the

individuals who browse the state's website;" the law "prohibits all state agencies from

---

[1] In Government Code § 11015.5, "'Electronically collected personal information' means any
information that is maintained by an agency that identifies or describes an individual user,. . . and
information that reveals any network location or identity . . . "

distributing or selling any electronically collected personal information [] about users to any third party without [permission]. . . Any distribution [] will be solely for the purposes for which it was provided to us;" "[P]rivate information . . . will not be shared with another entity except as prescribed by law."  Meta RJN Ex. 6 at 2.  The DMV also tells users that it does not use cookies to identify them.  It states that its website "does not use cookies to maintain personalization . . . The state makes every attempt to avoid the use of cookies. . . . We use the cookie feature only to store a randomly generated identifying temporary tag on your computer, for seven days."  *Id.* at 4.

The DMV's Privacy Policy states that the DMV complies with the DPPA, and "limits the collection of personal information to what is relevant and necessary to accomplish the lawful purpose of the DMV."  Pl. RJN Ex. 1 at 2.  It continues: "DMV tells persons who are asked to provide personal information about the general uses that DMV will make of that information.  DMV does this at the time of collection," and all records "relating to the physical or mental condition of any person, are confidential."  *Id.* at 3.

The DMV also maintains a webpage entitled "How information is protected or disclosed," which summarizes legal protections for information provided to the DMV.  Dkt. 1 ¶ 53 & n.31; Pl. RJN Ex. 2.  Among other assurances, this summary provides that the DMV notifies users of "any known or foreseeable disclosures which may be made" for its governmental functions; that "DMV does not share your e-mail address outside of the department except as authorized by law," and that only a person who "specifies that no person will be contacted by mail or otherwise may request address information for statistical research and reporting purposes."  *Id.* at 1, 3, 6.

Plaintiff was unaware of Meta's monitoring on the DMV website when he used it to communicate with the DMV in 2019-2022.  Dkt. 1 ¶¶ 62-63.  Plaintiff has never provided consent in writing to Meta or the DMV to use his personal information for marketing purposes, or to serve Meta's purposes in any way.  *Id.* ¶¶ 2, 63.  Although numerous facts about the Pixel's operation have since come to light, Plaintiff cannot avoid Meta's surveillance of his affairs with the DMV as long as the Pixel remains on the DMV website.  Plaintiff must continue interacting with the DMV and its website in order to continue using public roads and disabled parking accommodations.  *See* Dkt. 1 ¶¶ 27-29, 33, 37-43, 61-62

1

## <u>ARGUMENT</u>

2      "At the pleading stage, all allegations of material fact are taken as true and construed in

3 the light most favorable to the non-moving party."  *In re Facebook, Inc. Internet Tracking Litig.*,

4 956 F.3d 589, 601 (9th Cir. 2020) (citation omitted).  The facts alleged must "plausibly give rise

5 to an entitlement to relief."  *Id.*, quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); Fed. R. Civ.

6 Proc. 12(b)(6).  A claim is facially plausible when the allegations allow for "the reasonable

7 inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

8 Plaintiffs are to be "afforded the benefit of every favorable inference."  *Khoja v. Orexigen*

9 *Therapeutics, Inc.*, 899 F.3d 988, 1002, 1014 (9th Cir. 2018).  Defendants may not "insert their

10 own version of events into the complaint" or "exploit that benefit for themselves."  *Id.*

11 **I.      <u>Plaintiff's Driver's Privacy Protection Act claim is well-pled.</u>**

12      The DPPA robustly protects Plaintiff's right to control access to information he provides

13 the DMV, because he must provide it, to exercise his rights to drive on public roads.  This privacy

14 interest has long been respected in California.  *See e.g.*, *Perkey v. Dep't of Motor Vehicles*, 42

15 Cal. 3d 185, 199 (1986) (Bird, C.J., concurring) (discussing "the individual's expectation of

16 privacy—specifically, the expectation that he or she may maintain a zone of personal anonymity"

17 in transactions with the California DMV, which "is not abandoned when an individual is required

18 to provide identifying information.").

19      Congress enacted the DPPA because some states failed to respect and preserve those

20 interests. "[M]ost" state DMVs were selling data to marketers, and some were divulging data to

21 any taker for a fee, which facilitated stalking and other crimes.  139 Cong. Rec. S15745-01,

22 S15764 (Nov. 16, 1993), available at 1993 WL 470986 ("*Leg. History*").  By codifying the

23 "individual's fundamental right to privacy and safety" in federal law, the DPPA "seeks to control

24 dissemination of information collected using the coercive power of the state."  *Maracich v.*

25 *Spears*, 570 U.S. 48, 57, 82 (2013); *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1261 (9th

26 Cir. 2019).  As DPPA co-sponsors commented in 1993:

27          [Sen. Boxer]: If you want to own or operate a car, you must register
           with the DMV. This amendment simply gives people more control

28          over the disclosure of their personal information, especially for

- 5 -

> those reasons that are totally incompatible with the purpose for which the information was collected . . . .
>
> [Sen. Warner]: There is a war in this country to fight for privacy. People are now fighting, and this is coming to their assistance to provide the privacy, which I and many others thought existed. . . . Registering with the DMV is mandatory. The [DPPA] will provide individuals with knowledge of and control over the disclosure of their personal information for uses unrelated to the purpose(s) for which it was collected.

*Leg. History*, 1993 WL 470986; *see also Heglund v. Aitkin Cnty.*, 871 F.3d 572, 577 (8th Cir. 2017) (DPPA protects "[a]n individual's control of information concerning her person").

Plaintiff alleges that Meta broadly, and knowingly, obtains, and uses, personal information pertaining to him, from a motor vehicle record, for a purpose not expressly permitted by the DPPA. 18 U.S.C. § 2724(a).  Plaintiff states a claim under the DPPA.

**A.**   **Plaintiff's name, email address, disability and other information are protected because they are "information that identifies an individual."**

The DPPA protects any "information that identifies" a person to delineate a meaningful zone of privacy for data obtained through the state's coercive powers.  It enumerates eight categories of "personal information" expressly while also protecting other information that meets the statutory definition.  Specifically:

> 'Personal information' means information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status.

18 U.S.C. § 2725(3).  Plaintiff alleges that Meta obtained information that identifies him via the Meta Pixel. Dkt. 1 §§ II, IV.  Plaintiff's first name, email address, disability information, and other identifying data are "personal information" consistent with the statute, its purposes, the reasoning of multiple Circuit Courts, and California law.

**Plaintiff's first name** is, by far, not the only identifying information pertaining to Plaintiff that Meta obtained from the DMV (*see e,g,*, ¶¶ 31, 51–53).  But even standing alone, Plaintiff's first name is expressly protected "personal information." 18 U.S.C. § 2725(3).

Meta contends that Plaintiff's first name is fair game for advertisers because it "sweeps in so many people."  Dkt. 31 at 9.  That reasoning, taken seriously, would limit the DPPA's protections to individuals with unique names—an absurd result.  In any case, Meta's argument confuses the inquiry required by the DPPA and ignores the holdings of two Circuit Courts.

The DPPA does not ask how many people share a specific piece of information that identifies them, but whether something falls into a category that *is* such information.  "The term 'personal information' should be read naturally to include facts that can identify an individual, as opposed to facts that in every instance must identify an individual."  *United States v. Hastie*, 854 F.3d 1298, 1304 (11th Cir. 2017).  As the Eleventh Circuit explains, "'information that identifies an individual' does not require that a single piece of information on its own be sufficient."  *Id.* at 1303-04.  This is evident in the definition.  For example, "[a]n address might be associated with one person or many—**the ratio does not need to be 1:1**."  *Id.* (emphasis added).

Similarly, the Seventh Circuit recognizes that widely shared descriptors are protected in light of the DPPA's overall intent.  It holds that the DPPA protects age, height, weight, hair, and eye color, because "'[a]lthough a potential stalker would likely require information beyond hair and eye color to positively identify his victim, details regarding any pertinent physical feature would make such identification easier . . . [and] details regarding an individual's age, height, and weight, could conceivably be of great interest to businesses."  *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 944 (7th Cir. 2015).  A person's first name fits the bill because it describes a person, making identification "easier" at the very least, and it would be useful to marketers.  Further, a first name allows for inferences about ethnicity, age, and gender, characteristics widely used to profile individuals for crimes and for targeted advertising.

**Plaintiff's email address** is also categorically protected.  Meta's argument to the contrary contradicts Circuit authority on this specific issue.  *See Hastie*, 854 F.3d at 1303 ("[e]mail addresses fall within the ordinary meaning of 'information that identifies an individual.'").

Contrary to Meta's assertions, the Court need not consider the text of Plaintiff's email address to determine whether it is "personal information," because the DPPA defines personal information by category, not by contents.  *Hastie*, 854 F.3d at 1307 (no error in instructing the

jury that under the DPPA "a personal email address[] is personal information.").  As the Eleventh
Circuit reasoned in *Hastie*, email addresses are protected because they share many similarities
with the eight enumerated categories.  They may contain identifiers like a person's actual name,
birth year, or work affiliation, and like a phone number, email addresses can be used to locate
other identifying information.  *See Hastie*, 854 F.3d at 1303; *Dahlstrom*, 777 F.3d at 944; *Perkey*,
42 Cal. 3d at 196 ("[c]ertain key data . . . derive sensitivity from the information to which one
gains access through the key.") (concurrence, Bird, C.J., citation omitted).  Email addresses are
functionally equivalent to mailing addresses in DMV records.  Cal. Veh. Code § 1801.2(b) ("an
email . . . may be used" in lieu of an "address" for any required notice or mailing).[2]

Meta tries to support its argument that an email address "does not always qualify" by
quoting from *Dancel v. Groupon, Inc.*, 949 F.3d 999 (7th Cir. 2019), but Meta's reliance on
*Dancel* is misplaced in light of the above.  In addition, *Dancel* was in a different posture,
discussing whether a different statute (the Illinois Right of Publicity Act) could be read to protect
Instagram usernames as a person's "identity" without individualized questions under Rule 23.  *Id.*
at 1006–07.  In affirming the lower court's determination that answers to that (very different)
question depended on individual usernames, *Dancel* did not disagree with *Hastie's* analysis under
the DPPA.  *Id.* at 1008.  The Seventh Circuit did quote a portion of the Eleventh Circuit's
reasoning—the part explaining that an email address may contain a person's "other identifying
information"—but it would mischaracterize *Dancel* and *Hastie* to argue that this reference means
email addresses can only "qualify" for the *DPPA's* protection based upon their contents.  *Id.*
Even if the pertinent authority were not clear that emails are a protected category, Meta's
argument would only raise fact questions (can Plaintiff's email address, in fact, be used to
identify him in any of the possible ways?) to resolve on a full record.  *In re Zappos.com, Inc.*, 888
F.3d 1020, 1028 (9th Cir. 2018) ("contentions about the absence of certain facts . . . may be
appropriate for summary judgment").  Plaintiff's allegations are sufficient at the pleadings stage.

---

[2] Meta's Policies belie its arguments here.  *See* Dkt. 31 at 4, *quoting* Meta RJN Ex. 2 (listing "email address" as information "that by itself can be used to contact or identify you."); Meta RJN Ex. 4 at 1(a)(i) (defining "contact information" as "information that personally identifies individuals, such as names [and] email addresses. . . ."); *see also* Cal. Civ. Code § 1798.140.

1    **Plaintiff's disability information** is expressly protected. 18 U.S.C. § 2725(3).

2           Meta contends that Plaintiff's disabled parking application is not "disability information"

3    because Meta says it does not identify Plaintiff or reflect the nature of his disability; and that the

4    DPPA does not protect information about a person's disabled "status" because the DPPA

5    excludes "status" from "personal information." Dkt. 31 at 9. Meta's contentions lack merit.

6           The DPPA does not define the term "disability information," but like a "name," it is clear

7    that it is "personal" even if it does not identify a person *on its own*. *See* 18 U.S.C. § 2725(4);

8    *Dahlstrom*, 777 F.3d at 944 ("even though medical and disability information do not uniquely

9    pertain to a single individual, they are included in a subcategory of 'highly restricted personal

10   information,' which receives even greater protection under the DPPA."). Just like being a

11   particular age is identifying, simply having a disability is a descriptor useful to identify an

12   individual. Plaintiff's rights in what he tells the DMV extend well beyond just the "nature" of his

13   disability and include his "status."

14          Meta's status-related argument ignores that the DPPA allows individuals to disclose facts

15   about themselves with *knowledge* of how those facts will be used, leaving no wiggle room for

16   wordplay and semantic distinctions. *Leg. History*, 1993 WL 470986. Complementary

17   protections in the California Vehicle code, which protects the same interests, are instructive. In

18   California, "**all records** of the [DMV] **relating to** the physical or mental condition of any person

19   . . . are confidential." Cal. Veh. Code § 1808.5 (emphasis added). Like the DPPA, the Vehicle

20   Code creates a broad and inclusive field of confidentiality at the DMV around information

21   pertaining to one's body. The state's highest court confirms the breadth of these protections,

22   reasoning in *Perkey*, for example, that fingerprints could be said to "relate to" physical condition,

23   thus warranting the highest confidentiality. 42 Cal. 3d at 194. Other parts of the DPPA are also

24   instructive. For example, the DPPA carves out "organ donation information" on licenses

25   indicating that (like having a disability) Congress considered the binary fact of being an organ

26   donor, or not, to be identifying. See 18 U.S.C. § 2721(a)(2). If organ donation status were clearly

27   not "personal information," as Meta's arguments suggest, no carve-out would be needed.

28          Further, Meta's efforts to capitalize on the DPPA's "status" exclusion ignore that *driver's*

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
                                                 CASE NO. 3:23-CV-00083-SI

status is specified.  18 U.S.C. 2725(3).  Congress excluded status as a licensed driver to balance personal privacy against other legitimate interests, not all "statuses."  *See infra* Section I-C.  As Senator Boxer explained, "personal information" in the DPPA "does not include information on a driver's accidents, violations or **status**. Let me repeat that. Nothing in this bill will stop the press, insurance companies, employers, or anyone else from obtaining information **about an individual's driving record**."  *Leg. History*, 1993 WL 470986 (emphasis added).  "Status" as a disabled person, by contrast, is the type of highly personal fact that drivers are required to tell the DMV to exercise public rights.  Information that so much as "relates to" that status is protected.

**<u>Other information that identifies Plaintiff</u>** is protected.  Plaintiff alleges that, active at all times on nearly every page of the DMV website, the Meta Pixel broadly transmits to Meta other information that identifies website users.  This includes information concerning users' interests, phone and address status, health and disability status, immigration status, and concerns, all of which are personally identifying in themselves, and in combination, and made even more so by Meta's use of unique identifiers tied to the transmissions. Dkt. 1 ¶¶ 51; *see also id.* ¶ 3, 44, 52-53 (personally identifying communications); ¶ 21 (identifying cookies).

Congress could not have foreseen in the early 1990s that advertising companies would have the technology to monitor DMVs continuously in real time, that routine DMV business would be conducted online, or that circumstances would make it all but impossible to conduct that business offline.  *Id.* ¶ 28 & n.22 (discussing COVID-19 pandemic); ¶ 33.  Nor could Congress have foreseen the technological advances that, today, enable corporations to profile individuals with data captured across a vast array of sources, processed through computer algorithms that can predict their interests and other characteristics.  *See Id.* ¶¶ 15-22.  Congress did, however, see that it could not identify every category of "information that identifies an individual" when it passed the DPPA, and thus drafted a broad definition that allows the federal courts to effectuate the DPPA's purposes as technology and circumstances evolve.  *See Hastie*, 854 F.3d at 1304 ("[T]he word 'including' in a statute signifies enlargement, not limitation.").

Plaintiff plausibly alleges that Meta obtains his "personal information" by peering over Plaintiff's virtual shoulder at the DMV.  Contrary to Meta's footnoted argument (Dkt. 31 at 9

n.1), Meta's browser and user identifiers, users' IP addresses, and other details obtained through the Pixel, fit neatly into the statute because they *are* like the enumerated examples, such as a "driver identification number." 18 U.S.C. § 2725(3). Meta's cookies and unique Facebook-account associated c_user ID, moreover, are "key data" that allow Meta to unlock other personal information associated with a particular DMV visitor. Dkt. 1 ¶ 21. *Perkey*, 42 Cal. 3d at 196. The more recently enacted California Consumer Privacy Act defines "personal information" to include "online identifier, [IP] address, email address . . . or other similar identifiers." Cal. Civ. Code § 1798.140. Even if Plaintiff somehow believed that the DMV would harvest this information through its website, that would not help Meta because Plaintiff had (and has) no meaningful choice; he must disclose it anyway. *Andrews*, 932 F.3d at 1261; *see also Pavone v. L. Offs. of Anthony Mancini, Ltd.*, 205 F. Supp. 3d 961, 966 (N.D. Ill. 2016) ("it is as clear as day that the DPPA expressly prohibits disclosure" of information "given voluntarily" to the state).

## B.    Meta obtained Plaintiff's information "from a motor vehicle record."

Plaintiff's information came from a "motor vehicle record" even though transmissions on a website are not "tangible" and the Meta Pixel creates "independent" records for Meta.

The DPPA defines a "motor vehicle record" as "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. § 2725(1). Courts have observed that this definition raises "difficult question[s]" for DPPA claims involving information "from" sources outside a state DMV system, such as where the alleged data came from a previously issued driver's license, or, even further removed, from crash reports populated with the information from a person's driver's license. *See Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 926-27 (4th Cir. 2022) (crash reports); *Andrews*, 932 F.3d at 1259–62 (licenses).

Meta tries to exploit that uncertainty. Dkt. 31 at 10-12. But there is no difficulty, and no question that a "motor vehicle record" has been accessed, when information is obtained "from state DMVs." *Andrews*, 932 F.3d at 1259–60 (emphasis original, quoting *Maracich*, 570 U.S. at 57) ("It is clear, from the legislative history and case law, that Congress was motivated to enact the DPPA by the 'growing threat from stalkers and criminals who could acquire personal

information *from state DMVs*,' as well as '*the States''* common practice of selling personal

information to businesses engaged in direct marketing and solicitation."); *Rand v. Travelers*

*Indem. Co.*, No. 21-10744, 2022 WL 15523722, at *6 (S.D.N.Y. Oct. 27, 2022) (allegation that

data came from relevant DMV sufficient on a motion to dismiss); *Hatch v. Demayo*, No. 16-925,

2021 WL 231245, at *6 (M.D.N.C. Jan. 22, 2021), *aff'd*, 35 F.4th 917 (4th Cir. 2022) (emphasis

added) ("[C]ourts have not hesitated to award summary judgment **to plaintiffs** in cases where

defendants have acquired the protected information from the DMV directly.")

      Plaintiff plausibly alleges that his personal information came from the DMV directly.  The

DMV maintained Plaintiff's name, email address, and disability information in the DMV

database after Plaintiff disclosed it, pursuant to the DMV's policy that: "If [users] choose to

submit information to us, the information will be transmitted through secure lines to our

database."  Dkt. 1 ¶ 33 n.25; ¶ 78; *see also* Meta RJN Ex. 6.  That information was pulled from

the *DMV's* records during Plaintiff's interactions alleged, and transmitted to Meta.  Specifically:

- Plaintiff provided this first name to the DMV when he created a MyDMV account; the DMV saved that name to its database.  Dkt. 1 ¶ 33-34, 61.  Meta obtained Plaintiff's first name each time Plaintiff thereafter logged into his MyDMV account from **a "button" the DMV labeled** using Plaintiff's first name as stored in the DMV database.  *Id.* ¶¶ 32-35 & n.25.  The motor vehicle record alleged is the record the DMV maintained of Plaintiff's first name.

- Plaintiff provided his email address to the DMV in his application for a disabled parking placard; the DMV saved that email address to its database.  *Id.* ¶¶ 46, 62.  Meta obtained Plaintiff's email address **from the URL the DMV created** for its personalized "status checker" portal using the email address associated with Plaintiff's application in its database. *Id.* ¶ 46-47.  The motor vehicle record alleged is the record the DMV maintained of Plaintiff's email address.

- Plaintiff provided his disability information to the DMV by beginning an application for a disabled person parking placard and again by checking on his pending application.  *Id.* ¶¶ 21, 39-43, 62.  Meta obtained Plaintiff's disability information **from the URLs the DMV presented** for its application form after Plaintiff clicked the "Start DP Application" button, as well as for the associated "status checker" portal, while tying Plaintiff's communication to the DMV that he has a disability to other identifiers, including Plaintiff's Facebook account.  *Id.* ¶¶ 41-43.  The motor vehicle records alleged are the records the DMV maintained (a) of the application form taken from the DMV database, as presented in the context of Plaintiff's request to start applying; (b) of Plaintiff's initiation of the application by clicking the button; (c) that Plaintiff checked the status of his submitted application; and (d) a URL where Meta can check that status any time.

In addition to the well-recognized "motor vehicle records" alleged and discussed above, the

DPPA also prohibits Meta's real-time monitoring of drivers *while* they conduct their affairs with

1   the DMV.  *See* Dkt. 1 ¶¶ 17-21, 27-29, 44, 51-53.  A "motor vehicle record" reasonably includes

2   the DMV's communications with users pertaining to matters like vehicle registrations and

3   identification cards, which now occur in many instances via GET and POST requests on its

4   website.  *Id.* ¶ 20.  Meta acknowledges Plaintiff's allegations that the personal information

5   derives from the State, even as it argues that Plaintiff does not make them.  *See* Dkt. 31 at 1, 11,

6   21.  Meta's characterizations of GET and POST requests, and its improper citations to outside

7   materials for support (*id.* at 6, citing W3C, 11) merely dispute the facts alleged.  Dkt. 1 ¶ 20.

8          Meta's fact-based contention that Pixel transmissions "exist independently" (Dkt. 31 at

9   11) is no defense, it is part of the problem—Meta is not supposed to have its own copy of the

10  DMV's information.  The DPPA does not permit advertisers to create their own personally

11  identifiable moment-by-moment records of drivers' affairs with the DMV.  The important

12  allegation is that Meta violated anonymity *at* the DMV.  *Andrews*, 932 F.3d at 1260.

13         Meta relies on the Fourth Circuit's discussion of information "derived from" records in

14  *Garey* to argue that the DPPA permits surveillance of a DMV website (Dkt. 31 at 12), but *Garey*

15  says nothing of the sort.  *Garey* concerned information from law enforcement crash reports,

16  which in turn contained information from driver's licenses, which in turn contained personal

17  information from the DMV.  35 F.4th at 925-26.  *Garey* did not opine on whether licenses

18  themselves remain "motor vehicle records" after they are issued (a settled question in the Ninth

19  Circuit, *see Andrews*, 932 F.3d at 1260), but affirmed summary judgment on that DPPA claim

20  because the only potential "motor vehicle records" alleged (driver's licenses) were not the source

21  of the data alleged in that case (crash reports).  35 F. 4th at 924–25.  As discussed above, there is

22  some uncertainty surrounding downstream records like licenses, but no question about the legally

23  enforceable zone of anonymity around the DMV itself, including its website.  *See e.g.*, *Hastie*,

24  854 F.3d at 1300 (affirming criminal conviction under DPPA for disclosing email addresses that

25  License Commission [state DMV equivalent] had obtained through its website).

26         Meta also incorrectly contends that Plaintiff is required to allege records "on a tangible

27  medium."  Dkt. 31 at 11.  *Andrews*, on which Meta relies for this proposition, does not support it.

28  *Andrews* discussed whether a person's previously-issued driver's license could be a "motor

1    vehicle record," and simply noted that "among other," definitions, Black's Law Dictionary

2    defines "record" to *include* "a tangible medium." 932 F.3d at 1259.  Courts actually considering

3    this question have held that "access and observation" of intangible transmissions violates the

4    DPPA.  *See e.g.*, *McDonough v. Anoka Cnty.*, 799 F.3d 931, 944 (8th Cir. 2015) ("Congress could

5    not have intended to require physical procurement of intangible information. In the context of the

6    DPPA, the word "obtain" unambiguously includes access and observation of the data.").

7            Consistent with this precedent, Plaintiff does not, and need not, allege that Meta obtained

8    information from Plaintiff's disabled parking *placard*.  *See* Dkt. 31 at 10-11.  However, the fact

9    that Plaintiff applied for a placard "pertains to" his motor vehicle operator's permit, and at a

10   minimum, it "relates to" his disability.  *See* 18 U.S.C. § 2725(1); *Perkey*, 42 Cal. 3d at 194.

11   Meta's reliance on *Lake v. Neal*, 585 F.3d 1059, 1061 (7th Cir. 2009), therefore, is also

12   misplaced.  Registering to vote at the Illinois DMV was optional (registrations occurred at "a

13   variety of" places, of which the DMV was one), and Illinois law required voter data to be public.

14   *Id.*  By contrast, Plaintiff's request to access California's accommodations for disabled drivers,

15   which Meta calls "parking privileges," is part and parcel of his permit to use public roads with a

16   disability, and prohibited from disclosure under California law.  *See* Cal. Veh. Code § 1808.5.

17           **C.    Meta's alleged transmissions satisfy no "permissible" DPPA purpose.**

18           The DPPA lists fourteen exceptions to the general prohibition on accessing DMV records.

19   18 U.S.C. 2721(b).  All of the DPPA's exceptions must be interpreted narrowly.  *Maracich*, 570

20   U.S. at 60 ("Unless commanded by the text . . . these [DPPA] exceptions ought not operate to the

21   farthest reach of their linguistic possibilities . . ."); *Senne v. Vill. of Palatine, Ill.*, 695 F.3d 597,

22   603 (7th Cir. 2012) (DPPA "authorizes specific disclosures — each of which ... has a limited

23   object and a limited class of recipients."); *Gordon v. Softech Int'l, Inc.*, 726 F.3d 42, 53 (2d Cir.

24   2013) ("The default rule under the DPPA is non-disclosure.").

25           The exceptions "'strik[e] a critical balance between an individual's fundamental right to

26   privacy and safety and the legitimate governmental and business needs for th[e] information.'"

27   *Maracich*, 570 U.S. at 82 (citation omitted).  In particular, where, as here the defendant obtained

28   DMV data for alleged marketing purposes, the exceptions "should not be construed to interfere"

1    with the DPPA's requirement that consumers give express "written" consent to such use of their

2    information.  *Id.* at 50; *see also id.* at 67 ("Direct marketing and solicitation present a particular

3    concern [in the DPPA] . . . because contacting an individual is an affront to privacy even beyond

4    the fact that a large number of persons have access to the personal information.").

5         Meta's arguments about purposes it *might* have had request improper inferences in Meta's

6    favor, confuse the inquiry under the DPPA's exceptions, and raise unavailable defenses.  For all

7    of these reasons, Meta's reliance on the DPPA's exceptions is misplaced on a motion to dismiss.

8              1.    **Plaintiff's allegation of "a purpose not permitted" states a claim.**

9         The DPPA authorizes a civil cause of action against any "person"[3] who obtains protected

10   information for "a purpose not permitted" by the DPPA. 18 U.S.C. § 2724(a).  Plaintiff alleges

11   that Meta obtained his information for purposes other than those specified by Congress, including

12   serving advertisements, expanding Meta's warehouse of potentially marketable information, and

13   improving Meta's algorithms. Dkt. 1 ¶¶ 15, 17, 21-26, 79.  Meta concedes that Plaintiff makes

14   these allegations and further alleges that the Pixel's wide-ranging and near-constant acquisition of

15   personal information from the DMV supports an inference that Meta acted with purposes other

16   than those authorized in the law.  Dkt. 31 at 3-4, 13; Dkt. 1 ¶¶ 31, 51, 54, 79.

17        Regardless of *additional* "purposes" that Meta could have acted upon, or may disagree

18   with the Complaint about, Plaintiff's allegations of improper purpose state a claim.  *Pichler v.*

19   *UNITE*, 542 F.3d 380, 395 (3d Cir. 2008) (The DPPA does not "excuse an impermissible use

20   merely because it was executed in conjunction with a permissible purpose . . . Because

21   [defendant] obtained and used the confidential information for an impermissible purpose . . . it

22   does not matter what other permissible purpose [it] may have had."); *see also*, *e.g.*, *Dobruck v.*

23   *Borders*, No. 16-1869, 2016 WL 7157557, at *3 (M.D. Fla. Dec. 8, 2016) (denying motion to

24   dismiss, collecting cases where allegation of "impermissible purpose" was sufficient); *Rollins v.*

25   *City of Albert Lea*, 79 F. Supp. 3d 946, 968 (D. Minn. 2014) ("inference" of impermissible

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [3] Meta complains that Plaintiff should have sued the DMV (Dkt. 31 at 1), but it is Meta's conduct
     that forms the basis of this suit.  *See Reno v. Condon*, 528 U.S. 141, 147-48 (2000) (Congress
28   may punish private actors for acquiring DPPA-protected information); 18 U.S.C. §§ 2723(b),
     2725(2) (subjecting "person[s]," excluding the state and its agencies, to private damages actions).

purpose sufficient); *Akkawi v. Sadr*, No. 20-01034, 2021 WL 3912151, at *6 (E.D. Cal. Sept. 1, 2021). Whether an exception also motivated Meta is beside the point on this motion.

### 2.   Meta's defenses dispute well-pled facts and misconstrue the law.

The Court need not consider Meta's fact-based affirmative defenses because Plaintiff states a claim under the DPPA by alleging an impermissible purpose, as discussed above. Meta nonetheless disputes the facts alleged to argue that the DPPA expressly authorizes its alleged invasions: as an "agency function" under 18 U.S.C. 2721(b)(1), under the "motor vehicle or driver safety" exception of (b)(2), and pursuant to Plaintiff's "written consent" under (b)(13). Of these three exceptions, only (b)(1) and (b)(13) can authorize access to "highly restricted personal information;" here, Plaintiff's alleged "disability information." 18 U.S.C. 2721(a)(2).

Meta's arguments are not valid defenses under the DPPA, for at least four reasons:

*First,* protection from DPPA liability requires having (only) a permissible purpose *at the time* information is obtained. *See e.g.*, *Sistrunk v. TitleMax, Inc.*, No. 14-628, 2016 WL 9450445, at *5 & n.2 (W.D. Tex. Aug. 26, 2016) (emphasis added) (rejecting similar arguments; "*obtaining* Drivers' information without a permissible purpose" is a violation). Meta does not even claim it had any contemporaneous lawful purpose. Dkt. 31 at 13 (asserting that "statistical analysis" is a "reason[] developers use the Meta Pixel," but not that Meta obtained Plaintiff's data to perform statistical analysis for the DMV; arguing Meta *could have been* assisting the DMV with "market research," "[t]o the extent" the DMV sent Meta information for such a purpose).

*Second*, "[t]he actual information disclosed—i.e., the disclosure as it existed in fact—must be information that is used for the identified purpose." *Senne*, 695 F.3d at 605-6 (rejecting argument that "as long as [the defendant] can identify a subsection of the law under which some disclosure is permitted, any disclosure of information otherwise protected by the statute is exempt, whether it serves an identified purpose or not."); *Wiles v. Worldwide Info., Inc.*, 809 F. Supp. 2d 1059, 1082 (W.D. Mo. 2011) (denying summary judgment where defendant who obtained entire state database was "unable to match the individuals whose highly restricted personal information it obtained . . . with permissible uses pertaining to them."); *see also, e.g.,* Cal. Veh. Code § 1808.47 (no obtaining "for any purpose other than the reason the information

was requested").  Meta makes no effort to match any DPPA exception or purpose to the full

volume of data it obtains, let alone to Plaintiff.

*Third*, California has strict protocols for information with the DMV, making Meta's

assertions implausible.  For example, the DMV may disclose personal information to a

"commercial requester" only upon payment of a $50,000 bond and formal application. Cal. Veh.

Code § 1810.2.  The DMV does not have rights to share protected information for "social media."

*See* Dkt. 31 at 13.  Section 1656.5 of the Vehicle Code, which Meta erroneously cites for that,

confirms that the California Legislature controls and *limits* what the DMV can transmit; it

authorized a single contract for delineated purposes.  These laws regulating the DMV's data belie

any notion that Meta—with no authorization from the Legislature; no DMV-specific contract; and

not even a formally approved "request"—was an agent or researcher protected by the DPPA.

Meta's authority underscores the implausibility of Meta's factual contentions here.

Unlike Meta's defense that its Policies grant unlimited access to DMV records, *Downing v. Globe

Direct LLC*, 682 F.3d 18 (1st Cir. 2012) and cases discussed therein like *Rine v. Imagitas, Inc.*,

590 F.3d 1215 (11th Cir. 2009), concerned vendor contracts to handle DMV mailings entered

through state administrative processes, similar to Vehicle Code § 1656.5.  The contracts specified

their governmental "purposes," state laws there recognized reducing costs to the DMV as an

agency function.  682 F.3d at 24.  Drivers argued that the vendors impermissibly made a

"marketing" use of protected data by including advertisements in the mailings, requiring express

written consent under 18 U.S.C. 2721(b)(12).  In determining that these arrangements were

lawful, the First Circuit in *Downing* considered the contractually stated purposes and functions;

the limited information disclosed; the contract's express references to the DPPA; applicable state

law, the DMV's retention of ownership in the data; and the fact the DMV approved all the

advertisements. 682 F.3d at 20, 24-25.[4]  Meta does not point to even roughly comparable facts or

provisions in its Policies; this would be a fact question if it did.

---

[4] *Maracich* calls into question some of the First Circuit's reasoning, in particular, the analysis
Meta cites here.  Dkt. 31 at 13.  *Downing* reasoned that "[s]o long as [the vendor] may unlock the
(b)(1) door, the fact that they may or may not possess the key to the (b)(12) [marketing] door is
irrelevant . . . ."  682 F.3d at 23.  *Maracich* clarifies that "it is relevant," because "the statutory
design" shows the importance of express consent.  *Maracich*, 570 U.S. at 66; *id.* at 67.

*Fourth,* Meta's attempt to state a consent-based affirmative defense misapprehends the statute.  Meta's Policies do not "demonstrate[] . . . written consent." 18 U.S.C. § 2721(b)(13). The DPPA is an "opt-in" regime; not even the *DMV* can require that users "consent" to otherwise prohibited data sharing, as Meta's Policies purport to do. *Id.* § 2721(e); *Maracich*, 570 U.S. at 58, 67.  Meta's interpretation conflicts with the text of (b)(13), which protects "requesters," not hidden trackers, who "demonstrate" (to the DMV which must obtain express consent "**before** permitting the disclosure" (*Maracich*, 570 U.S. at 67)) that it has "written consent."  For this exception to grant an advertising company all rights to "collect" DMV data would contravene the statute.  Moreover, Meta bears the burden of proof on its defenses. *See Nayab v. Cap. One Bank*, 942 F.3d 480, 498 (9th Cir. 2019).  Meta's Policies, if relevant at all, suggest Meta does *not* receive personal information from the DMV.  *See e.g.* Meta RJN Ex. 2 at 7 (Meta "require[s]" third parties "to have the right to collect, use and share your information before giving it to us"); *see also* Dkt. 1 ¶ 55.  Meta's self-serving presentation of its "Exhibits," like its repeated self-serving characterization of Exhibit 6 at p. 2 regarding personal information in "form fields" (*i.e.*, *not* URLs or "links you select," which notably lacks any disclosure) raises fact disputes, at most.

For all of these reasons, and others discussed in connection with Plaintiff's CIPA cause of action, Meta does not, and cannot, support its argument for dismissal based on the exceptions. Even if Meta eventually comes up with a credible, factually-supported, and *exclusive* "purpose" contrary to the purposes alleged for obtaining *all* of the protected data that it obtained, "whether [Meta's] explanation satisfies the DPPA is a matter for the jury to decide." *Knowlton v. City of Wauwatosa*, No. 20, 2023 WL 2951425, at *1 (E.D. Wis. Apr. 14, 2023).

### D.   Plaintiff pleads the requisite scienter.

A person is subject to a civil DPPA claim if it "knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted." 18 U.S.C. § 2724(a).  Meta misconstrues this provision, presenting the DPPA's "knowingly" requirement as a standalone fourth element so Meta can argue that it did not know the data "constituted 'personal information,' let alone that it came directly 'from' a 'motor vehicle record.'" Dkt. 31 at 15. Numerous courts confirm, however, that "the 'knowingly' requirement in section 2724(a) only

1    applies to the portion before the commas ["obtained, disclosed, or used"], which is the first

2    element of the statute." *Wilcox v. Swapp*, 330 F.R.D. 584, 594–95 (E.D. Wash. 2019) (collecting

3    cases). "[B]eyond reasons related to punctuation, the first element of a DPPA claim contains the

4    action verbs . . ., and with the term "knowingly" being an adverb, it follows that "knowingly"

5    only applies to the requisite verbs," *i.e.* not to whether data fits legal definitions in the DPPA. *Id.*,

6    citing *United States v. Chi Tong Kuok*, 671 F.3d 931, 945 (9th Cir. 2012); *see also Howard v.*

7    *Crim. Info. Servs., Inc.*, 654 F.3d 887, 890 (9th Cir. 2011) (emphasis added) (DPPA "sets forth

8    the **three elements** giving rise to liability, *i.e.*, that a defendant (1) **knowingly obtained**,. . . .").

9        Plaintiff alleges that Meta knowingly *obtained* his personal information. Dkt. 1 ¶ 76.

10    Plaintiff supports this allegation: Meta provided the DMV with code that Meta designed to

11    monitor and transmit a click-by-click account of transmissions as alleged. *Id.* ¶ 2, 31, 55. Meta

12    has systems to house and process this data evidencing knowledge it is "obtained;" Meta even

13    "quietly" expanded the Pixel's default configuration to obtain more information for advertising.

14    *Id.* ¶¶ 17, 19-26, 29, 32, 36, 46, 55 & n.31, 76, 79. Consistent with courts' analysis of § 2724 and

15    conversely to Meta's, the DPPA does not require "knowing" the data fits a statutory definition.

16    "Voluntary action, not knowledge of illegality or potential consequences, is sufficient to satisfy

17    the mens rea element." *Senne*, 695 F.3d at 603; *Pichler*, 542 F.3d at 396–97; *Hastie*, 854 F.3d at

18    1305. Meta's knowledge regarding the source of this information and its legal status may be at

19    issue later, *see* 18 U.S.C. 2724(b)(2) (punitive damages), but not on a motion to dismiss.

20        Meta disputes the facts alleged, but can only say that some of its actions were "passive,"

21    *i.e.*, automatic. Dkt. 31 at 15-16. That is not *involuntary* or even not "knowing" where Meta

22    *designed* the Pixel to operate that way. *Cf. Rand v. Travelers Indem. Co.*, No. 21-10744, 2022

23    WL 15523722, at *6 (S.D.N.Y. Oct. 27, 2022) (decision to "auto-populate" protected information

24    on website effected "knowing" disclosure); *Tison v. Arizona*, 481 U.S. 137, 150 (1987) (applying

25    principle that a party "intends certain consequences when . . . [it] knows that those consequences

26    are substantially certain to result from [its] acts"). Meta tries to analogize creating and

27    distributing the Meta Pixel to the non-actions of employers accused of "disclosing" information

28    *stolen* by "various, unknown identity thieves." *Enslin v. The Coca-Cola Co.*, 136 F. Supp. 3d 654,

   PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00083-SI

659 (E.D. Pa. 2015), *aff'd*, 739 F. App'x 91 (3d Cir. 2018).  The analogy is no good because unlike *Enslin's* crime victims, Meta voluntarily deployed its Pixel to send the pertinent data an unlawful recipient—itself.  Meta had a responsibility to comply with the DPPA.  Meta's arguments that its Policies require businesses to have "rights" to send the information, if the Court considers them, only raise questions for the fact-finder, such as whether a single sentence so clearly demonstrates reasonable care as to overwhelm Plaintiff's evidence of Meta's knowledge and intent.  *Cf. Gordon*, 726 F.3d at 56 (discussing duty of care under DPPA in context of redisclosing DMV data: "in light of the clear congressional intent to safeguard the privacy and safety of drivers, it is inconceivable that a dropdown menu, a check box, and a representation that no laws would be violated could satisfy any reasonable diligence floor.")

Even if knowledge regarding a "motor vehicle record" were at issue, Plaintiff adequately pleads that non-element, because Meta tracks and records this data as coming from the DMV. Dkt. 1 ¶ 30; *Ctr. for Individual Rts. v. Chevaldina*, No. 16-20905, 2018 WL 1795470, at *4 (S.D. Fla. Feb. 21, 2018) ("a person who gets the information directly from a state agency quite obviously knows that is where he is getting [it]"); *Knowlton v. City of Wauwatosa*, No. 20-1660, 2023 WL 2480353, at *12 (E.D. Wis. Mar. 13, 2023) (where "reports themselves state that this information came from DOT records, a reasonable jury could find" a DPPA violation).

Plaintiff adequately pleads all elements of his claim under the DPPA.

## II.    Plaintiff's California Invasion of Privacy Act claim is well-pled.

Plaintiff pleads all elements of his CIPA claims.  CIPA targets "the substantive intrusion that occurs when private communications are intercepted by someone who does not have the right."  *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1118 (9th Cir. 2020).  CIPA covers "far more than illicit wiretapping," and bars three "mutually independent patterns of conduct." *Ribas v. Clark*, 38 Cal. 3d 355, 360 (1985); *Tavernetti v Superior Court*, 22 Cal. 3d 187, 192 (1978).  The first clause of section 631 creates liability for anyone who "**intentionally taps** . . . any telegraph or telephone wire . . . ."  The second clause creates liability for any person who "**willfully and without the consent of all parties** to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of" communications.  The third clause

1  creates liability for any person who "uses, or attempts to use, in any manner . . ., or to

2  communicate in any way, **any information so obtained**," or who even agrees to do so.  *See id.*;

3  *Matera v. Google Inc.*, No. 15-04062, 2016 WL 8200619, at *18 (N.D. Cal. Aug. 12, 2016).

4          A.      **Plaintiff pleads the requisite willfulness.**

5          Meta challenges Plaintiff's allegations of "intentional" conduct and emphasizes the

6  "wiretapping" provision of CIPA (prong one) throughout its brief, but Plaintiff specifically pleads

7  claims for Meta's violation of section 631(a) prongs two and three.  Dkt. 1 ¶¶ 14, 85, 91.  Meta's

8  briefing on the standard for (only) the *first* prong of section 631(a), and another unalleged CIPA

9  provision (section 632) improperly "reads . . . into the second prong . . . requirements that are not

10  present." *Cf. Javier v. Assurance IQ, LLC*, No. 20-02860, 2023 WL 114225, at *6 (N.D. Cal. Jan.

11  5, 2023) (rejecting argument that "use" is required for second prong, because that would

12  "swallow the third prong").  The questions for the fact-finder here are (1) did Meta *willfully* read

13  communications between Plaintiff and the DMV (or attempt to); (2) did Meta use the information

14  so obtained (or agree or conspire to use it).  Plaintiff plausibly alleges that the answer to both

15  questions is Yes. Dkt. 1 ¶¶ 2, 15-26, 29, 35-53, 57, 62, 86-90.

16          Meta tries to conflate the "willful" and "intentional" standards, but the distinction is

17  meaningful.  This is evidenced by a Congressional amendment to the ECPA (Electronic

18  Communications Privacy Act), CIPA's federal corollary, which once contained the same

19  "willful" terminology as CIPA.  In 1986, Congress "*increased* the scienter requirement from

20  'willful' to 'intentional'" for all prongs of the federal law.  *Bartnicki v. Vopper*, 532 U.S. 514, 547

21  n.4 (2001) (emphasis added).  California's legislature did not follow suit.

22          Even if precedent regarding different CIPA provisions applied, it supports Plaintiff, who

23  alleges Meta read communications by design, not fortuitously or inadvertently.  *See e.g.*, *People*

24  *v. Buchanan*, 26 Cal. App. 3d 274, 289 (Ct. App. 1972); Dkt. 1 ¶¶ 17-19, 29, 32, 88.  Willfulness

25  and intent are fact questions, and Meta cannot escape liability by pretending the DMV configured

26  the Pixel.  *See* Dkt. 31 at 6, 17-18.  Even if the DMV had "*agree[d] with*" Meta's surveillance,

27  the relevant CIPA prongs still require that "all" parties consent.  Cal. Penal Code § 631(a); *Ribas*,

28  38 Cal. 3d at 360.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:23-CV-00083-SI

1

### B.    Meta does not carry its burden to prove Plaintiff's consent.

2    Plaintiff alleges that he did not consent to Meta's interceptions.  Dkt. 1 ¶¶ 62, 87.

3    Plaintiff's allegation is supported by factual allegations that the Pixel is "hidden" on the DMV

4    website and that the website itself suggests no such surveillance occurs.  Dkt. 1 ¶¶ 2, 55 & n.31;

5    Pltf. RJN Ex. 1.  Plaintiff disputes Meta's characterization of this case as one of a "series," (Dkt.

6    31 at 1), but Meta's introduction of the fact that website users in myriad industries nationwide

7    have filed suit alleging *they* did not know of Meta's intrusions further supports this allegation, as

8    do the extensive protections for the disclosure of information in this context, discussed above.

9    It is the defendant's burden to prove consent.  *Calhoun v. Google LLC*, 526 F. Supp. 3d

10   605, 620 (N.D. Cal. 2021).  Meta contends that Exhibits 2, 3, and 6 to its Request for Judicial

11   Notice meet this burden.  The Court need not reach the argument because these materials only

12   "insert [Meta's] version of events into the complaint," and the remainder of Meta's contentions

13   seek improper inferences.  *Khoja*, 899 F.3d at 1002.  It also lacks merit, because:

14   **First**, Meta does not show that Plaintiff took "any affirmative action to demonstrate

15   assent" to any policies.  *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1178–79 (9th Cir. 2014);

16   *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1081 (C.D. Cal. 2021) (quoting *Nguyen*,

17   finding burden to establish consent unmet because disclosures in privacy policies "without more"

18   do not bind users under Ninth Circuit precedent).

19   **Second**, according to Meta's outside counsel, Exhibits 2 and 3 were published on January

20   1, 2023 and October 5, 2022, respectively.  Barrera Decl. ¶¶ 3-4.  Plaintiff alleges repeated

21   interceptions of his communications starting as early as 2019 (Dkt. 1 ¶ 61), and "the California

22   Supreme Court would interpret Section 631(a) to require the **prior** consent of all parties to a

23   communication."  *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *2 (9th Cir.

24   May 31, 2022) (unpublished, emphasis added), citing, *inter alia*, *Ribas*, 38 Cal. 3d at 358–62.

25   **Third**, the "reasonable consumer" standard applicable here "raises questions of fact that

26   are appropriate for resolution on a motion to dismiss only in rare situations." *Dinan v. SanDisk*

27   *LLC*, No. 18-05420, 2020 WL 364277, at *7 (N.D. Cal. Jan. 22, 2020) (citation omitted).  Even a

28   policy properly before the Court "must have only one plausible interpretation for a finding of

1   consent." *In re Meta Pixel Healthcare Litig.*, No. 22-03580, 2022 WL 17869218, at *10 (N.D.

2   Cal. Dec. 22, 2022) (citation omitted, preliminary injunction motion).  Meta's Exhibits 2 and 3 do

3   not pass muster.  Meta cites vague statements about how "advertisers" and "businesses" use the

4   Meta Pixel (Dkt. 31 at 3-4, 19), but this terminology reasonably *excludes* governmental entities

5   like the DMV.  In addition, Exhibit 2 states that Meta "require[s] Partners to have the right to

6   collect, use and share your information before giving it to us."  If that was the language of Meta's

7   Policies throughout the relevant period, which cannot be discerned from Meta's Exhibits, it is

8   ambiguous.  It could mean that Meta does *not* receive information from the DMV for advertising

9   purposes without "express" (written) consent consistent with 18 U.S.C. 2721(b)(13).  *Cf. Id.*, at

10  *10.  Meta's Exhibit 6 would only bolster that interpretation.  All of these ambiguities distinguish

11  this case from Meta's authority, *e.g.*, *Smith v. Facebook, Inc.*, 745 F. App'x 8 (9th Cir. 2018).

12      **C.    Meta's indiscriminate harvesting of communications intercepted "contents."**

13          Meta's suggestion that the Pixel transmits only meaningless "record information" rather

14  than "contents" ignores Plaintiff's allegations of substantive transmissions, including

15  communications Plaintiff personally exchanged with the DMV.

16          Plaintiff supports his allegation that Meta intercepted "contents" (Dkt. 1 ¶ 88) with facts

17  illustrating the scale and purposes of Meta's surveillance (*Id.* ¶¶ 17-20), and examples of

18  communications Meta obtained through interactions with the DMV.  *Id.* ¶ 52 (log in, "change

19  phone number"); ¶ 53 (text of searches).  Plaintiff alleges that Meta learned the meaning of his

20  communication to the DMV that he has a disability by clicking the "Start DP Application" button.

21  *Id.* ¶ 41, 62.  Plaintiff explains that he has used his MyDMV account approximately two times per

22  year since 2019.  *Id.* ¶¶ 61-62.  It is reasonable to infer from that allegation that Meta learned—at

23  a minimum—that Plaintiff requested to "log in," as well as the reason, when he communicated

24  the reason by clicking the appropriate hyperlink (*e.g.*, change phone number; renew registration).

25  *Id.* ¶ 51, 61.  The Court should reject Meta's arguments based on contrary inferences.  Dkt. 31 at

26  22; *Khoja*, 899 F.3d at 1002.  Plaintiff also alleges that Meta has taken extensive measures to

27  maximize the information it obtains to "learn" about users, belying Meta's claim that it only reads

28  uninformative "record information."  *Id.* ¶¶ 17-18; Dkt. 31 at 2, 21-22.

Under the CIPA, "any information relating to the substance, purport, or meaning" of a communication qualifies as "contents." *In re Google RTB Consumer Priv. Litig.*, No. 21-2155, 2022 WL 2165489, at *10-11 (N.D. Cal. June 13, 2022) (same definition as ECPA).  URLs and other data from web browsing activity meet this definition when they convey substantive information about what is being requested and received, as alleged here.  In *Facebook Internet Tracking*, for example, the Ninth Circuit concluded that URLs that could disclose the search terms users typed into the search engines were "contents" because they could provide "significant information regarding the user's browsing history" and divulge "a user's personal interests, queries, and habits." 956 F.3d at 596, 605; *see also, e.g.*, *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 275 (3d Cir. 2016) ("a URL may convey 'substantive information'"); *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 137 (3d Cir. 2015) (If a URL is "part of the substantive information conveyed to the recipient, then by definition it is 'content.'"); *In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 949 (N.D. Cal. 2022) (URL and "details about the content within the site or app" were "contents" under ECPA).  Here, URLs disclosing disability status, the fact that a person is moving, selling a car, changing their number, renewing their driver's license, changing their name, or performing any number of other personal tasks that Californians are required to undertake with the DMV, meet the definition.

Meta's authority establishes that web browsers *can* convey "record information," not that they *only* convey record information.  Dkt. 31 at 21.  Judge Breyer's discussion of "inferences" required to "glean" information in *Hammerling v. Google LLC* concerned allegations that a defendant did *not* access information about "what [users viewed] on the websites."  615 F. Supp. 3d 1069, 1093 (N.D. Cal. 2022).  Similarly, *Svenson v. Google Inc.* involved disclosure of contact information associated with payment processing, not monitoring communications via URLs and webpage hyperlinks.  65 F. Supp. 3d 717, 728–29 (N.D. Cal. 2014).  In *Graham v. Noom, Inc.*, the plaintiffs "did not dispute that [the alleged] information is not content," and the Court granted them leave to amend to identify "other website interactions" that they contended were content. 533 F. Supp. 3d 823, 833 (N.D. Cal. 2021).  Plaintiff's CIPA claim is well pled.

**III.**     **The Court should not "narrow" Plaintiff's well-pled claims.**

Meta asks the Court to "narrow" one, or possibly both, of Plaintiff's claims under Rule 12 "insofar as they sweep in conduct outside of the limitations period." Dkt. 31 at 22. The request is procedurally infirm because "[a] motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (emphasis original) (explaining that *summary judgment* allows motions to narrow factual issues).

Meta also fails to shift the burden of overcoming its affirmative defense to Plaintiff, so the Court need not reach Meta's disputes with the Complaint about fraudulent concealment and the discovery rule. Plaintiff alleges misconduct within the CIPA's one-year statute, and the DPPA's four-year statute, and timely filed this case. Dkt. 1 ¶¶ 61-63. "Plaintiffs are generally not required to plead around affirmative defenses." *Ortega v. Santa Clara Cnty. Jail*, No. 19-17547, 2021 WL 5855066, at *1 (9th Cir. Dec. 9, 2021) (citation, quotation marks omitted). Tolling and fraudulent concealment need be alleged only "[i]f the running of the statute is apparent on the face of the complaint." *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980).

Further, Meta's request could "be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *Id.* This defense turns on fact-bound questions about whether the circumstances on the DMV website (Dkt. 1 ¶¶ 2, 15-31, 52) would "excite the inquiry of a reasonable person;" or lead "reasonable persons" to understand they had no claim for relief, warranting estoppel. *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 787–88 (N.D. Cal. 2007); *Gomez v. City of Torrance*, 311 F. App'x 967, 969 (9th Cir. 2009). These should be resolved with a full record, not Meta's claim that its own press releases are "prominent news publications." *See* Dkt. 31 at 25, citing Dkt. 1 ¶ 17 n.5 (Meta RJN Ex. 7); *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 810 (2005) (statute of limitations defense "is normally a question of fact"); *Dinan*, 2020 WL 364277, at *7. Plaintiff's allegations (Dkt. 1 ¶¶ 56-60) are plausible and factually supported. Meta's authority does not support its procedurally improper request here. *See* Dkt. 31 at 22-25.

## CONCLUSION

The Court should deny Meta's motion to dismiss.

Dated:  April 28, 2023

Respectfully submitted,

*/s/ Melissa Gardner*
Michael W. Sobol (SBN 194857)
msobol@lchb.com
David T. Rudolph (SBN 233457)
drudolph@lchb.com
Melissa Gardner (SBN 289096)
mgardner@lchb.com
Jacob H. Polin (SBN 311203)
jpolin@lchb.com
Nabila Abdallah (SBN 347764)
nabdallah@lchb.com
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery Street,
29th Floor San Francisco,
CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008

Joseph Henry (Hank) Bates, III (SBN 167688)
hbates@cbplaw.com
Allen Carney (pro hac vice)
acarney@cbplaw.com
Courtney E. Ross (pro hac vice)
cross@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
519 W. 7th Street
Little Rock, AR 72201
Telephone: 501.312.8500
Facsimile: 501.312.8505

*Counsel for Plaintiff and the Proposed Class*

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that on April 28, 2023, I directed the electronic filing of the foregoing

3   document with the Clerk of the Court using the CM/ECF system, which will automatically send

4   notification of the filing to all counsel of record.

5

6                                        By:   _____

7                                                Melissa Gardner

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
                                            CASE NO. 3:23-CV-00083-SI