# Exhibit B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MIKHAIL GERSHZON, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.<br><br>Defendant. | Case No. 3:23-cv-00083-SI-VKD<br><br>**STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION**<br><br>Action Filed: January 6, 2023<br><br>Honorable Judge Susan Illston |

Gibson, Dunn &
Crutcher LLP

1. **PURPOSE**

This Order will govern discovery of electronically stored information ("ESI") ("eDiscovery") in this case as a supplement to the Federal Rules of Civil Procedure, this Court's Guidelines for the Discovery of Electronically Stored Information, and any other applicable orders and rules.

2. **COOPERATION**

The Parties are aware of the importance of cooperation and commit to cooperate in good faith throughout the matter consistent with this Court's guidelines for the discovery of ESI.

3. **DEFINITIONS**

**(a)** **"Electronically stored information"** or **"ESI,"** as used herein, has the same meaning as in Federal Rules of Civil Procedure 26 and 34.

**(b)** **"Media"** means an object or device, real or virtualized, including but not limited to a disc, tape, computer or other device, on which data is or was stored.

**(c)** **"Non-Party"** means <u>any</u> natural person, partnership, corporation, association, or other legal entity who is not a Party (as defined below) in this action.

**(d)** **"Party"** means any party to this action, including all of its officers, directors, and employees.

**(e)** **"Producing Party"** means a Party or Non-Party that produces ESI in this action.

**(f)** **"Receiving Party"** means a Party that receives ESI from a Producing Party in this action.

4. **LIAISON**

The Parties have identified liaisons to each other who are and will be knowledgeable about and responsible for discussing their respective ESI. Each e-discovery liaison will be, or have access to those who are, knowledgeable about the technical aspects of e-discovery, including the location, nature, accessibility, format, collection, search methodologies, and production of ESI in this matter. The Parties will rely on the liaisons, as needed, to confer about ESI and to help resolve disputes without court intervention.

5. **PRESERVATION**

[[*Option I*:  The Parties will enter a separate Order regarding preservation in this matter.]]

STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION
CASE NO. 3:23-CV-00083-SI-VKD

[[*Option II*:

The Parties have discussed their preservation obligations and needs and agree that preservation of potentially relevant ESI will be reasonable and proportionate consistent with Sedona Conference Principle 6 which instructs that "[r]esponding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information." To reduce the costs and burdens of preservation and to ensure proper ESI is preserved, the Parties agree that:

(a)     The Parties will preserve non-duplicative, relevant information currently in their possession, custody, or control; however, the Parties are not required to modify, on a going forward basis, the procedures used by them in the usual course of business to back up and archive data;

(b)     The Parties will discuss the sources and types of ESI they believe will be sources of potentially relevant information;

(c) The Parties will agree on the number of custodians per Party for whom ESI will be preserved, and agree to meet and confer to discuss additional custodians as reasonably necessary (i.e. when specific evidence warrants expanding the initial custodian list);

(d) The following data sources are not reasonably accessible because of undue burden or cost pursuant to Fed. R. Civ. P. 26(b)(2)(B) and unwarranted extraordinary measures will not be taken to preserve ESI from these sources; ESI from these sources will be retained pursuant to standard business processes, but not otherwise preserved, searched, reviewed, or produced unless ordered by the Court upon a motion of a Party:

1.  backup systems and/or tapes used for disaster recovery;

2.  systems no longer in use that cannot be accessed by using systems currently in use by the Party;

3.  voice messages;

4.  instant messages and chats that are not chronicled to an email archive system;

5.  sound recordings;

6.  video recordings;

7.  version histories for Google Docs or Google Sheets; and

-3-

**STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION**
CASE NO. 3:23-CV-00083-SI-VKD

8.  information solely contained on mobile devices.

**(e)**  In addition to the agreements above, the Parties agree data from the following sources (a) could contain relevant information, but (b) under the proportionality factors, should not be preserved:

1.  Deleted, slack, fragmented, or unallocated data only accessible by forensics.

2.  Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system.

3.  On-line data such as temporary internet files, history, cache, cookies, and the like.

4.  Data in metadata fields that are frequently updated automatically, such as last-opened or last modified dates.

5.  Mobile device activity logs.

6.  Information created or copied during the routine, good-faith performance of processes for the deployment, maintenance, retirement, and/or disposition of computer equipment by the Party.

**(f)**  Among the sources of data the Parties agree are not reasonably accessible, based on mutual representation of the Parties' counsel, the Parties agree not to preserve, collect, process, review, and/or produce from the following sources in general; however, to the extent that a party identifies discoverable information contained in the following sources in custodial or non-custodial files, the parties will preserve, collect, process, review, and/or produce non-privileged, responsive material from such sources:

1.  Server, system, or network logs.

2.  Dynamic fields in databases or log files not stored or retained in the usual course of business.

**(g)**  The Parties acknowledge that Meta Platforms, Inc. is subject to various privacy regulations and court orders that require the disposition of identifiable user data.  To the extent that identifiable user data subject to routine disposition as required by privacy regulations and court orders is identified as relevant to the claims or defenses in this case, the parties will meet and confer on preservation of

such information as it exists at that time, including the feasibility of such preservation and the type and import of the user data implicated.]]

**6.     SEARCH**

The Parties agree that each Producing Party is best situated to determine the most appropriate method or methods for that Producing Party to search, collect, cull, and produce documents responsive to discovery.  The Parties agree that in responding to an initial Fed. R. Civ. P. 34 request, or earlier if appropriate, they will meet and confer about methods to search ESI in order to identify ESI that is subject to production in discovery and filter out ESI that is not subject to discovery.

**(a)** Data Sources:  The Parties will meet and confer regarding the sources and types of ESI they believe will be sources of potentially relevant information, and the appropriate methods to search such ESI in order to identify responsive, non-privileged information.

**(b)** Custodians:  The Producing Party will propose custodians whose ESI will be subject to search to identify potentially  responsive, non-privileged information.  The Parties will then meet and confer regarding the custodians whose ESI will be subject to search to identify responsive, non-privileged information.

**(c)** Search Terms:  Each Producing Party may use search terms to locate potentially relevant documents for collection and/or culling after collection.   If a Producing Party determines to use search terms, the Producing Party will develop its own narrowly tailored search terms to locate its relevant documents that are responsive to discovery.  After applying its search terms to the targeted document set(s), that Producing Party will review a statistically valid (95% ±5), randomly generated sample set of the documents that do not hit upon any search terms ("Null Set Sample") and produce to the Receiving Party the relevant, responsive, non-privileged documents.  The Producing Party will develop appropriate new search term(s), if needed, to capture any relevant, responsive documents located within the Null Set Sample.  The Producing Party will then apply the original and new search terms to the targeted document set and disclose the original and new search terms to the Receiving Party, along with hit reports (to include unique hits and hits with families).  If the Receiving Party objects to the sufficiency of the Producing Party's original and new search terms, the Parties agree to conduct up to three rounds of the four-step process identified below:

1.  The Receiving Party may request one additional Null Set Sample to be reviewed by the Producing Party;

2.  The Producing Party will review the additional Null Set Sample and produce all relevant, responsive, non-privileged documents identified, if any, to the Receiving Party;

3.  The Receiving Party can propose additional search terms designed to capture the relevant, responsive, non-privileged documents from the additional Null Set Sample; and

4.  The Producing Party will apply the search terms to evaluate their reasonableness and will share hit reports (to include unique hits and hits with families) with the Receiving Party.

If the search terms proposed by the Receiving Party have an unreasonably high or overbroad yield, the Producing Party may review a randomly generated 95/5 confidence level/margin of error sample set of documents to determine the overbreadth of the proposed search terms. Where appropriate, the Producing Party may develop alternative search terms that are more narrowly tailored to capture the relevant, responsive, non-privileged documents from the additional Null Set Sample. No additional iterations of search term development will be conducted.

   **(d)**    <u>Technology Assisted Review</u>.   A Party may use technology assisted review (TAR) or similar advanced analytics to filter out or exclude non-responsive documents.[1]  A Receiving Party may request the following information about a Producing Party's use of TAR or similar advanced analytics limited to the following:  (1) the custodians and data sources against which TAR or advanced analytics will be run; (2) the TAR or advanced analytics tool being used and vendor; and (3) the measure(s) used to validate the results of the TAR methodology or similar advanced analytics.

   **(e)**    Nothing in this Order may be construed or interpreted as precluding a Producing Party from performing a responsiveness review to determine if documents captured by search terms are in fact relevant to the Receiving Party's discovery requests.  Similarly, nothing may be construed or

---

[1] A Producing Party need not disclose whether it is using TAR, Continuous Active Learning (CAL), or any other predictive coding to prioritize the review of documents collected.

**STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION**
CASE NO. 3:23-CV-00083-SI-VKD

interpreted as precluding a Producing Party from performing, by any means, a privilege review of documents determined to be relevant.  Further, nothing in this Order requires the production of documents captured by any search term that are irrelevant to the Receiving Party's discovery requests, privileged, or otherwise protected from disclosure.

**(f)**     Each Producing Party will use its best efforts to filter out common system files and application executable files by using a commercially reasonable hash identification process.  For example, Hash values may be filtered out during this process using the National Software Reference Library ("NSRL") NIST hash set list.

### 7.     DE-DUPLICATION AND EMAIL THREADING

**(a)**     <u>De-Duplication</u>.  Each Producing Party is required to produce only a single copy of a responsive document and each Producing Party may de-duplicate responsive ESI (e.g., based on MD5 hash values at the document level) across custodians, provided that metadata is produced indicating all of the Custodians with whom a copy of the responsive document was associated.  For emails with attachments, the hash value is generated based on the parent/child document grouping.  To the extent that de-duplication through MD5 hash values is not possible, the Parties shall meet and confer to discuss any other proposed method of de-duplication.

**(b)**     <u>Email Threading</u>.  Where multiple email messages are part of a single chain or "thread," a Producing Party is only required to produce the most inclusive message ("Last In Time Email") and need not produce earlier, less inclusive email messages or "thread members" that are fully contained, including attachments and including identical senders and recipients, within the Last In Time Email.  Only email messages for which the parent document and all attachments are contained in the Last In Time Email will be considered less inclusive email messages that need not be produced.

### 8.     PRODUCTION FORMATS

Appendix A sets forth technical specifications that govern the form of production of documents in this litigation.   If particular documents warrant a different format, the Parties will cooperate to arrange for the mutually acceptable production of such documents.

The Parties agree not to degrade the searchability of documents as part of the document production process. The Parties agree to meet and confer in good faith to address any issues that may

arise in this regard, and to seek judicial intervention only if their efforts to resolve the issues on an informal basis are unsuccessful.

To the extent any data, ESI, or documents requested in discovery are not reasonably usable absent translation by the Producing Party or its systems, the Parties shall meet-and-confer regarding translation by the Producing Party into a reasonably usable form and the production of legends or keys employed to translate the data, to the extent the information is reasonably accessible and it is not unduly burdensome to provide.

### 9.     DOCUMENTS PROTECTED FROM DISCOVERY

**(a)**     Communications involving trial counsel of record that post-date the filing of the complaint (June 17, 2022) need not be placed on a privilege log.  Communications may be identified on a privilege log by category, rather than individually, if appropriate.  The Parties reserve the right to revisit at a later date whether the Parties must log communications that post-date the filing of the initial complaint, involve in-house counsel, and were created either (1) to pursue or defend this action, or (2) to obtain or provide legal advice on issues relevant to any Party's claim or defense in this action.

**(b)**     Parties agree to log only the Last In Time Emails in a thread and need not log earlier, less inclusive email messages or "thread members" that are fully contained within the Last In Time Email.

**(c)**     The Parties agree to furnish logs that comply with Fed. R. Civ. P. 26(b)(5) and any other legal requirements for all documents withheld or redacted on the basis of privilege, attorney work product, or similar doctrines.  Privilege logs will be produced in Microsoft Excel.

**(d)**     The Parties will negotiate interim and final deadlines for the production of privilege logs that permit any disputes about claims of privilege or work product protection to be addressed in advance of the close of fact discovery.  If the parties are unable to agree on specific dates for interim and final deadlines for the production of privilege logs, the Parties may ask the Court to resolve the dispute.

### 10.     MODIFICATION

This Stipulated Order may be modified by a Stipulated Order of the Parties or by the Court for good cause shown.

Gibson, Dunn & Crutcher LLP

-8-

1   **IT IS SO STIPULATED**, through Counsel of Record.

2   Dated:

3   *Attorneys for Plaintiffs*

4   By: _____

5

6   **LIEFF CABRASER HEIMANN
    & BERNSTEIN, LLP**
7   Michael W. Sobol, SBN 194857
    David T. Rudolph, SBN 233457
8   Melissa Gardner, SBN 289096
    Jacob H. Polin, SBN 311203
9   Nabila Abdallah, SBN 347764
    msobol@lchb.com
10  drudolph@lchb.com
    mgardner@lchb.com
11  jpolin@lchb.com
    nabdallah@lchb.com
12  275 Battery Street, 29th Floor
    San Francisco, CA 94111-3339
13  Telephone: 415.956.1000
    Facsimile: 415.956.1008
14

15  **CARNEY BATES & PULLIAM, PLLC**
16  Joseph Henry Bates, III, SBN 167688
    Allen Carney (admitted *pro hac vice*)
17  Courtney E. Ross (admitted *pro hac vice*)
    hbates@cbplaw.com
18  acarney@cbplaw.com
    cross@cbplaw.com
19  519 W. 7th St.
    Little Rock, AR, 72201
20  Telephone: 501.312.8500
    Facsimile: 501.312.8505
21

22

23

24

25

26

27

28

**STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION**
CASE NO. 3:23-CV-00083-SI-VKD

Dated:

*Attorneys for Defendant Meta Platforms, Inc.*

By: _____
　　　Lauren R. Goldman

**GIBSON, DUNN & CRUTCHER LLP**
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone:　(212) 351-4000
Facsimile:　(212) 351-4035

ELIZABETH K. MCCLOSKEY (SBN 268184)
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA (SBN 301746)
abarrera@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone:　(415) 393-8200
Facsimile:　(415) 393-8306

**COOLEY LLP**
MICHAEL G. RHODES (SBN 116127)
rhodesmg@cooley.com
KYLE C. WONG (SBN 224021)
kwong@cooley.com
CAROLINE A. LEBEL (SBN 340067)
clebel@cooley.com
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

**STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION**
CASE NO. 3:23-CV-00083-SI-VKD

1    **IT IS ORDERED** that the forgoing Agreement is approved.

2

3    Dated:

    _____
                UNITED STATES DISTRICT JUDGE

**STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION**
CASE NO. 3:23-CV-00083-SI-VKD

**APPENDIX 1: PRODUCTION FORMAT**

1.    **Production Components.**  Except as otherwise provided below, ESI shall be produced in accordance with the following specifications.

(a) an ASCII (or UTF8) delimited data file (.DAT) using standard delimiters;

(b) an image load file (.OPT) that can be loaded into commercially acceptable production software (*e.g.* Concordance or Relativity) that shall contain the following comma-delimited fields: BEGBATES, VOLUME, IMAGE FILE PATH, DOCUMENT BREAK, FOLDER BREAK, BOX BREAK, PAGE COUNT;

(c) TIFF images;

(d) native files; and

(e) document level .TXT files for all documents containing extracted full text or OCR text.

In addition:

(a) Parent-child relationships will be maintained in production.  Links within a document are not considered attachments.

(b) If a particular document warrants a different production format, the Parties will cooperate in good faith to arrange for a mutually acceptable production format.

2.    **Production Media and Access Controls.**  Documents shall be encrypted and produced through electronic means, such as secure file sharing methods (e.g. FTP), or on CD, DVD, flash drive or external hard drive ("Production Media").  Each piece of Production Media shall identify a production number corresponding to the production volume (e.g. "VOL001").  Each piece of Production Media shall also identify: (a) the case caption; (b) the following label: "This media contains material subject to Court Ordered security measures"; (c) the Producing Party's name; (d) the production date; and (e) the Bates Number range of the materials contained on the Production Media. Nothing in this Order

will preclude or impair any and all protections provided to any Party or Non-Party by any Protective Order(s) agreed and entered into by the Parties. Any data produced by the Producing Party must be protected in transit, in use, and at rest by all in receipt of such data. Parties will use best efforts to avoid the unnecessary copying or transmittal of produced documents. Any copies made of produced data must be kept on media or hardware employing whole-disk or folder level encryption or otherwise secured on information systems and networks in a manner consistent with the best practices for data protection. If questions arise, Parties will meet and confer to ensure security concerns are addressed prior to the exchange of any documents.

3. **Data Load Files/Image Load Files.** Each TIFF in a production must be referenced in the corresponding image load file. The total number of documents referenced in a production's data load file should match the total number of designated document breaks in the image load file(s) in the production. The total number of pages referenced in a production's image load file should match the total number of TIFF files in the production. All images must be assigned a unique Bates number that is sequential within a given document and across the production sets. The Bates Numbers in the image load file must match the corresponding documents' beginning Bates numbers in the data load file. The total number of documents in a production should match the total number of records in the data load file. Load files shall not vary in format or structure within a production, or from one production to another.

4. **Metadata Fields and Metadata File[2].** Each of the metadata and coding fields set forth below that can be extracted shall be produced for each document. A Producing Party is not obligated to populate or edit manually any of the fields below if such fields cannot be extracted from a document, with the exception of

---

[2] The Parties reserve the right to request that additional metadata fields are added as discovery progresses.

Gibson, Dunn &
Crutcher LLP

the following: (a) BEGBATES, (b) ENDBATES, (c) BEGATTACH, (d) ENDATTACH, (e) PRODVOL, (f) ALLCUSTODIAN(S), (g) CONFIDENTIALITY, (h) REDACTIONS, (i) NATIVEFILEPATH, (j) TEXTFILEPATH, and (k) HASHVALUE, which should be populated by the Producing Party or the Producing Party's vendor. The Producing Parties will make reasonable efforts to ensure that metadata fields automatically extracted from the documents correspond directly to the information that exists in the original documents. The metadata shall be delimited according to the following characters:

- Delimiter = ¶ (ASCII:020)
- Text-Qualifier = þ (ASCII:254)
- New Line = ® (ASCII:174)
- Multi-value delimiter = ; (ASCII Code 059)

**STIPULATED ORDER RE: DISCOVERY OF ELECTRONICALLY STORED INFORMATION**
CASE NO. 3:23-CV-00083-SI-VKD

| Field Name | Field Description |
|---|---|
| BEGBATES | Beginning Bates number as stamped on the production image |
| ENDBATES | Ending Bates number as stamped on the production image |
| BEGATTACH | First production Bates number of the first document in a family |
| ENDATTACH | Last production Bates number of the last document in a family |
| PRODVOL | Production volume |
| ALLCUSTODIAN(S) | Individual(s) from whom the document was obtained and de-duplicated out during global de-duplication |
| CONFIDENTIALITY | Confidentiality designation assigned to document |
| NATIVEFILEPATH | Native File Link (Native Files only) |
| TEXTFILEPATH | Path to extracted text/OCR file for document |
| HASHVALUE | MD5 hash value of document |
| ATTACHNAME | The file name(s) of the attachment(s) to a parent document(s). Separated by a semicolon. |
| AUTHOR | Any value populated in the Author field of the document properties |
| DOCDATE | Date the document was created (format: MM/DD/YYYY) |
| DATEMODIFIED | Date when document was last modified according to filesystem information (format: MM/DD/YYYY) |
| FILENAME | Original file name |
| FILEPATH | Original path to the individual source file.  Includes path up to and including internal path of containers |
| TITLE | Any value populated in the Title field of the document properties |
| DOCEXT | File extension of document pulled from the document properties |
| EMAIL SUBJECT | Subject line of email pulled from the document properties |
| FROM | The sender of the email |
| TO | All recipients that were included on the "To" line of the email |
| CC | All recipients that were included on the "CC" line of the email |
| BCC | All recipients that were included on the "BCC" line of the email |
| DATETIMERECEIVED | Date and time email was received (format: MM/DD/YYYY HH:MM SS) |
| DATETIMESENT | Date and time email was sent (format: MM/DD/YYYY HH:MM SS) |

| Field Name | Field Description |
|---|---|
| REDACTIONS | Indicate Yes/No if document is redacted |
| MESSAGE ID | The Unique Identifier assigned by a program to a Message/Communication |
| PAGE COUNT | The number of pages of the Document, excluding the pages of documents in the same family |

5.   **Processing.**  With the exception of time zone modification (discussed below), ESI items shall be processed in a manner that preserves the source native file and all of the above-referenced metadata without modification. ESI items shall be produced with all of the metadata and coding fields set forth above.

(a) Time Zone. ESI items shall be processed so as to preserve and display the date/time shown in the document.  ESI items shall be processed to reflect the date and time standardized to a single time zone for all productions by a Producing Party, that time zone shall be Pacific Standard Time (PST), and shall be consistent across each Producing Party's productions.  Such standardization affects only metadata values and does not affect, among other things, dates and times that are hardcoded text within a file.  Dates and times that are hard-coded text within a file (for example, in an e-mail thread, dates and times of earlier messages that were converted to body text when subsequently replied to or forwarded; and in any file type, dates and times that are typed as such by users) will be produced in accordance with the formats set forth in this Protocol.

(b) Hidden Content.  ESI items shall be processed in a manner that is designed to preserve hidden columns or rows, hidden text or worksheets, speaker notes, tracked changes, comments, and other rich data (including, but not limited to strikethrough text, etc.) as displayed in the document to the extent it is reasonably and technically feasible.

(c) TIFFs.  Unless excepted below, single page Group IV TIFFs should be provided, with at least 300 dots per inch (dpi) for all documents.  Each TIFF image shall

be named according to a unique corresponding Bates number associated with the respective page of a document. Each image shall be branded with the Bates number and the agreed upon confidentiality designation. Original document orientation should be maintained (i.e., portrait to portrait and landscape to landscape). All images will display all data visible in its native application, to the extent it is reasonably and technically feasible. Where the TIFF image is unreadable or has materially degraded the quality of the original, the Producing Party shall provide a higher-quality TIFF image or the native or original file. TIFFs shall show all text and images that would be visible to a user of the hard copy documents.

6. **Hard Copy Documents.** Documents that exist only in hard copy format shall be scanned and produced as TIFFs. Unless excepted below, documents that exist as ESI shall be converted and produced as TIFFs. Hard copy documents shall be produced with an accompanying metadata load file as forth above in Appendix 1, Paragraph 4, with the exception of NATIVEFILEPATH and HASHVALUE which would not exist for hard copy documents.

(a) <u>Unitization of Paper Documents</u>: Paper documents, to the extent collected and/or produced, should be logically unitized for production. Therefore, when scanning paper documents for production, documents should be scanned as they are kept in the regular course of business including maintaining any groupings, distinct documents shall not be merged into a single file or database record, and distinct documents shall not be split into multiple files or database records. Producing Parties will make reasonable efforts to unitize documents as they are kept in the regular course of business.

(b) <u>File/Binder Structures (Parent-Child Unitization)</u>: Where multiple documents were organized into groups, such as folders, clipped bundles and binders, each distinct document shall be unitized as described in subsection (a) above, but maintained together in a parent-child relationship as specified in paragraph

Gibson, Dunn & Crutcher LLP

1(a).  The parties will make their best efforts to unitize parent-child groups correctly.

**(c)** <u>Identification</u>: Where a document or a document group – such as folder, clipped bundle, or binder – has an identification spine, "Post-It Note" or any other label, the information on the label shall be scanned and produced as the first page of the document or grouping.

7.  **Color.**  Native documents in color will be produced in color.  For non-native documents, the Parties may request color copies of a reasonable number of documents where color will aid in the interpretation of the document, provided that such request is made in good faith and does not impose an undue burden on the Producing Party.

8.  **Text Files.**  A single multi-page text file shall be provided for each document, and the filename should match its respective BEGBATES filename.  When possible, the text of native files should be extracted directly from the native file.  Text files will not contain the redacted portions of the documents and OCR text files will be substituted instead of extracted text files for redacted documents.  A commercially acceptable technology for optical character recognition "OCR" shall be used for all scanned, hard copy documents and for documents with redactions.

9.  **Native files.**

**(a)** All spreadsheet (e.g., Microsoft Excel) and presentation (e.g. Microsoft PowerPoint) files shall be produced as native files with TIFF placeholder images.  Spreadsheet files requiring redaction, including Microsoft Excel files, will be redacted within the native file, and the redacted native file will be produced as provided herein.  Presentation files requiring redaction, including Microsoft PowerPoint files, will be produced as TIFF images with redactions, and for presentations with speakers notes, Producing Parties shall take reasonable efforts to show both the slide and speakers' notes for that slide on a

-18-

Gibson, Dunn & Crutcher LLP

single TIFF image.  To the extent that they are produced in this action, audio, video, and multi-media files will be produced in native format.

**(b)** Native files will be produced with a link in the NATIVEFILEPATH field, along with extracted text (where extracted text is available) and applicable metadata fields set forth in paragraph 4 above.  A Bates numbered TIFF placeholder indicating that the document was provided in native format must accompany every native file.

**(c)** To the extent other types of documents are produced in this litigation, the parties will meet-and-confer regarding whether production of those documents in native format is feasible and appropriate.

10. **Confidentiality Designation.**  Documents produced in TIFF format will be stamped with the appropriate confidentiality designations in accordance with the Protective Order entered in this matter.  Each document produced in native format will have its confidentiality designation identified in the filename of the native file and indicated on its corresponding TIFF placeholder.

11. **Databases and Other Structured Data.**

**(a)** The Parties agree to meet and confer regarding the production format for data contained in databases or other structured data types, to ensure that any information produced is reasonably usable by the Receiving Party and that its production does not impose an undue burden on the Producing Party.

**(b)** To the extent a Producing Party is constrained from producing responsive ESI because of a third-party license or because software necessary to view the ESI is hardware-dependent, the Parties shall meet and confer to reach an agreement on alternative methods to enable the Receiving Party to view the ESI.

12. **Proprietary Files.**  To the extent a response to discovery requires production of ESI accessible only through proprietary software, the parties shall meet and confer regarding the appropriate production format.

13.   **Manner of Production.**  All productions must be made by secure file transfer to agreed-upon email addresses.  In the event the Producing Party deems it is not practical to upload a voluminous production (e.g., a production exceeding 20GB) to a secure file transfer site, it shall be sent to the Receiving Party by overnight mail on external hard drives, readily accessible computer(s) or other electronic media ("Production Media").  Each production shall be accompanied by a cover letter that identifies: (1) the Producing Party's name; (2) the production date; and (3) the Bates Number range of the materials contained on the Production Media.