GIBSON, DUNN & CRUTCHER LLP
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035

ELIZABETH K. MCCLOSKEY, SBN 268184
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
abarrera@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone:    (415) 393-8200
Facsimile:    (415) 393-8306

ANDREW M. KASABIAN, SBN 313210
akasabian@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:    (213) 229-7311
Facsimile:    (213) 229-6311

COOLEY LLP
MICHAEL G. RHODES (SBN 116127)
rhodesmg@cooley.com
KYLE C. WONG (SBN 224021)
kwong@cooley.com
CAROLINE A. LEBEL (SBN 340067)
clebel@cooley.com
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

*Attorneys for Defendant Meta Platforms, Inc.*
*(formerly known as Facebook, Inc.)*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| MIKHAIL GERSHZON, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No. 3:23-cv-00083-SI<br><br>**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT**<br><br>Action Filed: January 6, 2023<br><br>Date: June 9, 2023<br>Time: 10:00 AM<br>Courtroom: 1<br>Before: Hon. Susan Illston |

**TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................................... 1

II. ARGUMENT................................................................................................................ 1

    A.    Plaintiff Fails to State a Claim Under the Driver's Privacy Protection Act. ............... 1

        1.    None of the Information Sent to Meta "Identifies" Plaintiff as "An Individual." ......................................................................................................... 1

        2.    The Data Allegedly Sent To Meta Did Not Come "From a Motor Vehicle Record." ............................................................................................... 6

        3.    The DPPA Expressly Permits the Use of Plaintiff's Information. .................. 7

        4.    Meta Did Not "Knowingly" Receive Any Protected Information. .................. 9

    B.    Plaintiff Fails to State a Wiretapping Claim Under CIPA. ........................................ 11

        1.    Plaintiff Has Not Plausibly Alleged Scienter. ............................................... 11

        2.    Plaintiff Consented to Meta's Receipt of Information. ................................ 12

        3.    Plaintiff Has Not Alleged the DMV Sent Meta The "Contents" of Any Communication. ........................................................................................... 14

    C.    Plaintiff Cannot Bring Claims Outside the Applicable Limitations Period. .............. 15

III. CONCLUSION............................................................................................................ 15

DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS
CASE NO. 3:23-CV-00083-SI

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. Sirius XM Radio Inc.*,
   932 F.3d 1253 (9th Cir. 2019) ................................................................... 6, 7

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................. 3, 9

*BBL, Inc. v. City of Angola*,
   809 F.3d 317 (7th Cir. 2015) ...................................................................... 15

*Dahlstrom v. Sun-Times Media, LLC*,
   777 F.3d 937 (7th Cir. 2015) ....................................................................... 4

*Dancel v. Groupon, Inc.*,
   949 F.3d 999 (7th Cir. 2019) ................................................................... 2, 3

*Downing v. Globe Direct LLC*,
   682 F.3d 18 (1st Cir. 2012) ........................................................................ 8

*F.B.T. Prods., LLC v. Aftermath Records*,
   621 F.3d 958 (9th Cir. 2010) ..................................................................... 13

*In re Facebook Biometric Info. Privacy Litig.*,
   185 F. Supp. 3d 1155 (N.D. Cal. 2016)................................................... 12, 13

*In re Facebook, Inc. Internet Tracking Litigation*,
   956 F.3d 589 (9th Cir. 2020) ..................................................................... 14

*Flores-Figueroa v. United States*,
   556 U.S. 646 (2009).............................................................................. 10

*Garey v. James S. Farrin, P.C.*,
   35 F.4th 917 (4th Cir. 2022) ................................................................... 6, 7

*Hammerling v. Google LLC*,
   615 F. Supp. 3d 1069 (N.D. Cal. 2022)........................................................ 15

*Howard v. Criminal Info. Servs., Inc.*,
   654 F.3d 887 (9th Cir. 2011) ................................................................. 8, 11

*Lake v. Neal*,
   585 F.3d 1059 (7th Cir. 2009) ..................................................................... 7

*Los Angeles Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*,
   506 F. Supp. 3d 1018 (C.D. Cal. 2020)........................................................ 15

*People v. Buchanan*,
   26 Cal. App. 3d 274 (1972) ....................................................................... 11

*Pichler v. UNITE*,
   542 F.3d 380 (3d Cir. 2008) ............................................................... 5, 8, 14

*Rehaif v. United States*,
    139 S. Ct. 2191 (2019) ........................................................................ 10

*Rios v. Direct Mail Express, Inc.*,
    435 F. Supp. 2d 1199 (S.D. Fla. 2006) ............................................... 10

*Ruan v. United States*,
    142 S. Ct. 2370 (2022) ........................................................................ 10

*Smith v. Facebook, Inc.*,
    745 F. App'x 8 (9th Cir. 2018) ........................................................... 13

*In re Uber Techs., Inc.*,
    2019 WL 6317770 (C.D. Cal. Aug. 19, 2019) .................................... 13

*United States v. Hastie*,
    854 F.3d 1298 (11th Cir. 2017) ..................................................... 2, 3, 4

*Wilcox v. Swapp*,
    330 F.R.D. 584 (E.D. Wash. 2019) .................................................... 10

*Wiles v. Worldwide Info., Inc.*,
    809 F. Supp. 2d 1059 (W.D. Mo. 2011) ............................................. 10

*Yates v. United States*,
    2020 WL 2615011 (N.D. Cal. May 22, 2020) .................................... 12

*In re Zynga Privacy Litig.*,
    750 F.3d 1098 (9th Cir. 2014) ....................................................... 14, 15

**Statutes**

18 U.S.C. § 1028A(a)(1) .............................................................................. 10

18 U.S.C. § 2721(b) .................................................................................... 8, 9

18 U.S.C. § 2721(b)(13) ............................................................................. 8, 9

18 U.S.C. § 2724(a) ............................................................................. 1, 6, 7, 9

18 U.S.C. § 2725(1) ...................................................................................... 6, 7

18 U.S.C. § 2725(3) ........................................................................... 1, 2, 3, 4, 5

Cal. Penal Code § 7(1) ............................................................................... 11, 12

Cal. Penal Code § 631(a) ........................................................................... 11, 12

Cal. Penal Code § 637.2 .................................................................................. 14

Cal. Veh. Code §§ 1656.5 ................................................................................. 9

Cal. Veh. Code § 1808.5 ................................................................................... 4

Cal. Veh. Code § 22511.5 .............................................................................. 5, 7

Cal. Veh. Code § 22511.55 ................................................................................................ 7

**Other Authorities**

Cal. DMV, *Disabled Person Parking Placard Application Form*,
    https://www.dmv.ca.gov/portal/dmv-virtual-office/dpp-application/dpp-
    application-form/ (accessed May 19, 2023) ................................................................. 5

Merriam-Webster's Collegiate Dictionary (11th ed. 2004) ............................................. 7

**Rules**

Cal. Rules of Court, rule 8.401(a)(1) .............................................................................. 3

# I. INTRODUCTION

Plaintiff's complaint fails to state a claim under the Driver's Privacy Protection Act (DPPA) or the California Invasion of Privacy Act (CIPA), and his opposition brief confirms it. Plaintiff barely tries to show how his allegations satisfy the requirements for bringing these claims. Instead, he tries to water those requirements down. On the DPPA, plaintiff's theory would stretch the concept of "personal information" far beyond where any court has gone; rewrite the statutory term "from a motor vehicle record" to mean "from the DMV"; disregard the DPPA's long list of "permissible uses" of data; and adopt a crabbed reading of "knowingly" at odds with basic interpretive principles. Plaintiff's CIPA argument is likewise an attempt to distract from his failure to plead essential elements of the claim— for scienter he says "willfulness" is the standard but never explains how he pled that Meta had *any* level of awareness that it was receiving protected information without his consent; he disregards the clear disclosures in Meta's policies; and in response to Meta's argument that it did not receive the "contents" of a communication between plaintiff and the DMV, he points to *hypothetical* communications from *other* possible DMV website visitors but fails to explain how his own communications could qualify.

Each of these deficiencies is independently fatal to plaintiff's claims. This Court should dismiss his complaint with prejudice.

# II. ARGUMENT

## A. Plaintiff Fails to State a Claim Under the Driver's Privacy Protection Act.

Plaintiff's proposed interpretation of the DPPA would broaden the statutory scheme beyond recognition, placing a far heavier burden on state DMVs than Congress actually imposed. The DPPA does not prohibit state DMVs from sharing any and all driver information. Instead, it protects *personal information* (a defined term) that comes *from a motor vehicle record* (another defined term) from being put to a *use* not authorized by the statute—and it imposes liability on private parties only if they transgress these limitations *knowingly*. Plaintiff does not plausibly allege any of these elements.

### 1. None of the Information Sent to Meta "Identifies" Plaintiff as "An Individual."

The DPPA's protections are limited to "personal information," which is defined to mean "information that identifies an individual." 18 U.S.C. §§ 2724(a), 2725(3). None of the information

plaintiff alleges the DMV sent to Meta about him—his email address, first name, or the fact that he accessed an application for a disabled-person parking placard—does that. Mot. 8–10.

***Email address.*** Plaintiff says his "email address" qualifies. Opp. 7. He never alleges what his email address *is*, so his argument depends on his contention that *all* email addresses are "categorically protected" without reference to their "contents." *Id.* But whether an email address "identifies an individual," 18 U.S.C. § 2725(3), depends on its "contents": even if johnpavlowski123@aol.com *might* qualify, momof2@gmail.com would not, because the latter does not identify anyone. Mot. 9.

Plaintiff correctly notes that email addresses "*may* contain identifiers like a person's actual name, birth year, or work affiliation," and sometimes "*can* be used to locate other identifying information." Opp. 8 (emphases added). But that simply shows *some* email addresses *may* identify an individual, not that *all* categorically do. And for the ones that do, it is because they reveal some *other* information (full name, workplace, or the like) that is actually doing the identifying.

Plaintiff's leading case, the Eleventh Circuit's decision in *United States v. Hastie*, 854 F.3d 1298 (11th Cir. 2017), says exactly that. The court reasoned that because email addresses "often" reveal "the account holder's name, affiliated organization, or other identifying information," they can qualify as personal information "*so long as the moniker identifies an individual.*" *Id.* at 1303 (emphasis added); *see also id.* at 1305 ("perhaps not *all* email addresses are personal information") (quotation marks and citation omitted). As the Seventh Circuit later explained, *Hastie* "did not hold that email addresses categorically identify an individual, only that they *often* did, and they often did so only because of their content, not their inherent nature as email addresses." *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1008 (7th Cir. 2019). In line with that analysis, *Dancel* held that assessing whether online usernames "identify [an] individual" would require individualized analysis of each "username's content." *Id.* at 1008–09.

Plaintiff tries to distinguish *Dancel* on the ground that it addressed class certification issues under a state statute. Opp. 8. That is true, but irrelevant: the state-law standard paralleled the DPPA's definition of "personal information," and the basis for rejecting class certification was that usernames have to be analyzed individually—not categorically—to determine whether they meet that standard. *Dancel*, 949 F.3d at 1008–09. And the court was specifically construing *Hastie*. Plaintiff next asserts

that "it would mischaracterize *Dancel* and *Hastie* to argue that this reference means email addresses can only 'qualify' for the DPPA's protection based upon their contents." Opp. 8 (emphasis omitted). But that is *precisely* how *Dancel* read *Hastie*—and if *Hastie* had adopted the categorical rule plaintiff advances, it would be inconsistent with the DPPA. Mot. 9; *supra* 2. Retreating, plaintiff says his allegations are enough "at the pleadings stage" because whether his (undisclosed) email address qualifies as personal information "would only raise fact questions." Opp. 8. But a plaintiff must do more than "plea[d] facts that are merely consistent with a defendant's liability." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). Because liability turns on the specific "content" of plaintiff's email address, *Dancel*, 949 F.3d at 1009, plaintiff's failure to allege that the email address the DMV allegedly shared included any of his identifying information requires dismissal.

     ***First name.*** Plaintiff also says his "first name," standing alone, qualifies as "personal information." Opp. 6–7. That is absurd; a person's first name cannot "identif[y] an individual." 18 U.S.C. § 2725(3); Mot. 9. That is why California's Rules of Court require the use of a first name (and last initial) "[t]o protect the *anonymity* of juveniles involved in juvenile court proceedings." Cal. Rules of Court, rule 8.401(a)(1) (emphasis added). It is also why even local phone directories and high school yearbooks do not rely solely on a first name to identify the people in them. Statutory context confirms this: just as the DPPA says that personal information includes a full "address" but *not* a "zip code," it includes a person's full "name" but not their first name alone. 18 U.S.C. § 2725(3). In a database as vast as the California DMV's, a first name—like a zip code—does not "identif[y] an individual." *Id.*

     Plaintiff says this commonsense conclusion "ignores the holdings of two Circuit Courts." Opp. 7. It does not. As discussed above, *Hastie* held that *some email addresses* can qualify as "personal information." 854 F.3d at 1303. The court reasoned that "[w]ith a simple search engine or a service like Spokeo, an email address can also be used to find personal information such as a corresponding username or physical address." *Id.* That reasoning *undermines* plaintiff's argument that his first name is "personal information": typing "Mikhail" into a search engine will not identify the plaintiff in this suit. *Hastie* also relied on "the material similarity between email addresses and the examples in the statute" because "[e]mail addresses are much like an online version of a physical address or a telephone number: they serve both as a way to find an individual in an online space and as a way to contact a

person." *Id.* First names are more like zip codes (which are *not* "personal information") than a full address (which is): a first name is not a means to find or contact somebody. Nor does plaintiff's interpretation find support in *Hastie*'s observation that "the ratio" between a piece of information and a particular individual "does not need to be 1:1." *Id.* at 1304. The problem is not that a first name (like a phone number or address) fails to narrow the pool to a class of *one*, but rather that a first name (like a zip code) leaves a pool so vast that it cannot "identif[y] an individual" *at all*. 18 U.S.C. § 2725(3).

Plaintiff next cites *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937 (7th Cir. 2015). But *Dahlstrom* specifically *disclaimed* any holding about names. *See id.* at 940 & n.2, 941. The court held that details about police officers' "age, height, weight, hair color, [and] eye color" were personal information under the DPPA because they "relate[] to the Officers' physical appearance and, therefore, indisputably aid[] in 'identif[ying]' them." *Id.* at 943. But a physical description is a classic means of identifying a person—which is why "WANTED" posters most prominently provide a photo or sketch of a suspect rather than a first name. Plaintiff does not allege anything like that was sent to Meta. And his suggestion that anything can qualify as "personal information" if it "mak[es] identification 'easier'" or "would be useful to marketers," Opp. 7, stretches abstract notions of statutory purpose far beyond the statutory text, which expressly excludes other information that could make identification easier or be useful to marketers (like zip codes, vehicular accidents, and driving violations).

**Disability information.** Finally, plaintiff says the DMV sent Meta his "disability information." Opp. 9. But the complaint does not allege the DMV sent Meta *any information about his disability*. It alleges only that he "click[ed] on the 'Start DP Application' button" to get the online application form for a disabled-person parking placard and later clicked on a link to "check the status of his application." Compl. ¶¶ 41, 46–47, 62; *see also id.* ¶¶ 44, 62. That is not "disability *information*"—*i.e.*, information about the nature of a specific person's specific disability—or any "information that identifies an individual." 18 U.S.C. § 2725(3) (emphasis added); *see* Mot. 9–10.

Implicitly conceding the point, plaintiff backtracks and suggests that any "[i]nformation that so much as 'relates to' [disability] status is protected." Opp. 10. That contention is doubly flawed.

*Relates to.* The phrase "relates to" comes from a *different statute* protecting anything "relating to" physical or mental condition. Opp. 9–10 (quoting Cal. Veh. Code § 1808.5). That language is

absent from the DPPA, which protects only certain "information that identifies an individual, including . . . medical or disability information." 18 U.S.C. § 2725(3). The DPPA also includes "medical or disability information" in its separate list of "*highly restricted* personal information," *id.* § 2725(4) (emphasis added)—which clearly contemplates something more sensitive and personally identifying than the fact that someone clicked on an application form for a parking placard (which, if granted, would be publicly displayed in a person's vehicle, *see* Cal. Veh. Code § 22511.5).

*Status.* Plaintiff's focus on his alleged "disability status" *undermines* his claim, because the DPPA's definition of personal information expressly *excludes* a "driver's status." 18 U.S.C. § 2725(3). Plaintiff suggests this exclusion applies only to "status as a licensed driver," Opp. 9–10, but he does not explain why a "driver's status" does not encompass one's status as a driver with a disability.[1] But ultimately this does not matter, because plaintiff does not allege Meta *learned* anything about his disability status: plaintiff never alleges Meta learned whether his application was granted, rejected, or even processed. The fact that he clicked on a "start application" button and later checked on the status of his application could not have informed Meta whether he was disabled. Indeed, the application itself provides instructions for people who "are submitting this application *on behalf of someone else*." Cal. DMV, *Disabled Person Parking Placard Application Form*, https://www.dmv.ca.gov/portal/dmv-virtual-office/dpp-application/dpp-application-form/ (accessed May 19, 2023) (emphasis added).

**"Other information."** Plaintiff also claims the DMV sends Meta "other information," including "information concerning users' interests, phone and address status, health and disability status, immigration status, and concerns." Opp. 10. But plaintiff never alleges the DMV sent Meta this "other information" *about him*. *See* Compl. ¶¶ 61–63. Plaintiff cannot base his claim on information allegedly collected about other people—even if that information qualified as "personal information," which much of it does not. *Pichler v. UNITE*, 542 F.3d 380, 391–92 (3d Cir. 2008).

Plaintiff lastly argues that "browser and user identifiers" and "IP addresses" fall within the statute, and that "Meta's cookies and unique Facebook-account associated c_user ID . . . are 'key data'

---

[1] The legislative history plaintiff cites states only that the statutory exclusion for "driver's status" *encompasses* "information about an individual's driving record," Opp. 10 (emphasis omitted) (quoting floor statements from Senator Boxer); it does not say that "driver's status" is limited to such information or suggest that "driver's status" does *not* encompass one's status as a driver with a disability.

that allow Meta to unlock other personal information." Opp. 11. That argument fails because none of the data plaintiff describes comes "from a motor vehicle record." *See infra* 6–7.

### 2. The Data Allegedly Sent To Meta Did Not Come "From a Motor Vehicle Record."

Plaintiff's DPPA claim fails for a second, independent reason. Even if he alleged Meta received his "personal information" (but see *supra* 1–5), his claim would fail unless that "personal information" came "from a motor vehicle record," a defined term limited to "record[s] that pertain[] to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. §§ 2724(a), 2725(1). Nothing in the complaint connects the information the DMV allegedly sent to Meta about plaintiff to any such record. Mot. 10–12.

At the outset, plaintiff fails to allege that the information Meta allegedly received about him came "from" any "record" at all. A "record" is something that is "maintained by an agency." *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1260 (9th Cir. 2019) (quotation marks and emphasis omitted). Plaintiff says the DMV "maintained [his] name, email address, and disability information in the DMV database *after [he] disclosed it.*" Opp. 12 (emphasis added). But the complaint alleges the DMV sent Meta information about his activity on the DMV website "simultaneously" with the activity itself. Compl. ¶¶ 41–42. That timeline gives plaintiff a chronology problem: Meta could not have received any information "from" any record because the record would not yet have existed when Meta allegedly received the information. *Cf. Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 927 (4th Cir. 2022) ("[R]egardless of whether a given DMV database is or contains 'motor vehicle record[s],' the Defendants here did not 'obtain' any information 'from' such a database.").[2]

Further, plaintiff fails to allege that the information the DMV shared with Meta came from a "*motor vehicle* record," which is limited to records that "pertain[] to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. § 2725(1). Plaintiff argues it is enough that his information came "from the

---

[2] That is true regardless of whether some information—*e.g.*, plaintiff's first name—had previously been stored in the DMV's database, because plaintiff's own allegations demonstrate that each piece of information Meta received came "from" the GET and POST requests generated during plaintiff's activity on the DMV website, not from any preexisting database records. *See* Mot. 11.

DMV." Opp. 12. That is plainly wrong. Not all information "from the DMV"—and *none* of the information plaintiff alleges the DMV sent Meta *about him*—comes from permit, title, registration, or identification-card records. *Compare, e.g.*, *Lake v. Neal*, 585 F.3d 1059, 1061 (7th Cir. 2009) (voter registration form filled out at DMV is not a "motor vehicle record"), *with* Opp. 12 (arguing only that plaintiff's information was "pulled from the *DMV's* records") (emphasis in original).

Plaintiff's discussion of the caselaw, Opp. 11–12, misses the point. He tries to distinguish cases rejecting DPPA claims where information came "from" a source other than the DMV, saying there is no problem here because "his personal information came from the DMV directly." Opp. 12; *see Garey*, 35 F.4th at 927 (information came from "accident reports"); *Andrews*, 932 F.3d at 1259 (information came from "driver's license in the possession of its owner"). That argument confuses a necessary condition for a sufficient one. Yes, information must come *from the DMV*, but that alone is not enough. The information must also come *from a motor vehicle record*. 18 U.S.C. § 2724(a).

Hedging, plaintiff asserts that "the fact that [he] applied for a [disabled-person parking] placard 'pertains to' his motor vehicle operator's permit, and at a minimum, it 'relates to' his disability." Opp. 14. But the fact that someone applied for a disabled-person parking placard does not "pertain[] to" that person's motor vehicle operator's permit. "'[P]ertains' means 'to belong as a part, member, accessory, or product.'" *Lake*, 585 F.3d at 1061 (quoting Merriam-Webster's Collegiate Dictionary (11th ed. 2004)). A disabled-person parking placard—much less the mere fact of applying for one—is not a "part, member, accessory, or product" of a motor vehicle operator's permit; it concerns where a person "is allowed to *park*," not their driver's license or authorization to *drive*. Cal. Veh. Code § 22511.5 (emphasis added). It is also "filled out separately and at the applicant's option," rather than as part of a driver's license application. *Lake*, 585 F.3d at 1061 (voting registration form did not "'pertain' to" operator's permit); *see* Cal. Veh. Code § 22511.55 (separate procedures to apply for a disabled-person parking placard). And even if such information "relates to" a person's disability, that does not mean it comes "from a motor vehicle record," because not all information that "relates to" a person's disability gets incorporated into their driver's license, car title, registration, or ID card. 18 U.S.C. § 2725(1).

### 3. The DPPA Expressly Permits the Use of Plaintiff's Information.

The DPPA sets out 14 "[p]ermissible uses" for which protected information "may be disclosed"

by a state DMV to third parties. 18 U.S.C. § 2721(b). Three are relevant here: "carrying out [the DMV's] functions," *i.e.*, improving its online services for users, *id.* § 2721(b)(1); conducting "motor vehicle market research activities," *id.* § 2721(b)(2); and acting pursuant to "written consent of the individual to whom the information pertains," *id.* § 2721(b)(13). Mot. 12–14. Plaintiff asserts there are "four reasons" that these permissible uses are inapplicable, Opp. 16; all four are meritless.[3]

*First*, plaintiff says there was no "permissible purpose *at the time* information [was] obtained," evidently suggesting Meta can be liable even if the DMV ultimately used the information for a permissible purpose. Opp. 16. That makes no sense in light of the Pixel's purpose and the DMV's disclosures: the Pixel is a common Internet analytics tool used to improve developers' online services, *see* Compl. ¶ 16, and the DMV uses it to "provide statistical analysis for the improvement of the content and quality of [its] web services and applications." Meta RJN Ex. 6 at 2. That purpose existed at all relevant times, and it places this case firmly within the permissible uses of "carrying out [the DMV's] functions" and conducting "motor vehicle market research activities." 18 U.S.C. § 2721(b)(1), (2).[4]

*Second*, plaintiff says any information disclosed by the DMV must be "used for the identified purpose," and claims "the full volume of data" sent here does not "match any DPPA exception or purpose." Opp. 16–17 (quotation marks omitted). But plaintiff never identifies the data he thinks was not used to "provide statistical analysis" or "for the improvement of the content and quality of [the DMV's] web services and applications," Meta RJN Ex. 6 at 2—the entire reason for the Pixel's existence and the reason the DMV uses it.

*Third*, plaintiff suggests that because "California has strict protocols" regulating "the DMV's data," it is "implausible" that Meta "was an agent or researcher" that was engaged in market research

---

[3] Plaintiff also says Meta is liable *even if his information was used for a permissible purpose*, because Meta allegedly *also* used the information for an impermissible advertising purpose. Opp. 15–16. That is not the law; plaintiff's leading case was expressly distinguished in a case where, as here, "the advertising function is inextricably linked to the proper government functions." *Downing v. Globe Direct LLC*, 682 F.3d 18, 24 (1st Cir. 2012) (distinguishing *Pichler*, 542 F.3d at 396, and collecting cases). "[T]he integration of the advertising into the structure of the program renders that advertising a part of the government function exempted from the statute's reach under subsection (b)(1)." *Id.*

[4] To the extent plaintiff asserts the DPPA prohibits collecting information for *future* use, that is plainly wrong. *See Howard v. Criminal Info. Servs., Inc.*, 654 F.3d 887, 891 (9th Cir. 2011) ("stockpiling information for a permitted use does not constitute a violation under the DPPA").

or assisting the DMV with carrying out its functions. Opp. 17. But to support his "strict protocols" argument, plaintiff cites statutes that address wholly irrelevant types of contracts between the DMV and third parties. *See* Cal. Veh. Code §§ 1656.5 (authorizing the DMV to enter into contracts for vendors to supply "message display systems"), 1810.2 (authorizing the DMV to "establish commercial requester accounts"). Meta is not claiming that it had a contract to provide message display systems or a commercial requester account; rather, the point is that the DMV chose to use the Pixel as part of *the DMV's own* efforts to "provide statistical analysis for the improvement of the content and quality of [its] web services and applications." Meta RJN Ex. 6 at 2. And unlike the state laws plaintiff cites, the DMV's use here answers the question the DPPA asks: whether the information allegedly sent to Meta was used "in carrying out [the DMV's] functions" or for "motor vehicle market research activities." 18 U.S.C. § 2721(b)(1), (2). The uses here—improving the DMV's website through statistical analysis, Meta RJN Ex. 6 at 2—are squarely within those permissible uses. Mot. at 13–14.

*Fourth*, plaintiff claims the "written consent" permissible use is inapplicable because "Meta's Policies do not 'demonstrate[] . . . written consent.'" Opp. 18 (quoting 18 U.S.C. § 2721(b)(13)). That argument is meritless. As a Facebook user, plaintiff agreed to Meta's Privacy Policy, which stated that Meta would "receive information using cookies and similar technologies, like the Meta Pixel . . . when you visit other websites," "whether or not [plaintiff was] logged in" to Facebook. Meta RJN Ex. 2 at 7–8; *see* Mot. 14. Those disclosures and others like them in Meta's policies plainly "demonstrate[] . . . written consent" for the DMV to disclose plaintiff's information to Meta. 18 U.S.C. § 2721(b)(13).[5]

### 4.    Meta Did Not "Knowingly" Receive Any Protected Information.

The DPPA imposes liability only if a defendant violates it "knowingly." 18 U.S.C. § 2724(a). Plaintiff's allegations do not satisfy that requirement, because his complaint fails to plausibly allege Meta knew the DMV was sending it "personal information"—much less (1) personal information (2) "from a motor vehicle record" (3) being used for an impermissible purpose. Mot. 14–16.

Plaintiff says he only needs to allege Meta knowingly *obtained* his information, not that Meta

---

[5] Plaintiff also tries to recast his pleading failures as fact questions for a jury. Opp. 18. But here again, it is plaintiff's burden to plead facts that are more than "merely consistent with a defendant's liability." *Iqbal*, 556 U.S. at 678 (quotation marks omitted). He has not cleared that bar.

knew it was receiving information in violation of the statute. Opp. 19. But the statutory term "knowingly" requires knowledge that the defendant's conduct satisfied all elements of the offense. In *Flores-Figueroa v. United States*, 556 U.S. 646 (2009), the Supreme Court interpreted a statute punishing any person who "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person." *Id.* at 647 (quoting 18 U.S.C. § 1028A(a)(1) (emphasis omitted)). The Court rejected the government's argument that "knowingly" required only a knowing transfer, possession, or use, and not knowledge that the "means of identification" belonged to "another person":

> As a matter of ordinary English grammar, it seems natural to read the statute's word "knowingly" as applying to all the subsequently listed elements of the crime. The Government cannot easily claim that the word "knowingly" applies only to the statute's first four words, or even its first seven. It makes little sense to read the provision's language as heavily penalizing a person who "transfers, possesses, or uses, without lawful authority" a *something*, but does not know, at the very least, that the "something" (perhaps inside a box) is a "means of identification." Would we apply a statute that makes it unlawful "*knowingly* to possess drugs" to a person who steals a passenger's bag without knowing that the bag has drugs inside?

*Id.* at 650. So too here: as a matter of grammar, it "makes little sense" to read the DPPA to penalize Meta for obtaining "a *something*" if Meta "does not know, at the very least, that the 'something'" is information the DPPA actually protects—*i.e.*, personal information, from a motor vehicle record, used for an improper purpose. *Id.*; *see also, e.g.*, *Ruan v. United States*, 142 S. Ct. 2370, 2376 (2022) ("knowingly" applies to "except as authorized" clause); *Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019) (courts "normally read the statutory term 'knowingly' as applying to all the subsequently listed elements of the crime") (some quotation marks omitted).[6]

---

[6] Plaintiff cites a case from the Eastern District of Washington in support of his argument, but even that case does not venture as far as plaintiff hopes. There, the court held that "knowingly" did not apply to the requirement that information "came from a motor vehicle record." *Wilcox v. Swapp*, 330 F.R.D. 584, 594 (E.D. Wash. 2019). But "knowingly" still applied to "the first element of the statute," which includes the "personal information" requirement. *See id.* at 594–95 (describing "the first element" as whether a person "obtains, discloses or uses personal information") (quotation marks omitted). So even under that court's reading, a defendant would need to know that it was obtaining "personal information"—something plaintiff has not shown. *See id.* The cases the court cited in support of its analysis are similar. *See Wiles v. Worldwide Info., Inc.*, 809 F. Supp. 2d 1059, 1080 (W.D. Mo. 2011) (rejecting scienter requirement for "whether the purpose was permissible"); *Rios v. Direct Mail Express, Inc.*, 435 F. Supp. 2d 1199, 1205 (S.D. Fla. 2006) (same, and stating that "knowingly" "modifies the phrase 'obtains, discloses, or uses personal information'"). Tellingly, when plaintiff quotes the Ninth Circuit's description of the first element of a DPPA claim, he cuts off everything after

-10-

None of plaintiff's allegations plausibly shows Meta knew "personal information" was at issue. Mot. 14–16. Plaintiff halfheartedly suggests Meta knew the information it received came from a "motor vehicle record," but his only basis for that is that "Meta tracks and records this data as coming from the DMV," Opp. 20; this argument in turn rests on his incorrect premise that all information "from the DMV" is "from a motor vehicle record." *Supra* 6–7. And plaintiff makes no effort at all to allege Meta knew the data was being used for an impermissible purpose. Each of those failures is fatal.

## B.    Plaintiff Fails to State a Wiretapping Claim Under CIPA.

Plaintiff dedicates comparatively little space to defending his CIPA claim. *Compare* Opp. 5–20 (more than 15 pages on DPPA), *with id.* 20–24 (less than 4.5 pages on CIPA). The halfhearted defense plaintiff does offer fails to identify any plausible allegations supporting scienter, lack of consent, or the "contents" of any allegedly intercepted communications.

### 1.    Plaintiff Has Not Plausibly Alleged Scienter.

Meta cannot be held liable under CIPA unless it *affirmatively desired* to intercept plaintiff's communications without his consent. Mot. 16–18; *see* Cal. Penal Code § 631(a). Plaintiff does not even try to make this showing. Instead, he simply abandons any reliance on § 631(a)'s first prong (which prohibits "intentional[]" wiretapping) and says he is relying on § 631(a)'s second and third prongs (which forbid "willfully" obtaining the contents of a communication or using any information so obtained). Opp. 21. But that tack from intent to willfulness gets plaintiff nowhere.

Plaintiff's lead case says that "the word 'willfully' was meant to refer only to *intentional*, as opposed to inadvertent, interception." *People v. Buchanan*, 26 Cal. App. 3d 274, 288 (1972) (emphasis added). And California defines "willfully" to mean "a purpose or willingness to commit the act." Cal. Penal Code § 7(1). Accordingly, plaintiff must allege Meta had a *purpose* or *willingness* to intercept his communications unlawfully and without his consent. He has not plausibly alleged that, and indeed he could not—because Meta expressly tells every developer that uses the Pixel, including the DMV, *not* to send it any information unless it has the legal right to do so (and further tells developers they must provide prominent notice to users that Meta may receive or use their information, and provide

---

"knowingly obtained," misleadingly obscuring the "personal information" part. Opp. 19 (emphasis omitted) (quoting *Howard*, 654 F.3d at 890).

opt-out instructions). Meta RJN Ex. 4 §§ 1(e), 3(c). Meta also expressly forbids developers from sending "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines." *Id.* § 1(h). In light of those policies—which every Pixel user, like the DMV, must agree to before installing the Pixel on its website—plaintiff cannot show Meta had any "purpose or willingness," Cal. Penal Code § 7(1), to obtain any information without his consent (or any sensitive information, period).[7]

## 2. Plaintiff Consented to Meta's Receipt of Information.

Meta's policies contain clear and broad disclosures about the data that third parties can send to it (including through the Pixel) and how that data can be used. Mot. 18–20. Plaintiff consented to these policies when he signed up for a Facebook account and continued to use the service thereafter, and that consent is fatal to his CIPA claim. Mot. 18–20; *see* Compl. ¶ 61. The Conditions of Use on the DMV's website, which detail the DMV's collection of "personal and confidential information" and state that this information is collected "to provide statistical analysis for the improvement of the content and quality of our web services and applications," bolster that conclusion. Meta RJN Ex. 6 at 2. None of plaintiff's three counterarguments is persuasive.[8]

*First*, plaintiff says "Meta does not show that [he] took any affirmative action to demonstrate assent to any policies." Opp. 22 (quotation marks omitted). But plaintiff alleges he "has had a Facebook and/or Meta account since approximately 2010." Compl. ¶ 61. As numerous courts have

---

[7] Nor can plaintiff fix this problem by "alleg[ing] Meta read communications by design, not fortuitously or inadvertently." Opp. 21. For a CIPA claim to lie, plaintiff must allege that Meta purposefully read communications knowing such communications were sent *without his consent*—not just that Meta knew it was receiving communications. Cal. Penal Code § 631(a).

[8] Plaintiff resists this Court's judicial notice of Meta's policies and says the Court "need not reach the [consent] argument." Opp. 22. Plaintiff's counterarguments to consent also strive to inject fact questions into the analysis. *See infra* 12–14. To the extent the Court concludes this dispositive issue turns on limited questions of fact about plaintiff's assent to Meta's policies or the content of prior versions of those policies, the Court could direct the parties to engage in targeted discovery on the issue. *Cf. Yates v. United States*, 2020 WL 2615011, at *7 (N.D. Cal. May 22, 2020) (allowing "limited, targeted discovery" to facilitate "a dispositive motion"). Numerous cases have found that Meta's terms are enforceable, that users agree to those terms when they sign up for a Facebook account, and that users agree to updates in Meta's terms through continued use. *See, e.g.*, *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1164–1167 (N.D. Cal. 2016) (concluding after evidentiary hearing that "plaintiffs assented to the user agreement when they signed up for Facebook" and "agreed to the current user agreement" through continued use).

held, users "assent[] to the user agreement when they sign[] up for Facebook," and when terms are updated, "individualized notice in combination with a user's continued use is enough for notice and assent." *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d at 1167; *see also, e.g.*, *Smith v. Facebook, Inc.*, 745 F. App'x 8, 8–9 (9th Cir. 2018) (affirming dismissal of "data tracking and collection" claims based on disclosures in Meta's policies); *In re Uber Techs., Inc.*, 2019 WL 6317770, at *4 (C.D. Cal. Aug. 19, 2019) (plaintiff consented to updated terms based on notice and continued use). Plaintiff does not contend that he lacked notice or that he discontinued use of his Facebook account.

*Second*, plaintiff says that the Privacy Policy and Cookies Policy submitted with Meta's motion to dismiss "were published on January 1, 2023 and October 5, 2022, respectively," and that he "alleges repeated interceptions of his communications starting as early as 2019." Opp. 22. But those documents are merely the most recent versions of policies that plaintiff would have agreed to when he created a Facebook account *in 2010*—well before any of the conduct alleged in this case. Compl. ¶ 61.

*Third*, plaintiff says Meta's policies "raise[] questions of fact" because they are unclear about the practices at issue here. Opp. 22–23 (quotation marks omitted). That argument is meritless. As courts have already recognized, Meta's terms and policies "contain numerous disclosures relating to information collected on third-party websites." *Smith*, 745 F. App'x at 8. A "reasonable person viewing [Facebook's] disclosures would understand that Facebook maintains the practices of (a) collecting its users' data from third-party sites and (b) later using the data for advertising purposes." *Id.* at 8–9. Plaintiff asserts without citation that Meta's disclosure that "advertisers" and "businesses" use the Pixel "reasonably *excludes* governmental entities like the DMV," Opp. 23, but Meta's Privacy Policy states without limitation that "[b]usinesses and people can use our Products" and includes a non-exhaustive list of "examples" that includes "[p]ublishers (*like a website* or app)." Meta RJN Ex. 2 at 16 (emphasis added). Plaintiff does not explain why a reasonable person would read that language to exclude user-facing, interactive websites operated by government entities. *See F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 964 (9th Cir. 2010) (a disclosure is not "ambiguous just because it is broad"). Plaintiff also says the provision stating Meta "require[s] Partners to have the right to collect, use and share your information before giving it to us" is "ambiguous" because it "could mean that Meta

-13-

does *not* receive information from the DMV for advertising purposes without 'express' (written) consent consistent with [the DPPA]." Opp. 23 (quotation marks omitted). That argument fails for the reasons above, because none of the information at issue is protected under the DPPA and because, in any event, Meta *does* require web developers (like the DMV) to have the right to send any information they choose to send. *See supra* 11–12.

### 3. Plaintiff Has Not Alleged the DMV Sent Meta The "Contents" of Any Communication.

CIPA forbids only unauthorized access to a communication's "contents"—the "intended message conveyed by the communication." *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). None of the information plaintiff alleges the DMV sent about him to Meta—URLs revealing his first name, email address, and the fact that he clicked on a button to start a disabled-person parking placard application—fits the bill. Mot. 20–22. And nothing in his opposition brief shows otherwise.

In his opposition brief, plaintiff first points to generic allegations about information the DMV *may have* allegedly sent to Meta about *other* DMV website visitors—for example, the "text of searches." Opp. 23. But plaintiff does not allege Meta obtained any text of searches *from him*, and he cannot bring a claim based on alleged receipt of information from other people. *See Pichler*, 542 F.3d at 391–92 (reaching this conclusion for DPPA claim); Cal. Penal Code § 637.2 (allowing CIPA action by a "person who has been injured").[9]

Plaintiff next says "Meta learned the meaning of his communication to the DMV that he has a disability by clicking the 'Start DP Application' button." Opp. 23. But the only information Meta allegedly received is that plaintiff clicked a button to navigate to a disabled-person parking placard application, and *Zynga*'s core holding is that information revealing a person's online navigation (there, through "referer headers") is not "contents" *even if* it enables inferences about that person that touch

---

[9] For the same reason, plaintiff's citation to *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020), and similar cases involving search terms, *see* Opp. 24, misses the mark. Moreover, to the extent plaintiff suggests information qualifies as "contents" so long as it "could provide 'significant information regarding the user's browsing history' and divulge 'a user's personal interests, queries, and habits,'" Opp. 24 (quoting *Facebook Internet Tracking*, 956 F.3d at 596, 605), that is simply wrong. The Ninth Circuit in *Facebook Internet Tracking* was discussing whether the information in that case intruded upon a reasonable expectation of privacy—an issue relevant to tort claims plaintiff has not brought, not to whether information qualifies as "contents."

-14-

on sensitive subjects. 750 F.3d at 1108; *see also Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1093 (N.D. Cal. 2022) (regardless of its "sensitivity," "information about personal habits and identities that Google 'infers' from the types of apps a user uses is not 'content' of a communication"). The same goes for plaintiff's argument that it is "reasonable to infer" that "Meta learned—at a minimum— that [he] requested to 'log in,' as well as the reason, when he communicated the reason by clicking the appropriate hyperlink (*e.g.*, change phone number; renew registration)." Opp. 23. Those are *actions* reflecting plaintiff's online navigation, not the substance of any communication. *See Zynga*, 750 F.3d at 1108. And plaintiff's conclusory claim that "Meta has taken extensive measures to maximize the information it obtains to 'learn' about users," Opp. 23, does not identify any content.

**C.    Plaintiff Cannot Bring Claims Outside the Applicable Limitations Period.**

If this Court allows plaintiff's CIPA claim to proceed at all, any violations accruing before January 6, 2022 (one year before plaintiff filed his complaint) are time-barred. Mot. 22–25.

Notably absent from plaintiff's opposition brief is any real defense of his threadbare "tolling, concealment, and estoppel" recitals, Compl. ¶¶ 56–60—plaintiff generically asserts those issues are "fact-bound" and "should be resolved with a full record," Opp. 25, but identifies no actual facts alleged in support. Instead, plaintiff's topline response is that Meta's statute-of-limitations argument "is procedurally infirm because '[a] motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims.'" Opp. 25 (quoting *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015)). But the case plaintiff quotes does not concern statute-of-limitations issues, and Meta does not seek piecemeal dismissal—plaintiff alleges *separate* violations for "[e]ach time" Meta allegedly violated the law. Compl. ¶ 63; *see, e.g.*, *Los Angeles Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*, 506 F. Supp. 3d 1018, 1031 (C.D. Cal. 2020) (on motion to dismiss, limiting plaintiff's claims to "actions occurring within the applicable limitations period"). Unless plaintiff concedes he is alleging only a single violation (and caps damages accordingly), each alleged violation outside the limitations period is a distinct claim that must be dismissed in its entirety.

## III.    CONCLUSION

Plaintiff's claims should be dismissed. At a minimum, any surviving claims must be narrowed to the applicable limitations period.

DATED: May 19, 2023

**GIBSON, DUNN & CRUTCHER LLP**


By:     _/s/ Lauren R. Goldman_
        Lauren R. Goldman

**COOLEY LLP**

By:     _/s/ Michael G. Rhodes_
        Michael G. Rhodes


_Attorneys for Meta Platforms, Inc._

**CIVIL L.R. 5-1(h)(3) ATTESTATION**

Pursuant to Civil Local Rule 5-1(h)(3), I, Lauren R. Goldman, hereby attest under penalty of perjury that concurrence in the filing of this document has been obtained from all signatories.

Dated: May 19, 2023                    GIBSON, DUNN & CRUTCHER LLP

By:     */s/ Lauren R. Goldman*

Lauren R. Goldman