LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
Michael W. Sobol (SBN 194857)
msobol@lchb.com
David T. Rudolph (SBN 233457)
drudolph@lchb.com
Melissa Gardner (SBN 289096)
mgardner@lchb.com
John D. Maher (SBN 316157)
jmaher@lchb.com
Nabila Abdallah (SBN 347764)
nabdallah@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
Linnea D. Pittman (admitted *pro hac vice*)
lpittman@lchb.com
250 Hudson Street, 8th Floor
New York, New York 10013-1413
Telephone: 212.355.9500
Facsimile: 212.355.9592

CARNEY BATES & PULLIAM, PLLC
Joseph Henry (Hank) Bates, III (SBN 167688)
hbates@cbplaw.com
Allen Carney (admitted *pro hac vice*)
acarney@cbplaw.com
Courtney Ross Brown (admitted *pro hac vice*)
cbrown@cbplaw.com
Connor Thompson (admitted *pro hac vice*)
cthompson@cbplaw.com
519 W. 7th St.
Little Rock, AR, 72201
Telephone: 501.312.8500
Facsimile: 501.312.8505

*Counsel for Plaintiffs and the Proposed
Classes*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| MIKHAIL GERSHZON, ANACLETO DELEON, and JEFFREY DIETRICH on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No. 3:23-cv-00083-SI-VKD<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: May 8, 2026<br>Time: 10:00 a.m.<br>District Judge Susan Illston<br>Courtroom: Courtroom 1 – 17th Floor |

<u>**NOTICE OF MOTION AND MOTION**</u>

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on May 8, 2026, at 11:00 a.m., or at another time as the Court directs, Plaintiffs Mikhail Gershzon and Anacleto DeLeon ("Plaintiffs") will move for certification of the following Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> **Placard Class**: All current and former holders of a Permanent, Temporary, or Travel Disabled Person Parking Placard issued by the California Department of Motor Vehicles whose Disabled Person Parking Placard application, replacement or renewal ("Placard Transaction") record is in Meta's records from the DMV website.

> **MyDMV Class:** All natural persons who held a Validated MyDMV Account and conducted an Authenticated DMV Online Transaction between February 22, 2020 and August 25, 2023 at 11:03 a.m. PT.

Excluded from the Classes are the assigned Judge(s), Plaintiffs' counsel, Defendant's counsel, and their retained experts, Meta Platforms, Inc., its officers and directors, members of their immediate families, any entity in which Defendant has or had a controlling interest, and the successors, or assigns of any of the foregoing.

Plaintiff DeLeon seeks appointment as Placard Class Representative to pursue claims for violation of the Driver's Privacy Protection Act and California Invasion of Privacy Act. Plaintiffs Gershzon and DeLeon seek appointment as MyDMV Class Representatives to pursue claims for violation of the Driver's Privacy Protection Act. Plaintiff Jeffrey Dietrich seeks no appointment.

Plaintiffs also request that the Court appoint their counsel, Melissa Gardner of Lieff Cabraser Heimann & Bernstein LLP ("Lieff Cabraser") and Allen Carney of Carney Bates & Pulliam, PLLC ("Carney Bates"), as Class Counsel. The grounds for this motion are that this action meets all requirements for class treatment as required under Rules 23(a), 23(b)(2), 23(b)(3), and 23(g) of the Federal Rules of Civil Procedure.

The Motion is based on this Notice of Motion and supporting Memorandum of Points and Authorities; the Joint Declaration of Melissa Gardner and Allen Carney and Exhibits 1-29 thereto; the Declaration of Nabila Abdallah and Exhibits A-D thereto; the expert report of Dr. Serge Egelman, Ph.D.; the expert report of Arthur Olsen; the reply briefing in further support of this Motion; the arguments of counsel; and any such other matters as the Court may consider.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................... 1

II. SUPPORTING MATERIALS ................................................................................... 2

III. FACTS ....................................................................................................................... 3

    A. The Meta Pixel on the DMV Website .......................................................... 3

    B. DMV Online Transactions, Placard Transactions, and MyDMV ................ 4

    C. Meta's Records of Authenticated MyDMV and Placard Transactions ......... 6

    D. Plaintiffs' Placard and Authenticated MyDMV Transactions ..................... 8

IV. STANDARD ............................................................................................................... 9

V. CLASS CERTIFICATION IS APPROPRIATE UNDER RULE 23(a). ..................... 9

    A. Numerous Individuals Fit the Class Definitions (Fed. R. Civ. P. 23(a)(1)) ............ 9

    B. Common Answers Will Resolve this Action (Fed. R. Civ. P. 23(a)(2)). ............... 9

    C. Plaintiffs Are Typical Class Members (Fed. R. Civ. Proc. 23(a)(3)) ................. 10

    D. Plaintiffs are Adequate Representatives (Fed. R. Civ. Proc. 23(a)(4)) ................ 11

VI. CLASS CERTIFICATION IS APPROPRIATE UNDER RULE 23(b)(3). .................... 12

    A. Common Issues Will Predominate for All Class Members' DPPA Claims ......... 12

        1. Did Meta Obtain or Use the Information at Issue "Knowingly?" ............. 13

        2. Was the Information Meta Obtained or Used "Personal Information?" .......... 13

        3. Did the Personal Information Come "From a Motor Vehicle Record?" ......... 15

        4. Did Meta Have a Purpose other than Those "Permitted" by The DPPA? .......... 17

        5. Did the Personal Information "Pertain to" the Class Member? ............... 18

        6. Is the Class Member Entitled to Relief? .................................................... 19

    B. Common Issues Will Predominate for Placard Class Members' CIPA Claims. ....... 20

    C. A Class Action Is Superior to Individual Actions.......................................... 22

VII. CLASS CERTIFICATION IS APPROPRIATE UNDER RULE 23(b)(2). .................... 23

VIII. APPOINTMENT OF CLASS COUNSEL ................................................................. 24

IX. CONCLUSION ......................................................................................................... 24

**Page**

**Cases**

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) .................................................................................................... 9

*Andrews v. Sirius XM Radio Inc.*,
932 F.3d 1253 (9th Cir. 2019) .................................................................................... 16

*Brown v. Google, LLC*,
No. 20-3664, 2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) .................................... 24

*Campbell v. Facebook, Inc.*,
951 F.3d 1106 (9th Cir. 2020) .................................................................................... 22

*Coulter v. Bank of Am.*,
28 Cal. App. 4th 923 (1994) ....................................................................................... 23

*Dahlstrom v. Sun-Times Media, LLC*,
777 F.3d 937 (7th Cir. 2015) ...................................................................................... 14

*Durham v. City of Charlotte*,
No. 21-00638, 2024 WL 4279513 (W.D.N.C. Sept. 24, 2024) ................................... 16

*DZ Rsrv. v. Meta Platforms, Inc.*,
96 F.4th 1223 (9th Cir. 2024), cert. denied, 145 S. Ct. 1051 (2025) ...................... 4, 11, 12

*Edwards v. First Am. Corp.*,
798 F.3d 1172 (9th Cir. 2015) .................................................................................... 18

*Ehret v. Uber Techs., Inc.*,
148 F. Supp. 3d 884 (N.D. Cal 2015) ......................................................................... 11

*Frasco v. Flo Health, Inc.*,
349 F.R.D. 557 (N.D. Cal. 2025) ........................................................................... 21, 22

*Frasco v. Flo Health, Inc.*,
No. 21-00757, 2025 U.S ............................................................................................. 23

*Gershzon v. Meta Platforms, Inc.*,
No. 23-00083, 2023 WL 5420234 (N.D. Cal. Aug. 22, 2023) ................................... 22

*Heglund v. Aitkin Cnty.*,
871 F.3d 572 (8th Cir. 2017) ...................................................................................... 15

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017) .................................................................................... 19

*Kearney v. Salomon Smith Barney, Inc.*,
39 Cal. 4th 95 (2006) ................................................................................................. 22

*Kehoe v. Fidelity Fed. Bank & Trust*,
421 F.3d 1209 (11th Cir. 2005) .......................................................................... 13, 19

*Kellman v. Spokeo, Inc.*,
No. 21-08976, 2024 WL 2788418 (N.D. Cal. May 29, 2024) ................................... 20

*Krekelberg v. City of Minneapolis*,
No. 13-3562, 2023 WL 4828382 (D. Minn. July 27, 2023) ...................................... 20

*Leyva v. Medline Industries Inc.*,
716 F.3d 510 (9th Cir. 2013) ................................................................................... 13

*Lilly v. Jamba Juice Co.*,
308 F.R.D. 231 (N.D. Cal. 2014) ............................................................................. 13

*Lytle v. Nutramax Lab'ys, Inc.*,
114 F.4th 1011 (9th Cir. 2024), cert. denied, 145 S. Ct. 1308 (2025) ............... 12, 19

*Maracich v. Spears*,
570 U.S. 48 (2013) ....................................................................................... 15, 17, 18

*McDonough v. Anoka Cnty.*,
799 F.3d 931 (8th Cir. 2015) ................................................................................... 16

*Noohi v. Johnson & Johnson Consumer Inc.*,
146 F.4th 854 (9th Cir. 2025) ................................................................................. 11

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) (en banc) ...................................................................... 9

*Opperman v. Path, Inc.*,
No. 13-00453, 2016 WL 3844326 (N.D. Cal. Jul. 15, 2016) .................................... 20

*Perkey v. Dep't of Motor Vehicles*,
42 Cal. 3d 185 (1986) .............................................................................................. 15

*Pichler v. UNITE*,
542 F.3d 380 (3d Cir. 2008) .............................................................................. 17, 18

*Pub. Int. Legal Found. v. Boockvar*,
431 F. Supp. 3d 553 (M.D. Pa. 2019) ...................................................................... 14

*Ribas v. Clark*,
38 Cal. 3d 355 (1985) .............................................................................................. 22

*Sayce v. Forescout Techs., Inc.*,
754 F. Supp. 3d 878 (N.D. Cal. 2024) ................................................................. 9, 11

*Senne v. Vill. of Palatine, Ill.*,
695 F.3d 597 (7th Cir. 2012) .............................................................................. 13, 18

*Stallone v. Farmers Grp., Inc.*,
No. 22-01659, 2022 WL 10091489 (D. Nev. Oct. 15, 2022) .................................. 13

*Svoboda v. Amazon.com Inc.*,
No. 25-1361, 2025 WL 3654053 (7th Cir. Dec. 17, 2025) ..................................... 23

*United States v. Hastie*,
854 F.3d 1298 (11th Cir. 2017) ............................................................................ 14

*United Steel, et al. v. Conoco Phillips Co.*,
593 F.3d 802 (9th Cir. 2010) ................................................................................ 15

*Vinole v. Countrywide Home Loans*, *Inc.*,
571 F.3d 935 (9th Cir. 2009) ................................................................................ 12

*Wilcox v. Swapp*,
330 F.R.D. 584 (E.D. Wash. 2019) ................................................................. 13, 23

**Statutes**

18 U.S.C. § 2721(a) .................................................................................... 10, 15, 16

18 U.S.C. § 2721(b) ............................................................................................... 17

18 U.S.C. § 2721(b)(11)-(13) ................................................................................ 18

18 U.S.C. § 2721(b)(12)-(13) ................................................................................ 10

18 U.S.C. § 2721(b)(13) ........................................................................................ 10

18 U.S.C. § 2724(a) ......................................................................................... 10, 13

18 U.S.C. § 2724(b) ......................................................................................... 13, 19

18 U.S.C. § 2725 .................................................................................................... 16

18 U.S.C. § 2725(1) ......................................................................................... 10, 15

18 U.S.C. § 2725(3) ......................................................................................... 10, 14

Cal. Civ. Code § 1798.18 ......................................................................................... 4

Cal. Civ. Code § 2330 ....................................................................................................... 23

Cal. Penal Code § 631(a) ............................................................................................. 11, 21

California Invasion of Privacy Act (CIPA) ................................................................ *passim*

Driver's Privacy Protection Act (DPPA) .................................................................. *passim*

**Court Rules**

Fed. R. Civ. Proc. 12 ........................................................................................................ 24

Fed. R. Civ. Proc. 23 .......................................................................................................... 9

Fed. R. Civ. Proc. 23(a) ................................................................................................ 9, 10

Fed. R. Civ. Proc. 23(a)(1) ............................................................................................... 10

Fed. R. Civ. Proc. 23(a)(2) ............................................................................................... 10

Fed. R. Civ. Proc. 23(a)(3) ............................................................................................... 11

Fed. R. Civ. Proc. 23(a)(4) ............................................................................................... 12

Fed. R. Civ. Proc. 23(b) ..................................................................................................... 9

Fed. R. Civ. Proc. 23(b)(2) ............................................................................................... 24

Fed. R. Civ. Proc. 23(b)(3)............................................................................. 12, 19, 23, 24

Fed. R. Civ. Proc. 23(b)(3) ............................................................................................... 24

Fed. R. Civ. Proc. 23(g)(1)(A) ......................................................................................... 24

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR CLASS CERTIFICATION
CASE NO. 3:23-CV-00083-SI-VKD

## I. <u>INTRODUCTION</u>

The relevant facts in this action are straightforward and common. The California Department of Motor Vehicles (DMV) is a State agency responsible for maintaining California's authoritative identity and motor vehicle database. In that capacity, it has civic and statutory obligations to safeguard the information it obtains from individuals, including obligations imposed by the Federal law at issue here, which Congress passed in response to DMVs' history of releasing drivers' personal information to marketers for advertising purposes.

Meta is a data aggregator and online advertising company. It developed "Business Tools" for other businesses to use on their websites. Meta designed these tools to obtain information about individuals as they navigated the web for the purpose of identifying them and targeting them with ads. The tool at issue here, the Pixel, works by opening a portal for Meta, through other websites, to people. Through that portal, Meta instructs the person's browser to extract, label, package, and transmit as much information as the browser's settings will allow. By default and design, this includes identifying information. Where the subject matter is personal, this includes the contents of protected communications.

The DMV used the Pixel from August 14, 2019 to August 25, 2023. Simply by installing a Pixel, the DMV disclosed, and Meta obtained, information about the disability status of an estimated 750,000 Disabled Person Parking Placard Holders in California, including proposed Placard Class Representative Anacleto DeLeon. The DMV disclosed, and Meta obtained, identifying information from, about, within, and involving the motor vehicle records of both Plaintiffs and an estimated 17-20 million others who hold MyDMV Accounts that the DMV has validated against the State's other identity records.

Deciding whether these facts state Class-wide claims and injury can be done efficiently once, on behalf of all who were affected. Meta has records proving beyond question what information it obtained, and when. The DMV has the best records in the State of California for confirming the accuracy of what Meta's copy of the DMV's records already show. The proposed Class Representatives are diligently committed to pursuing their claims in the best interests of the Class, and proposed Class Counsel have demonstrated the same commitment over more than

three years. The Court should grant this motion and certify the following Classes:

**Placard Class**: All current and former holders of a Permanent, Temporary, or Travel Disabled Person Parking Placard issued by the California Department of Motor Vehicles whose Disabled Person Parking Placard application, replacement or renewal ("Placard Transaction") record is in Meta's records from the DMV website.

**MyDMV Class:** All natural persons who held a Validated MyDMV Account and conducted an Authenticated DMV Online Transaction between February 22, 2020 and August 25, 2023 at 11:00 a.m. PT.

Excluded from the Classes are the assigned Judge(s), Plaintiffs' counsel, Defendant's counsel, and their retained experts, Meta Platforms, Inc., its officers and directors, members of their immediate families, any entity in which Defendant has or had a controlling interest, and the successors, or assigns of any of the foregoing.

Plaintiff DeLeon seeks appointment as Representative of the Placard Class to pursue claims for violation of the Driver's Privacy Protection Act (DPPA) and California Invasion of Privacy Act (CIPA). Plaintiffs Gershzon and DeLeon seek appointment as Representatives of the MyDMV Class to pursue claims for violation of the DPPA.

## II.     SUPPORTING MATERIALS

The accompanying Expert Report of Dr. Serge Egelman, Ph.D. describes the ad tech industry and technology that gave rise to Plaintiffs' claims in this case.  Dr. Egelman explains how Meta Pixels on the DMV website operated, as well as what Meta obtained through them. Exhibit A to his report describes his investigation of what the Pixels transmitted to Meta in real time as he interacted with the DMV website in 2022 and 2023. The Expert Report of Art Olsen describes analysis of a sample containing 27 days of records that Meta obtained from the DMV website (one day per month from June 2021 – August 2023). Mr. Olsen demonstrates that it is feasible to distinguish transactions by members of the proposed Classes from other data in Meta's records. Mr. Olsen's analysis further shows that, through a course of conduct that affected every interaction across the DMV website, it is virtually certain that Meta captured personal information pertaining to every person who held a Validated MyDMV Account or applied for a Disabled Person Parking Placard online as of August 25, 2023. The accompanying Trial Plan explains how this action can be manageably tried on a class basis.

## III. **FACTS**

### A. **The Meta Pixel on the DMV Website**

The DMV put Meta's JavaScript Pixel code snippet on "all pages" of its website on August 14, 2019. Egelman Report ¶¶ 53, 57; Ex. 3.[1] The code the DMV installed told every browser loading a DMV webpage ███████████████████ Egelman Report ¶¶ 60-62.

When browsers made contact, ████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████. *Id.* at ¶¶ 63-84; *id.* Ex. A. Meta's recommended default Pixel settings, in effect at the DMV, told browsers ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████████████ ████████████████████████. *Id.*; *see also* Dkt. 121 (Am. Complaint) ¶¶ 16-21, 29, 32, 36. Meta controlled this code and ████████████████████████████████ ██████████████████. Egelman Report ¶¶ 82, 155.

Both the DMV's instructions that browsers request Pixel code from Meta, and the code Meta send those browsers to execute in return, were compulsory. Individuals could not stop JavaScript from executing on their browsers and still use the DMV website. Egelman Report ¶ 127. Privacy tools that might interfere with this code were not widely used (*id.* ¶¶ 128-133), and there was no reason to suspect that they needed to be. The DMV stated that it *could not* share information for advertising purposes without express consent, that it did not even use cookies, and that it made no attempt to link users' DMV activity with their activity on other websites. *See e.g.* Dkt. 49-4 at 2; Dkt. 31-8 at 2-4 (Government Code "prohibits all state agencies from distributing or selling any electronically collected personal information . . . about users to any third party without the permission of the user"; "[P]rivate information will only be used for the purposes for which it was provided and will not be shared with another entity except as

---

[1] Unless otherwise specified, citations to "Ex." herein are to the Joint Declaration of Melissa Gardner and Allen Carney.

prescribed by law"; "The state makes every attempt to avoid the use of cookies."). Even *Meta's* Privacy Policy denied that DMVs were using Pixels. Meta distinguished between its "Partners," described as "businesses and people" who use "Products" defined to include the Pixel, and "Government authorities," which it said "don't use our Products." *See* Dkt. 31-4 at 16-17.

Throughout four years while Pixel code generated comprehensive records of every Placard Class member's and MyDMV Class member's transactions with the DMV, it was

███████████████████████████████████████████████████████████

████████████ The DMV did not stop transmitting protected information through the Pixel until August 25, 2023 just after 11:00 a.m., the morning after it learned of this lawsuit. Ex. 5.

### B. DMV Online Transactions, Placard Transactions, and MyDMV

This action concerns "DMV Online Transactions," which are transactions individuals conduct on the DMV website to manage their motor vehicle records. In the 2019 – 2023 time period, the DMV hosted approximately 30 online forms for these purposes. All of these forms (listed in Exhibits A and B to the Abdallah Declaration) required providing personal information to the DMV. This included "Electronically Collected Personal Information," ("Electronic PII") *i.e.*, IP address, browser and operating system type, date and time of visit, and the URL of any previously-visited website. Dkt. 31-8 at 2; Ex. 6 (Harrald Dep., 50:13-25, 51:1-11, 99:18-25, 100:1-10). All of the DMV's transactional web forms pertained to licenses, ID cards, registrations, and titles issued by the DMV. *See e.g.*, Ex. 7; Abdallah Decl. Exs. A-B. The DMV kept records of all forms that were submitted. Ex. 6 (Harrald Dep., 50:13-25); Ex. 8 (Smith Dep., 64:1-25, 65:1-16).

As pertinent to members of the Placard Class, the DMV introduced the Disabled Person Parking Placard Application form ("Placard Application") on December 1, 2020. It introduced the Disabled Person Parking Placard Replacement form on May 18, 2023. These forms required the applicant's name, email address, phone number, home address, and photo ID, as well as the Electronic PII. Ex. 9. The DMV had processed 151,150 Placard Applications at the end of 2023. Ex. 10. On November 3, 2022, the DMV introduced the Disabled Person Parking Placard Renewal form ("Placard Renewal"). It required the Placard holder's Renewal Notice or Placard

ID number, full name, and date of birth. Ex. 12 (Renewal form). The DMV had processed 618,601 Placard Renewals at the end of August 2023. Ex. 10. *See also* Ex. 12 (showing publish dates for all forms); Ex. 8 (Smith Dep., 14:20-16:9, explaining). The estimated number of Placard Class members is 769,751.

As pertinent to the MyDMV Class, MyDMV is "DMV's Identity Management (IDM) system" linked to each Account-holder's "driver's license/identification card information, vehicles owned, status of pending transactions, and . . . address(es)," among other DMV records. Ex. 13 at -613. To use MyDMV, individuals must first create a "Basic" MyDMV Account through a multi-step process that involves providing a name, email address, and telephone number to the DMV. Ex. 8 (Smith Dep., 86:22-24); Abdallah Decl., Ex. C. The DMV validates MyDMV Accounts through a "Validate Account" webpage, where it confirms that personal information in the MyDMV Account matches the applicant's DMV-issued ID. Ex. 8 (Smith Dep. 86:25-87:12); Abdallah Decl., Ex. D.

All MyDMV Accounts that existed as of August 25, 2023 were created on or after February 22, 2020, when the DMV instituted the validation system described above. Ex. 29. Therefore, every individual who held a Validated MyDMV Account as of August 25, 2023 necessarily completed the same multi-step Account creation process, and the Account validation process, after February 22, 2020. "Over 17 million" MyDMV Accounts existed in 2022. Ex. 13 at DMV_PLTF_00000613. The DMV maintains a precise record of when each MyDMV Account was created, whether the Account is Validated, and the individual to whom it pertains. Ex. 8 (Smith Dep., 86:9-25, 87:1-12); Ex. 14 (Gershzon MyDMV Account record). The DMV has a statutory obligation to maintain all such records, "to the maximum extent possible, with accuracy, relevance, timeliness, and completeness." Cal. Civ. Code § 1798.18. The DMV can readily provide those, and many other, records for all MyDMV Class members. Ex. 6 (Harrald Dep. 76:21-25, 77:1-25, 78:1-10).

Only individuals who hold Validated MyDMV Accounts are able to conduct seven "Authenticated DMV Transactions," which are not otherwise permitted on the DMV website: Renew License, Renew ID Card, Replace License, Change Address, Request Vehicle Record,

Request Driver Record, and Receive Paperless Notices. Ex. 8 (Smith. Dep., 87:13-25, 88:1-4.). A Basic MyDMV Account is required to *apply* for a driver's license or ID Card, so teenagers applying for their first license typically have Basic MyDMV Accounts. Ex. 8 (Smith Dep., 87:16-20).[2] The DMV publishes annual totals for most Authenticated DMV Transactions, which are summarized below (*see* Ex. 15):

| Internet Transactions | 2023 | 2022 | 2021 | 2020 |
|---|---|---|---|---|
| Driver's License (DL) Renewal: | 1,794,929 | 1,460,925 | 2,042,110 | 2,233,897 |
| Identification (ID) Card Renewal | 105,526 | 88,419 | 117,540 | 103,364 |
| Change of Address: | 2,316,072 | 2,360,441 | 2,707,410 | 2,344,680 |
| VR/DL Record Request: | 738,287 | 711,160 | 798,443 | 685,833 |
| Replacement/D Driver's License (DL) | 508,027 | 488,857 | | |
| Duplicate Driver License (DL) | | | 463,120 | 261,866 |
| Grand Total | | | | 22,330,906 |

The estimated number of individuals in the MyDMV class is 17-20 million.

**C.     Meta's Records of Authenticated MyDMV and Placard Transactions**

Because of the Pixel, Meta's records of DMV Online Transactions closely track the DMV's. A sample containing 27 days of data from Meta's records of DMV activity from June 2021 to August 2023 showed the following:

[2] Mr. Olsen's analysis included URLs associated with sitting for an online Driver Knowledge Test for this reason; individuals who passed, which is also reflected in Meta's records, may have subsequently validated their MyDMV accounts.



[black redaction bars]

**D.      Plaintiffs' Placard and Authenticated MyDMV Transactions**

Both Plaintiffs are Validated MyDMV Account holders who conducted Authenticated MyDMV Transactions between February 22, 2020 and August 25, 2023. Plaintiff DeLeon is a Placard holder who applied for his Placard on the DMV website.

**Mikhail Gershzon.** Plaintiff Gershzon created and validated his MyDMV account on August 23, 2020, when he also renewed his ID Card.  Ex. 14; 20. His ID was delivered to an old address, so in March 2021 he logged back into his MyDMV account, where he changed his address on record with the DMV. He is a MyDMV Class member. Plaintiff Gershzon previously alleged that he renewed his Disabled Person Parking Placard on the DMV website, but discovery suggests that, while he visited the DMV website the same day he renewed his placard, he ultimately renewed his Placard by phone. He is not a Disabled Person Class member.

While Meta has only produced a ████████████████████████████, other common evidence shows that it tracked Mr. Gershzon's activity on the DMV website in 2020.

[black redaction bars]

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████ This evidence indicates that Meta must have received the record of Plaintiff's August 2020 Authenticated MyDMV transaction.

**Anacleto DeLeon.** Plaintiff DeLeon created and validated his MyDMV Account on

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████ *See* Ex. 25, Table 2, rows 12-14, 19, 77, 79, 81. He is a MyDMV Class member and a Placard Class member.

## IV.   STANDARD

Class certification is proper if Plaintiffs satisfy the requirements of Rule 23(a) and at least one prong of Rule 23(b). *Sayce v. Forescout Techs., Inc.*, 754 F. Supp. 3d 878, 888 (N.D. Cal. 2024); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc). The Court's "class certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013) (quotation marks omitted). However, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Id.*

## V.   CLASS CERTIFICATION IS APPROPRIATE UNDER RULE 23(a).

### A.   Numerous Individuals Fit the Class Definitions (Fed. R. Civ. P. 23(a)(1))

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." The Placard Class (estimated 769,751) and MyDMV Class (estimated 17-20 million) are too large to join the individual Class members. Numerosity is satisfied.

### B.   Common Answers Will Resolve this Action (Fed. R. Civ. P. 23(a)(2)).

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."

Questions common to all MyDMV and Placard Class Members include:

- Did Meta know that it obtained or used information when that information ███████ ██████████████████████████████████████████████ ████████████████████████████? *See* 18 U.S.C. § 2724(a);

- Was the data that Meta obtained and processed for ████████████████████████ ██████████ *See* 18 U.S.C. § 2721(a); § 2725(3);

- Did records generated from Validated MyDMV Transactions "pertain[] to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles"? *See* 18 U.S.C. § 2721(a); § 2725(1);

- Does the information provided to the DMV to update or create an individual's official records with the State of California "pertain to" that individual? *See* 18 U.S.C. § 2724(a);

- Did the DMV "disclose or otherwise make available" personal information to Meta by installing code on its website which compelled all visitors' browsers to transmit such information to Meta? *See* 18 U.S.C. § 2721(a);

- Would a reasonable person read the DMV's Conditions of Use to provide that no Pixel operated on the DMV website? *See* 18 U.S.C. § 2721(b)(12)-(13); 2725(5);

- Does obtaining "written consent" to disclosure of protected information require more than making Terms of Service available on a social media platform? *See* 18 U.S.C. § 2721(b)(13);

Additional questions common to all Placard Class Members include:

- Does CIPA require obtaining consent to the firsthand dissemination of communications that occur via GET and POST requests on the DMV website? *See id.*

- Does (at least) attempting to extract information typed into forms on a website, while also actually acquiring URLs that describe a "Disabled Person Parking Placard Application" or "Disabled Person Parking Placard Renewal Form" for use in "identity matching," "intent" and "prediction" models, constitute an attempt to read or learn the contents or meaning of communications? *See id.*

- Did the Pixels' extracting, labeling, and re-directing communications operate while communications were "being sent from, or received at any place within" the State of California when one party to the communication was the State of California, and the other was an individual entitled to a California parking Placard? *See* Cal. Penal Code § 631(a)?

Adjudicating these and many related questions once will "generate common answers apt to drive the resolution of the litigation." *Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 862 (9th Cir. 2025) (citations omitted). Commonality is satisfied.

### C. **Plaintiffs Are Typical Class Members (Fed. R. Civ. Proc. 23(a)(3)).**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical

of the claims or defenses of the class." "[C]laims are 'typical' if they are reasonably co-extensive with those of absent class members." *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1238 (9th Cir. 2024), cert. denied, 145 S. Ct. 1051 (2025); *Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 892 (N.D. Cal 2015) (Typicality met where "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.").

Plaintiffs experienced the same conduct and injury as every MyDMV or Placard Class member: Meta obtained identifying information and communications from their interactions with the DMV, violating their rights to control the personal information and communications that they provided to the State. There is nothing atypical about creating a MyDMV Account, validating it, and conducting an Authenticated DMV Transaction, as both Plaintiffs did. *Supra* § IV.B. Plaintiff DeLeon is typical of Placard Class members because when he submitted his Placard Application on DMV website, Meta learned his disability information and related communications.

Meta's Answer to the Complaint underscores Plaintiffs' typicality. Rather than raising "unique defenses which threaten to become the focus of the litigation," *Sayce*, 754 F. Supp. 3d at 902 (quotation omitted), Meta asserts numerous facial challenges that apply Class-wide. *See* Dkt. 126, Defense Nos. 1-2, 4-5, 9-16, 18, 20, 22 (*e.g.*, to the legal sufficiency of Plaintiffs' theories and the availability of remedies). Meta also pleads several defenses which, if they are even viable, turn on evidence common to the Classes. *Id.* Nos. 3, 6-8, 19 (*e.g.*, that public documents provided "notice" enabling Class members to "mitigate" their privacy damages). To the extent Meta's handful of theoretically individualized defenses, such as "double recovery" and "release" could raise individualized questions, they are speculative and meritless on this record: Meta can point to no releases, no prior recoveries, and no conduct by the Plaintiffs that distracts from the common course of events by which they were harmed. *See id.* Nos. 17, 21. Typicality is satisfied.

**D.   Plaintiffs are Adequate Representatives (Fed. R. Civ. Proc. 23(a)(4))**

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." Plaintiffs, fully aware that they stand to recover the same relief as any absent Class member, have exposed their private lives to scrutiny to vindicate privacy rights on

behad of the Classes. They each allowed their personal devices, email, and Meta accounts to be searched for discovery, provided their depositions, and responded to 89 discovery requests from Meta, each. Joint Decl. ¶¶ 13-14. Both are, and intend to remain, actively involved in prosecuting this action for the benefit of all Class members. Gershzon Decl. ¶¶ 7-9; DeLeon Decl. ¶¶7-9. Adequacy is satisfied.

## VI. CLASS CERTIFICATION IS APPROPRIATE UNDER RULE 23(b)(3).

To certify a class under Rule 23(b)(3), Plaintiffs must show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The test for predominance under Rule 23(b)(3) has three steps: (1) "identify which questions are central to the plaintiffs' claim," based on the elements of each cause of action; (2) "determine which of these questions are . . . capable of being established through a common body of evidence"; and (3) "analyze whether the common questions predominate," which asks if the common questions are "more prevalent or important" than any individualized questions. *DZ Rsrv.*, 96 F.4th at 1233, 1237-38. This inquiry also requires that "damages can be determined without excessive difficulty and attributed to [Plaintiffs'] theory of liability." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1025 (9th Cir. 2024), cert. denied, 145 S. Ct. 1308 (2025) (citation omitted). "The overarching focus remains whether trial by class representation would further the goals of efficiency and judicial economy." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009).

### A. Common Issues Will Predominate for All Class Members' DPPA Claims

Under the DPPA, a person who "knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted" is liable to "the individual to whom the information pertains." 18 U.S.C. § 2724(a). Upon a finding of liability, the Court may award minimum liquidated damages of $2,500, punitive damages upon proof of willful or reckless disregard of the law, and other appropriate equitable relief. 18 U.S.C. § 2724(b). Plaintiffs must show damages can be "feasibly and efficiently calculated." *Wilcox v. Swapp*, 330

F.R.D. 584, 595 (E.D. Wash. 2019) (citing *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 244 (N.D. Cal. 2014). That calculation is easy where plaintiffs seek the statutory minimum, as they do here. *See Kehoe v. Fidelity Fed. Bank & Trust*, 421 F.3d 1209, 1213 (11th Cir. 2005) ("proof of actual damages is not necessary for an award of liquidated damages" under the DPPA).

The central liability questions for this claim, for both the Placard Class and the MyDMV Class, are: (a) Did Meta obtain or use information knowingly; (b) was the information it obtained "personal information"; (c) did the information come from a "motor vehicle record;" (d) did Meta obtain the information for a purpose other than those "permitted" by the DPPA; and (e) did the information "pertain to" the individual seeking relief?

### 1. Did Meta Obtain or Use the Information at Issue "Knowingly?"

To act "knowingly" requires "voluntary action." *Senne v. Vill. of Palatine, Ill.*, 695 F.3d 597, 603 (7th Cir. 2012). Common proof of Meta's actions and decisions regarding the Pixel and the data it received will satisfy this element. *Cf. Stallone v. Farmers Grp., Inc.*, No. 22-01659, 2022 WL 10091489, at *10 (D. Nev. Oct. 15, 2022) (holding defendants' decision to design platform to show license numbers "automatically" was a "knowing disclosure" under the DPPA). Meta designed the Pixel code to obtain identifying information. Egelman Report ¶¶ 40-45. Meta ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ The common facts that Meta received the information labelled with the DMV's unique Pixel ID, at servers Meta designated for the purpose, and used Pixel data extensively in its internal systems, also evidence its knowledge. Dkt. 90 at 15 (finding that receipt of DMV Pixel ID was evidence of knowledge). The answers to this question will be common.

### 2. Was the Information Meta Obtained or Used "Personal Information?"

"Personal information" means "information that identifies an individual," which the

DPPA defines by illustrating eight categories of archetypal "personal information." 18 U.S.C. § 2725(3) ("photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information"). Consistent with the breadth of the illustrations, information "identifies an individual" when it shares characteristics in common with one or more of the examples.

The DPPA thus protects categories of data that "serve . . . as a way . . . to contact a person." *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017). It protects details about features that would make a positive identification "easier." *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 944 (7th Cir. 2015). This includes information that can reveal certain statuses, including immigration and disability status, even when the information disclosed is as simple as a "tag[]" in DMV records. *See Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 556 (M.D. Pa. 2019) (protecting "INS indicator" tag relating to immigration status). Data that can be used to locate other personal information is also protected. *Hastie*, 854 F.3d. at 1303 (email addresses protected because they can be used to "find an individual in an online space," or just to "to find [more] personal information such as a corresponding username"). Because Congress was concerned with access to DMV data by marketers, a relevant consideration for determining whether something is "personal information" is whether it "could conceivably be of great interest to businesses . . . seeking to market their products or services to targeted audiences." *Dahlstrom*, 777 F.3d at 944. Anonymity at the DMV requires protecting **all** information that "can be fed into a computer and matched with its owner's identity" from misuse. *Perkey v. Dep't of Motor Vehicles*, 42 Cal. 3d 185, 196 (1986) (concurrence, Bird, C.J.).

Common proof will show that the information Meta obtained about each Placard and MyDMV Class member not only could have, ██████████████████████████████ ██████████████████████████ Olsen Report ¶ 23. The information not only could have, but *did* serve to ████████████████████████████████ ████████████████████████████████████████ ████████████ *Supra* § II-C. What happened at the California DMV is what Congress sought to prevent. All Class members' information at issue here must also be protected to preserve the

purposes of the DPPA.

### 3. Did the Personal Information Come "From a Motor Vehicle Record?"

The DPPA defines "motor vehicle record" as "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. § 2725(1). Any interpretation of this element must respect its intent to "control dissemination of information collected using the coercive power of the state." *Maracich v. Spears*, 570 U.S. 48, 51-52 (2013) (Congress was "[c]oncerned that personal information collected by States in the licensing of motor vehicle drivers was being released . . ."). Because this case involves rampant dissemination of individuals' personal information *while* it was being "collected by" the DMV (as well as after the DMV had stored it), Plaintiffs can prevail on multiple theories for the "motor vehicle record" element, none of which raise individual issues. The Court should analyze Plaintiffs' theories for purposes of this motion. *United Steel, et al. v. Conoco Phillips Co.*, 593 F.3d 802, 808-09 (9th Cir. 2010).

First, the DPPA protects "[a]n *individual's* control of information." *Id.*; *Heglund v. Aitkin Cnty.*, 871 F.3d 572, 577 (8th Cir. 2017) (emphasis added). The part of the DPPA that applies to DMVs supports liability when compulsory code disseminates information during website interactions. Section 2721(a) provides that DMVs may not knowingly "disclose **or otherwise make available** . . . personal information about any individual obtained by the department in connection with a motor vehicle record." 18 U.S.C. 2721(a). This prohibition on making personal information available applies *whenever* the DMV obtains such information, including as the DMV is in the process of obtaining it from web forms, URLs, and MyDMV Accounts. Meta also cannot observe the information by peering in through a portal the DMV opened by using Meta's tools. *McDonough v. Anoka Cnty.*, 799 F.3d 931, 944 (8th Cir. 2015) (definition of "obtain"); *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1259–60 (9th Cir. 2019) ("[W]e interpret § 2721—prohibiting DMVs from 'knowingly disclos[ing] . . . personal information,' 18 U.S.C. § 2721(a)—as covering one side of the prohibited transaction. The statutory provision at issue here covers the other side of **that same transaction**, by creating liability for the person who 'obtain[s] or disclose[s] personal information' from the DMV's records.") (alterations in original).

Information comes "from" a motor vehicle record when it is "made available" by the DMV. The DMV made Class members' information available to Meta by installing the Pixel.

Second, the DPPA defines "motor vehicle record" to include "*any* record." 18 U.S.C. § 2725 (emphasis added). Every record that the Pixel generated pertaining to a Placard Transaction or Authenticated MyDMV Transaction is a motor vehicle record in itself. Meta's records were developed through essentially the same processes as the DMV's. ███████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Class members had no say in creating either set of records. All records pertaining to Placard Transactions and Authenticated MyDMV Transactions are protected, including those held by Meta.

Third, for the MyDMV Class, a Validated MyDMV Account is a motor vehicle record. MyDMV pertains to an individual's license and registration because it is the portal for managing both, and because the account and all personal information associated with it has been validated against DMV's other records. *See e.g.*, *Durham v. City of Charlotte*, No. 21-00638, 2024 WL 4279513, at *17-19 (W.D.N.C. Sept. 24, 2024) ("The Court concludes that all of the DMV-349 Crash Reports in which the box 'Same address as driver's license' is checked are motor vehicle records under the [DPPA] statutory definition."). Any record pertaining to that account, including login records, validation records, and records of password-protected activity within the Account (Authenticated MyDMV Transactions), is protected.

Fourth, certain personal information that Meta obtained from all Placard and MyDMV Class members came "from" the DMV not only in the sense that the DMV coercively disclosed it to Meta by installing the Pixel, but also because the DMV was the "original" source of the data. To name some examples, the DMV set the first-party cookie that Meta used to identify individuals, which was ████████████████████████████████████ to MyDMV Accounts. *See* Olsen Report. The DMV provided the Placard Application and Renewal Form and all associated hyperlinks and URLs online that revealed Placard Class members' disability information.

Whether Pixel data came from a "motor vehicle record" in this case is a common question

because it is primarily a question of law, which can be resolved efficiently on behalf of both Classes. To the extent there are fact questions, the answers will depend on common evidence in Meta's records and concerning the DMV's course of conduct (what information it disclosed directly by means *other than* granting Meta free license to take it during state-mandated interactions) applicable broadly to both Classes. It is a common question.

### 4. Did Meta Have a Purpose other than Those "Permitted" by The DPPA?

The DPPA lists fourteen "narrow" exceptions to the default rule that DMV records must not be shared. 18 U.S.C. 2721(b); *Maracich*, 570 U.S. at 60. The exceptions "should not be construed to interfere" with the DPPA's requirement that consumers give express "written" consent to use of their information for marketing. *Id.* at 50, 67 ("Direct marketing and solicitation present a particular concern [in the DPPA] . . . because contacting an individual is an affront to privacy even beyond the fact that a large number of persons have access to the personal information."). To prevail on this element, Plaintiffs will be required to show that Meta obtained or used Class members' information for at least one purpose not expressly listed in the statute. *Pichler v. UNITE*, 542 F.3d 380, 395 (3d Cir. 2008).

Plaintiffs' proof on this issue will be common. Evidence of Meta's goals and internal use of Pixel data will be the same for all Class members, even if Meta overcomes *Maracich*'s substantial presumption against any DPPA exception where information was obtained for marketing purposes. *See Pichler*, 542 F.3d at 395 ("Because [defendant] obtained and used the confidential information for an impermissible purpose . . . it does not matter what other permissible purpose [it] may have had."); *Senne*, 695 F.3d at 605 ("[T]he statute's purpose, clear from its language alone, is to prevent all but a limited range of authorized disclosures"). Meta's Answer provides limited insight into what, if any, DPPA exceptions it intends to raise on the merits. *See* Dkt. 126. At the pleadings stage, Meta relied on defenses likely to fail as a matter of law, such as that it had a "key . . . to escape DPPA liability" despite using the information to serve its advertising business, relying on pre-*Maracich* case law; and that Meta's Privacy Policy could establish it had "demonstrate[d] . . . written consent" to the DMV to obtain Plaintiff's

information for all purposes. *See* Dkt. 31 at 12-14; Dkt. 49 at 16-18. Such defenses create no individual issues. *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1184 (9th Cir. 2015) ("[I]f an alleged defense is invalid as a matter of law, the defense will not give rise to individual issues and thus cannot be a valid basis for denying class certification"). There has been no indication that Meta used the Pixel for any reason that would be individualized.

### 5. Did the Personal Information "Pertain to" the Class Member?

Only "the individual to whom the [personal information from a motor vehicle record] pertains" has standing to bring a DPPA claim. Congress did not specify how to identify "the" appropriate individual when personal information pertains to multiple people, but courts hold that it is the person whose "motor vehicle record is at issue." *See, e.g.*, *Pichler*, 542 F.3d 380, 391 (3d Cir. 2008). This understanding of "the" individual is consistent with the DPPA's purpose of protecting information collected with the "coercive power of the State," because the person updating or creating their own records with the DMV is the one coerced by the State. *Maracich*, 570 U.S. at 57 ("To obtain a driver's license or register a vehicle, state DMVs . . . require an individual to disclose detailed personal information . . ."). It is also the only reasonable interpretation of the same phrase in the context of the DPPA's "consent" provisions, which also allow the person to whom information "pertains" to grant the DMV or third parties access to DMV records in their name. *See Pichler*, 542 F.3d at 391; 18 U.S.C. 2721(b)(11)-(13).

Plaintiffs propose a straightforward methodology for tying Meta's pervasive violations of the DPPA back to the individuals to whom the information pertained: compare Meta's motor vehicle records to the DMV's. Mr. Olsen's Report describes a methodology by which likely Placard Transactions and Authenticated MyDMV Transactions can be isolated in Meta's records.

Mr. Olsen's analysis showed that ███████████████████████ in the files ███████████████████ what the DMV knows to an absolute certainty: Who in California logged into their MyDMV Account and conducted an Authenticated Transaction, and who holds a Placard that they applied for or renewed online? ████████████████████ ███████████████ Plaintiffs' expert reviewed, meaning that for those Class members, ████████████████████████

DMV's records for the relevant dates. Ex. 6 (Harrald Dep., 61:23-25, 62:1. 65:24-66:21, 92:4-25). For others, ██████████████████████████████ are in Meta's records from the Pixel directly. Over the course of four years, it is virtually certain that Meta obtained *some* personal information from at least one protected transaction for every member of both Classes.

### 6. Is the Class Member Entitled to Relief?

To meet the predominance requirement under Rule 23(b)(3), "plaintiffs must be able to show that their damages are 'capable of measurement on a classwide basis,' in the sense that the whole class suffered damages traceable to the same injurious course of conduct." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017); *see also Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1024 (9th Cir. 2024) (Plaintiffs must present a method to "reliably calculate damages in a manner common to the class at trial").

The DPPA authorizes damages upon proof of a violation. 18 U.S.C. 2724(b); *Kehoe v. Fid. Fed. Bank & Tr.*, 421 F.3d 1209, 1213 (11th Cir. 2005) ("[A] plaintiff need not prove actual damages to be awarded liquidated damages"). As demonstrated above and in the Olsen Report, the elements of liability under the DPPA are susceptible to common proof, and damages can be calculated formulaically by multiplying the number of violations proven by the liquidated damages amount. *See Kellman v. Spokeo, Inc.*, No. 21-08976, 2024 WL 2788418, at *11 (N.D. Cal. May 29, 2024) ("Statutory damages are calculated as prescribed by the statutes. What the statute provides is a common question of law, so common questions predominate for the damages analysis [].").

The typical DPPA award is calculated for each instance of "access" to DMV records. *See e.g., Krekelberg v. City of Minneapolis*, No. 13-3562, 2023 WL 4828382, at *1 (D. Minn. July 27, 2023). Meta's conduct in monitoring *all* DMV web transactions across the state for four years has resulted in an unfathomable—albeit calculable—number of DPPA violations. Meta obtained identifying information that *did* identify Plaintiffs dozens or hundreds of times in just two years. *See* Exs. 21, 25. However, each instance concerned one course of conduct by Meta—deploying Pixel code automatically to the DMV website—and two principal injuries. Those are obtaining

"personal information" of Validated MyDMV Account holders, and obtaining "highly restricted personal information" of Placard holders. *See* 18 U.S.C. § 2725(4). The number of affected individuals can be determined from common proof in the DMV's and Meta's records. Plaintiffs seek one liquidated damages award for each MyDMV Class member and one for each Placard Class member.

If the evidence shows that Plaintiffs are entitled to punitive damages, those can also readily be awarded on a class-wide basis. *See, e.g.*, *Opperman v. Path, Inc.*, No. 13-00453, 2016 WL 3844326, at *16-17 (N.D. Cal. Jul. 15, 2016) ("any claim for such damages hinges, not on facts unique to each class member, but on the defendant's conduct toward the class as a whole.") (quotation and citation omitted).

### B.     Common Issues Will Predominate for Placard Class Members' CIPA Claims.

Under CIPA, someone "who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state" or "who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained" is liable to "any person who has been injured" by such violation. Cal. Penal Code § 631(a); § 637.2.

The central liability questions for this claim, therefore, are (a) Did Meta act willfully; (b) did Meta have the consent of all parties; (c) did Meta attempt to or actually read or learn the "contents" of any communication; (d) was the communication "in transit" or "being sent from, or received at" a place in California; and (e) was the Placard Class member injured?

**Willfulness.** Questions about Meta's willfulness will be answered with evidence of Meta's actions to facilitate or prevent the transmissions, and what Meta did with the contents it received. *See e.g.*, Ex. ███████████████ *see also* Ex. 4 ████████████████ ███████████ Meta will ask the jury to judge its common defenses that the Business Tool Terms of Service and Meta's internal filters overcome contrary evidence. No part of this analysis will be individualized.

PLAINTIFFS' NOTICE OF MOTION AND
MOTION FOR CLASS CERTIFICATION
CASE NO. 3:23-CV-00083-SI-VKD

**Consent.** Any "consent" defense Meta proffers must overcome common proof that its invisible Pixel code *compelled* Class members to expose their personal communications to Meta. Any suggestion that some Placard Class members knew will be overwhelmed by contrary common evidence, such the DMV's policies posted throughout the Class period. *See Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 576 (N.D. Cal. 2025) (citations and quotation marks omitted) (common questions predominated for consent where "[t]he common disclosures will permit a jury to conclude in one fell swoop whether a reasonable person would have been on notice of, and so could impliedly consent to, the particular conduct . . . [and] [t]he relevance of Google and Meta's privacy disclosures is not obvious.")

**Contents.** To prove that Placard Class members' communications are "contents," Plaintiffs will rely on the substance of these communications, which are consistent for the Class. *See Gershzon v. Meta Platforms, Inc.*, No. 23-00083, 2023 WL 5420234, at *13 (N.D. Cal. Aug. 22, 2023) ("This type of information is substantive and personal, as it shows that Gershzon has a disability (or believes that he has a disability) and that he requires a disability parking placard.").

**In Transit to or From California.** To prove that Meta acquired Class members' communications "while" they were "in transit" or "being sent" to or from California, Plaintiffs will rely on the fact that the State of California was a party to the communications. At a technical level, some pages of the DMV website were hosted on California Department of Technology servers, and others were on Amazon Web servers, which can be located in other states. Ex. 6 (Harrald Dep., 33:20-22). In all cases, however, the DMV itself participated from California, as did the vast majority of Placard Class members.[3] Any other evidence necessary to prove CIPA's

---

[3] The exception is individuals who applied for a "Travel" Disabled Person Parking Placard to use while traveling in California from another state. *See* Ex. 26 (describing placard types). For these individuals, and any California resident who happened to be out of town during the relevant communication, it is enough, for CIPA, that their communications were read by a California resident (Meta) while being sent or received in California (the DMV). To the extent this raises questions regarding whether other states' privacy laws should apply, i.e., those allowing for "one party" consent, the facts favor applying CIPA: the State of California was a party to the communications, and it has a significant interest in ensuring that its own communications about California's accommodations for disabled persons are covered by state law. *See Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 120 (2006). Moreover, there may be no conflict. At this stage in discovery, it is not yet clear whether *any* party was notified of "of the specific practice at issue" as required for Meta to prove their consent. *Frasco*, 349 F.R.D. at 576. If at any time choice-of-law questions do threaten to overwhelm the common issues, non-resident Travel

"in transit" element will be technical, and common. *See e.g.* Olsen Report ¶ 19 (noting only seconds between Pixel initialization and Pixel fire); Egelman Report ¶¶ 60-62; *id.* Ex. A.

**Injury.** All Placard Class members suffered the same injury: "an unannounced second auditor" attempted to learn, and did learn, they submitted requests for disability accommodations to the State. *Ribas v. Clark*, 38 Cal. 3d 355, 360 (1985); *see also Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1118 (9th Cir. 2020) (recognizing the "substantive intrusion that occurs when private communications are intercepted by someone who does not have the right."). By defining this Class with reference to Placard Holders, Plaintiffs are pursuing the theory that Meta's CIPA violations injured the person making the request for accommodations, even if that person required assistance from a caregiver or other agent to communicate their needs. Cal. Civ. Code § 2330.

**Relief.** CIPA provides for a $5,000 damages award per violation. § 637.2(a)(1). To identify the total number of violations, Plaintiffs will rely on the DMV's records of who it issued Disabled Person Parking Placards to (records evidenced by its ability to send Renewal Notices containing those individuals' names, Ex. 11); as well as DMV records showing whether the Placard holder applied or renewed online and when; and what their IP address, user-agent string, and other PII were at the time. Ex. 6 (Harrald Dep., 62:25, 63:1-25, 64:1-25); Ex. 8 (Smith Dep. 64:1-25, 65:1-13); Ex. 10 (summaries reflecting DMV records of "resolved" online application forms). DMV records can be checked against Meta's duplicative records to determine the number of violations each Placard holder can prove, and to confirm each person's membership in the Placard Class. *Coulter v. Bank of Am.*, 28 Cal. App. 4th 923, 925 (1994) (affirming trial court's award of CIPA statutory damages). Awarding relief on this claim will be manageable.

For the reasons above, common questions of fact and law will predominate at trial.

**C.      A Class Action Is Superior to Individual Actions.**

The superiority inquiry considers: (A) the class members' interests in individual control; (B) the extent and nature of related litigation involving class members; (C) the desirability of concentrating the litigation of the claims in this forum; and, (D) likely management difficulties.

---

Placard holders can be identified from residency records and excluded from the Placard Class.

*See* Fed. R. Civ. P. 23(b)(3).

To date, Class members have not pursued individual actions for the DPPA and CIPA violations alleged here. Many will never learn of their claims without Class Notice. Even if they did learn, the potential recovery, while non-trivial, pales in comparison to the expenses and resources required to prove this technologically complex case and overcome substantial opposition. *See Svoboda v. Amazon.com Inc.*, No. 25-1361, 2025 WL 3654053, at *8 (7th Cir. Dec. 17, 2025) (affirming superiority finding for statutory privacy claims, noting "the lack of awareness of a claim . . . or complex, costly discovery, can [] hamper individual action regardless of the potential award."); *Wilcox v. Swapp*, 330 F.R.D. 584, 597 (E.D. Wash. 2019) (finding superiority for DPPA claims, noting that "each class member's potential recovery would be 'dwarfed' by the cost of litigating DPPA claims . . . individually."); *Frasco v. Flo Health, Inc.*, No. 21-00757, 2025 U.S WL (N.D. Cal. May 22, 2025) ("There is no doubt that a class action is the superior method of adjudicating the users' claims, compared to those millions of users individually suing the three remaining defendants."). Adjudicating these claims once in this forum for two Classes is far superior to burdening this Court and over 17 million potential litigants with duplicative individual litigation. This action will be comparatively manageable. Superiority is met.

**VII.  <u>CLASS CERTIFICATION IS APPROPRIATE UNDER RULE 23(b)(2).</u>**

Class certification under Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Here, Meta exploited a single piece of code to capture information pertaining to every Class and DP Class member. Appropriate injunctive relief would include requiring Meta to cease all use of identifying information so obtained, which cannot lawfully be used for any purpose the DPPA does not authorize; and to purge its systems of communications about Placard Class members' disability accommodations which cannot be used "in any manner, or for any purpose" under CIPA § 631, among other practice changes. Plaintiffs intend to seek such relief at trial, and punitive damages if the full record warrants, for the Class. In the event the Court finds that

certification is not appropriate under Rule 23(b)(3), or not appropriate for injunctive relief, Plaintiffs respectfully request that the Class be certified under Rule 23(b)(2) for these purposes. *See e.g.*, *Brown v. Google, LLC*, No. 20-3664, 2022 WL 17961497, at \*20 (N.D. Cal. Dec. 12, 2022) (certifying Rule 23(b)(2) class where Rule 23(b)(3) was not satisfied).

## VIII. <u>APPOINTMENT OF CLASS COUNSEL</u>

Rule 23(g)(1)(A) provides that in appointing class counsel, a court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."

Ms. Gardner, Mr. Carney, and their teams thoroughly investigated this action prior to filing the complaint in January 2023, with the result that the claims asserted did not need to be re-pled or re-litigated in multiple rounds of Rule 12 motions. *See* Dkts. 1, 90. Plaintiffs' counsel have substantial experience prosecuting privacy class actions, and have demonstrated knowledge of the relevant law throughout the litigation. Joint Decl. ¶¶ 16-33; Exs. 1-2. Both firms have committed substantial resources to representing the Class over the past three years, and will continue to do so through trial and any appeal. Joint Decl. ¶¶ 8-15.

## IX. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs request that the Court certify the Classes pursuant to Federal Rule 23(b)(3), or 23(b)(2) in the alternative; appoint Plaintiff Anacleto DeLeon as Class Representative for the Placard Class; appoint Plaintiffs Mikhail Gershzon and Anacleto DeLeon as Class Representatives for the MyDMV Class; and appoint Melissa Gardner of Lieff Cabraser Heimann & Bernstein, LLP and Allen Carney of Carney Bates & Pulliam, PLLC as Class Counsel.

Dated: December 19, 2025                    Respectfully submitted,

                                            */s/        Melissa Gardner*
                                            Michael W. Sobol (SBN 194857)
                                            msobol@lchb.com
                                            David T. Rudolph (SBN 233457)
                                            drudolph@lchb.com
                                            Melissa Gardner (SBN 289096)
                                            mgardner@lchb.com
                                            John D. Maher (SBN 316157)
                                            jmaher@lchb.com
                                            Nabila Abdallah (SBN 347764)
                                            nabdallah@lchb.com
                                            LIEFF CABRASER HEIMANN
                                            & BERNSTEIN, LLP
                                            275 Battery Street,
                                            29th Floor San Francisco,
                                            CA 94111-3339
                                            Telephone: 415.956.1000
                                            Facsimile: 415.956.1008

                                            Linnea D. Pittman (admitted *pro hac vice*)
                                            lpittman@lchb.com
                                            LIEFF CABRASER HEIMANN
                                            & BERNSTEIN, LLP
                                            250 Hudson Street, 8th Floor
                                            New York, New York 10013-1413
                                            Telephone: 212.355.9500
                                            Facsimile: 212.355.9592

                                            Joseph Henry (Hank) Bates, III (SBN 167688)
                                            hbates@cbplaw.com
                                            Allen Carney (admitted *pro hac vice*)
                                            acarney@cbplaw.com
                                            Courtney Ross Brown (admitted *pro hac vice*)
                                            cbrown@cbplaw.com
                                            Connor Thompson (admitted *pro hac vice*)
                                            cthompson@cbplaw.com
                                            CARNEY BATES & PULLIAM, PLLC
                                            519 W. 7th Street
                                            Little Rock, AR 72201
                                            Telephone: 501.312.8500
                                            Facsimile: 501.312.8505

                                            *Counsel for Plaintiffs and the Proposed Classes*