**GIBSON, DUNN & CRUTCHER LLP**
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035

ELIZABETH K. MCCLOSKEY, SBN 268184
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
abarrera@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone:    (415) 393-8200
Facsimile:    (415) 393-8306

**LATHAM & WATKINS LLP**
ANDREW B. CLUBOK (*pro hac vice*)
andrew.clubok@lw.com
555 Eleventh St., NW, Suite 1000
Washington, D.C. 20004-1304
Telephone:    (202) 637-2200

MELANIE M. BLUNSCHI, SBN 234264
melanie.blunschi@lw.com
KRISTIN I. SHEFFIELD-WHITEHEAD,
SBN 304635
kristin.whitehead@lw.com
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone:    (415) 395-8129
Facsimile:    (415) 393-8095

*Attorneys for Defendant Meta Platforms, Inc.*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MIKHAIL GERSHZON, ANACLETO DELEON, and JEFF DIETRICH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No. 3:23-cv-00083-SI<br><br>**DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date:  May 8, 2026<br>Time:  10:00 a.m.<br>Courtroom 1 – 17th Floor<br><br>Date Action Filed: January 6, 2023<br>Honorable Susan Illston |

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 3

    A.    Third-party web developers can use and customize Meta's Pixel code to send data to Meta, depending on individual users' settings. ....................... 3

    B.    Meta users consent to Meta's receipt and use of data from third-party websites, and Meta prohibits developers from sending certain data. ............... 4

    C.    The DMV sent data to Meta to support its public information campaigns. ......................................................................................................... 4

    D.    Plaintiffs sued Meta and now seek certification of two classes. ...................... 5

LEGAL STANDARD ................................................................................................... 6

ARGUMENT ............................................................................................................... 7

    I.    The Proposed Class Representatives Lack Article III Standing. ...................... 7

    II.    Individualized Issues Predominate Over Common Issues. .............................. 10

        A.    Article III standing is individualized. ............................................................ 10

            1.    Whether Meta received embarrassing information about each class member is individualized. ......................................................... 10

            2.    Whether each class member suffered any public disclosure or actionable intrusion is individualized. ................................................ 13

        B.    Plaintiffs' CIPA claim presents numerous individualized issues. .................. 13

            1.    Whether data was sent from or received in California is individualized. ................................................................................... 13

            2.    Whether class members were parties to a communication is individualized. ................................................................................... 14

            3.    Whether data reveals information about a class member is individualized. ................................................................................... 15

            4.    Whether Meta received a communication's "contents" is individualized. ................................................................................... 15

        C.    Plaintiffs' DPPA claims present numerous individualized issues. ................. 17

            1.    Whether a class member's "personal information" came "from a motor vehicle record" is, at best, individualized. ............................... 17

            2.    Whether Meta "obtained" or "used" a class member's personal information is individualized. ........................................................... 20

            3.    Determining who personal information "pertains" to is individualized. ................................................................................... 21

        D.    Consent cannot be litigated on a classwide basis. .......................................... 21

        E.    Plaintiffs cannot obtain statutory damages on a classwide basis. .................. 23

    III.    The Proposed Class Representatives Are Atypical and Inadequate. ............... 24

    IV.    The Court Should Not Certify an Injunctive-Relief Class. .............................. 25

CONCLUSION ............................................................................................................ 25

i

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ...................................................................................................6

*Am. Fed'n of Teachers v. Bessent*,
152 F.4th 162 (4th Cir. 2025) .....................................................................................9

*Andrews v. Sirius XM Radio Inc.*,
932 F.3d 1253 (9th Cir. 2019) ............................................................................17, 19

*Baysal v. Midvale Indem. Co.*,
78 F.4th 976 (7th Cir. 2023) ...................................................................................7–8

*Berman v. Freedom Fin. Network, LLC*,
400 F. Supp. 3d 964 (N.D. Cal. 2019) .................................................................22, 24

*Betts v. Reliable Collection Agency, Ltd.*,
659 F.2d 1000 (9th Cir. 1981) ..................................................................................22

*Bliss v. CoreCivic, Inc.*,
711 F. Supp. 3d 1233 (D. Nev. 2024) .......................................................................23

*Brodsky v. Apple, Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020) ......................................................................15

*Byrd v. Aaron's, Inc.*,
2017 WL 4326106 (W.D. Pa. Aug. 4, 2017) .............................................................15

*Cahen v. Toyota Motor Corp.*,
717 F. App'x 720 (9th Cir. 2017) ..............................................................................11

*Campbell v. Facebook Inc.*,
315 F.R.D. 250 (N.D. Cal. 2016) ..........................................................................23–24

*Daghaly v. Bloomingdales.com, LLC*,
2024 WL 5134350 (9th Cir. Dec. 17, 2024) .............................................................16

*Davidson v. Hewlett-Packard Co.*,
2021 WL 4222130 (N.D. Cal. Sept. 16, 2021) ..........................................................13

*Davis v. Meta Platforms, Inc.*,
2024 WL 3293644 (D. Nev. July 3, 2024)........................................................1, 18, 20

*Dawidzik v. Tesla, Inc.*,
2025 WL 3786963 (C.D. Cal. Dec. 29, 2025) .............................................................8

*Dinerstein v. Google, LLC*,
73 F.4th 502 (7th Cir. 2023).....................................................................................11

Gibson, Dunn &
Crutcher LLP

ii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*DirecTV, Inc. v. Huynh*,
  2005 WL 5864467 (N.D. Cal. May 31, 2005) .................................................................23

*Doe v. Call-On DOC, Inc.*,
  2025 WL 1677632 (S.D. Cal. June 13, 2025) ................................................................14

*Dreher v. Experian Info. Sols., Inc.*,
  856 F.3d 337 (4th Cir. 2017) ..........................................................................................7

*Dye v. Meta Platforms, Inc.*,
  2024 WL 2125602 (E.D.N.C. May 10, 2024) ...................................................1, 18, 20

*Flecha v. Medicredit, Inc.*,
  946 F.3d 762 (5th Cir. 2020) ..........................................................................................7

*Frasco v. Flo Health, Inc.*,
  349 F.R.D. 557 (N.D. Cal. 2025) ..................................................................................14

*Garey v. James S. Farrin, P.C.*,
  35 F.4th 917 (4th Cir. 2022) ..................................................................................17, 25

*Gershzon v. Meta Platforms, Inc.*,
  2023 WL 5420234 (N.D. Cal. Aug. 22, 2023) ...........................................5, 16, 18, 24

*Gonzales v. Uber Techs., Inc.*,
  305 F. Supp. 3d 1078 (N.D. Cal. 2018) ........................................................................14

*In re Google Inc. Cookie Placement Priv. Litig.*,
  806 F.3d 125 (3d Cir. 2015) ..........................................................................................15

*In re Google Inc. Gmail Litig.*,
  2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ..............................................................23

*Griffith v. TikTok, Inc.*,
  2024 WL 4308813 (C.D. Cal. Sept. 9, 2024) ................................................................16

*Hart v. TWC Prod. & Tech. LLC*,
  2023 WL 3568078 (N.D. Cal. Mar. 30, 2023) ..............................................................12

*Healy v. Milliman, Inc.*,
  164 F.4th 701 (9th Cir. 2026) ........................................................................................10

*Hester-Carrillo v. Pennsylvania*,
  2023 WL 6386508 (E.D. Pa. Sept. 29, 2023) .................................................................8

*Holmes v. Elephant Ins. Co.*,
  156 F.4th 413 (4th Cir. 2025) ..............................................................................7, 9, 25

*In re Hulu Priv. Litig.*,
  2014 WL 2758598 (N.D. Cal. June 17, 2014) ..............................................................21

*Jackson v. LinkedIn Corp.*,
  2025 WL 28643 (N.D. Cal. Jan. 3, 2025) .............................................................1, 18–20

iii

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

*Kehoe v. Fidelity Fed. Bank & Trust*,
    421 F.3d 1209 (11th Cir. 2005)............................................................................................23

*Keogh v. Meta Platforms, Inc.*,
    680 F. Supp. 3d 601 (D.S.C. Feb. 14, 2024).............................................................1, 18, 20

*Kishnani v. Royal Caribbean Cruises Ltd.*,
    2025 WL 1745726 (N.D. Cal. June 24, 2025) .........................................................................8

*Knight v. Meta Platforms, Inc.*,
    No. 2:23-cv-13347 (D.N.J. July 29, 2024)................................................................1, 18, 20

*Krzyzek v. OpenX Techs., Inc.*,
    2026 WL 206855 (N.D. Cal. Jan. 27, 2026) ..........................................................................9

*Lake v. Neal*,
    585 F.3d 1059 (7th Cir. 2009)..............................................................................................20

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
    350 F.3d 1018 (9th Cir. 2003)................................................................................................7

*Lineberry v. AddShoppers, Inc.*,
    2025 WL 1533136 (N.D. Cal. May 29, 2025) .......................................................................24

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)...........................................................................................7, 9, 10, 13

*Martinez v. D2C, LLC*,
    2024 WL 4367406 (S.D. Fla. Oct. 1, 2024)...........................................................................21

*McDaniel v. Meta Platforms, Inc.*,
    No. 21-cv-383231 (Cal. Super. Ct. Dec. 30, 2024)...............................................................15

*Mikulsky v. Bloomingdale's LLC*,
    713 F. Supp. 3d 833 (S.D. Cal. 2024)...................................................................................16

*Mikulsky v. Noom, Inc.*,
    2024 WL 251171 (S.D. Cal. Jan. 22, 2024)...........................................................................11

*In re Monster Worldwide, Inc. Sec. Litig.*,
    251 F.R.D. 132 (S.D.N.Y. 2008) ...........................................................................................25

*Myers v. Aitkin Cnty*,
    2014 WL 7399182 (D. Minn. Dec. 29, 2014).....................................................................20–21

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022)...................................................................................2, 6, 10, 12

*Pichler v. UNITE*,
    542 F.3d 380 (3d Cir. 2008)................................................................................11, 21, 23

*Popa v. Microsoft Corp.*,
    153 F.4th 784 (9th Cir. 2025)...............................................................................2, 7–10, 13

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 3:23-CV-00083-SI

Gibson, Dunn & Crutcher LLP

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Rabin v. Google LLC,*
787 F. Supp. 3d 934 (N.D. Cal. 2025) ..................................................................................25

*Rasmusson v. Chisago Cnty.,*
991 F. Supp. 2d 1065 (D. Minn. 2014) ...................................................................................8

*Semien v. PubMatic Inc.,*
2026 WL 216333 (N.D. Cal. Jan. 27, 2026) ...........................................................................9

*Siegler v. Best Buy Co. of Minn., Inc.,*
519 F. App'x 604 (11th Cir. 2013) ........................................................................................19

*Smith v. Facebook, Inc.,*
745 F. App'x 8 (9th Cir. 2018) .........................................................................................8, 22

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016) ................................................................................................................7

*TransUnion v. Ramirez,*
594 U.S. 413 (2021) ................................................................................................................7

*Wilson v. Google LLC,*
2025 WL 901941 (N.D. Cal. Mar. 25, 2025) ..............................................................1, 18–19

*Zinser v. Accufix Rsch. Inst., Inc.,*
253 F.3d 1180 (9th Cir. 2001) ..............................................................................................25

*In re Zynga Priv. Litig.,*
750 F.3d 1098 (9th Cir. 2014) .........................................................................................15–16

**Statutes**

18 U.S.C. § 2721(b)(13) ...............................................................................................................22

18 U.S.C. § 2724(a) .........................................................................................................17, 20–21

18 U.S.C. § 2724(b)(1) ................................................................................................................23

18 U.S.C. § 2725(1) .....................................................................................................................18

Cal. Civ. Code § 3515 .................................................................................................................22

Cal. Penal Code § 631(a) .................................................................................................14–15, 22

Cal. Penal Code § 637.2(a) ..........................................................................................................15

Cal. Veh. Code § 1656.5(a) ...........................................................................................................4

**Other Authorities**

Merriam-Webster's Collegiate Dictionary (11th ed. 2004) ..........................................................20

Gibson, Dunn &
Crutcher LLP

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 3:23-CV-00083-SI

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Rules**

Fed. R. Civ. P. 23(a)(3)–(4) ...............................................................................................24

Fed. R. Civ. P. 23(b)(2).................................................................................................3, 25

Fed. R. Civ. P. 23(b)(3).....................................................................................................10

**Treatises**

Restatement (Second) of Torts § 652D..............................................................................13

Gibson, Dunn &
Crutcher LLP

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 3:23-CV-00083-SI

**INTRODUCTION**

Plaintiffs Mikhail Gershzon and Anacleto DeLeon brought this suit, alleging the California Department of Motor Vehicles (DMV) used publicly available computer code to send data to Meta conveying their disability status. Discovery has shown that *neither plaintiff's disability status was ever shared* with Meta. Instead of dropping their claims, plaintiffs now assert that Meta's receipt of *other* data about them violated the Driver's Privacy Protection Act (DPPA) and the California Invasion of Privacy Act (CIPA), and they seek to represent two classes of people who used the DMV's website to (1) apply for, renew, or replace a disabled person parking placard, or (2) conduct certain other online transactions (*e.g.*, replacing an ID card, changing an address, or signing up for paperless notices).

Plaintiffs propose multiple convoluted legal theories in an attempt to find a classwide way to litigate their claims. Those theories all face serious merits hurdles: since this Court issued its motion-to-dismiss order, multiple courts have confirmed that the collection of information a person inputs while browsing the DMV's website does not violate the DPPA. *E.g.*, *Wilson v. Google LLC*, 2025 WL 901941, at *4–5 (N.D. Cal. Mar. 25, 2025); *Jackson v. LinkedIn Corp.*, 2025 WL 28643, at *3–5 (N.D. Cal. Jan. 3, 2025). Similarly, four different courts have dismissed DPPA claims against Meta because the alleged identifying information did not come from any motor vehicle record. *Knight v. Meta Platforms, Inc.*, No. 2:23-cv-13347, Dkt. 19 at 3–4 (D.N.J. July 29, 2024); *Davis v. Meta Platforms, Inc.*, 2024 WL 3293644, at *3–5 (D. Nev. July 3, 2024); *Dye v. Meta Platforms, Inc.*, 2024 WL 2125602, at *3–4 (E.D.N.C. May 10, 2024); *Keogh v. Meta Platforms, Inc.*, 680 F. Supp. 3d 601, 609–12 (D.S.C. Feb. 14, 2024). No matter which theory plaintiffs advance or how they try to avoid these hurdles, they run straight into problems of standing (for themselves and putative class members) and numerous other element-by-element individualized merits issues that preclude certification.

As a threshold matter, plaintiffs lack Article III standing. This Court permitted the case to get past the pleading stage based on Gershzon's allegations that the DMV conveyed his disability status to Meta. But those allegations were false: as Gershzon now concedes, he never applied for or renewed a disabled person parking placard on the DMV's website, so the data was never even created, much less shared with Meta. DeLeon, who was added as a plaintiff late in the case, likewise has no injury. The data transmitted to Meta suggests that DeLeon visited a webpage with an application for a disabled

Gibson, Dunn &
Crutcher LLP

1

person parking placard, but does not show whether he submitted an application—let alone whether he is disabled, or what disability he may have.

Plaintiffs are thus left with claims that Meta received data reflecting their non-sensitive browsing activity on the DMV's website. The Ninth Circuit recently held that there is no standing for such a claim, because there is nothing embarrassing or private about the disclosed information. *See Popa v. Microsoft Corp.*, 153 F.4th 784, 791 (9th Cir. 2025). The data Meta received about plaintiffs reflects commonplace activities on the DMV website; it did not reveal disability status or other potentially sensitive facts. Data like that is not "embarrassing, invasive, or otherwise private," as *Popa* requires; indeed, ███████████. Numerous courts have dismissed wiretapping and DPPA claims for lack of standing even where *more* potentially private information (like driver's license numbers) was at stake. Because this case should be dismissed on standing grounds, the Court need not reach the Rule 23 analysis.

If the Court does address Rule 23, class certification must be denied because individualized issues predominate. The first is standing, which plainly cannot be resolved on a classwide basis even if Gershzon and DeLeon themselves can satisfy *Popa*. As a result, "individualized inquiries" about "the injury status of class members" would "predominate over common questions" and preclude certification. *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 668 (9th Cir. 2022) (en banc). Beyond standing, plaintiffs' CIPA and DPPA claims raise additional individualized issues. For CIPA: (1) whether each class member was in California when they accessed the DMV's website, (2) whether each class member was a party to the communication at issue, (3) whether the data reflects their own information (survey results indicate that 48% of disabled person parking placard transactions are not performed by the person with the disability, A7-1396–97), and (4) whether Meta received the "contents" of their communication. For the DPPA: (1) whether any "personal information" Meta received came "from a motor vehicle record," (2) whether Meta "obtained" or "used" the information, and (3) who the information "pertains" to. And for both claims: each class member's consent and entitlement to damages. All these issues involve complex statutory and factual analyses, with no classwide answers.

In addition, neither plaintiff is a typical or adequate class representative. Plaintiffs propose to

represent classes including both Facebook users and non-users. But as Facebook users, plaintiffs expressly consented to Meta's receipt of data about their activity on third-party websites. So plaintiffs face a consent defense that non-users do not, and courts routinely find that class representatives are not typical where they are subject to unique defenses. Plaintiffs also have serious credibility problems: they engaged in demonstrable falsehoods and inflammatory statements that would be distracting at trial and should foreclose them from representing any class at all.

Finally, the Court should not certify any injunctive-relief class. Plaintiffs treat that request as an afterthought, but the primary relief sought is clearly monetary, making Rule 23(b)(2) certification inappropriate. They also lack standing for prospective relief: the DMV stopped using Pixel code more than two years ago, so there is no imminent risk of plaintiffs' data being sent to Meta.

For all these reasons, plaintiffs' class-certification motion should be denied.

## BACKGROUND

### A. Third-party web developers can use and customize Meta's Pixel code to send data to Meta, depending on individual users' settings.

This case concerns the Meta Pixel, computer code that Meta makes publicly available for web developers to use. A1-2; A7-1631.[1] Pixel code is ubiquitous—numerous companies offer similar analytics tools, and millions of web developers use them to measure activity on their websites. A6-582–609; A7-1630–31. Meta's Pixel code is free and customizable; web developers choose whether, where, and how to use it. A1-2–4; A7-1640–49. Developers can configure this code to measure certain actions users take on their websites, called "events." A1-3; A7-1632–36. They also choose what information to send along with an event (called "event data"). A1-3; A7-1642. Users' individual settings, including ad-blocking software and private-browsing modes (like in Firefox or Safari), can prevent any data from being sent. A1-9; A5-430–32; A7-1651–58.

When Meta receives event data from a web developer, it tries to match that data to a Facebook or Instagram account. A1-7; A5-420, 426–27, 437–38. But it cannot always do so. A1-9; A5-421–25, 428–29. Matching depends on, among other things, what data a developer sends, whether the

---

[1] Citations to "A#-#" are to the appendix filed concurrently with this brief. The first # represents the volume, and the second represents the page number (*e.g.*, A1-3 refers to appendix volume 1, page 3).

Gibson, Dunn & Crutcher LLP

developer uses Meta's "advanced matching" feature, whether the user has logged into a Facebook or Instagram account on their device, and the user's browser and account settings.  A1-7–11.

### B.    Meta users consent to Meta's receipt and use of data from third-party websites, and Meta prohibits developers from sending certain data.

When a person signs up for Facebook or Instagram, they agree to Meta's policies, including its Privacy Policy.  A1-34.  Those policies explain that Meta receives data about users' activity on third-party websites that use Pixel code, that Meta uses the data for ads, and that Meta and third parties use cookies on users' browsers and devices to facilitate these processes.  A2-108–A4-328; A5-545–78.

Developers that use Pixel code must agree to Meta's terms, including the Business Tools Terms.  A1-4–5.  Those terms forbid sending unhashed information that "personally identifies individuals, such as names, email addresses, and phone numbers."  A1-17, 21, 24, 27.[2]  Developers also must "represent and warrant" that they "have all of the necessary rights and permissions and a lawful basis . . . for the disclosure and use of Business Tool Data," and "that [they] have provided robust and sufficiently prominent notice to users regarding the Business Tool Data collection, sharing and usage that includes . . . how users can opt-out of the collection and use of information for ad targeting."  A1-17–18, 21, 24, 27, 29.

Meta has also built (and continuously enhances) systems designed to prevent receipt and use of certain information that developers are forbidden from sending.  A1-6; A5-415–19.  During the proposed class period, Meta maintained a filter designed to identify and remove unhashed contact information.  A1-6.  When Meta's systems detected that any web developer sent potentially prohibited data, Meta filtered it out and sent a notification to the developer advising it to check its configurations and reminding it of its obligation not to send such data.  A1-7.

### C.    The DMV sent data to Meta to support its public information campaigns.

The California DMV serves a wide range of functions, including "the disbursement of important public safety and consumer information."  Cal. Veh. Code § 1656.5(a); A5-523–24; A6-1354–55.  The DMV fulfills this function through various channels—including Facebook and Instagram, where the DMV has delivered ads to provide information to the public on a variety of topics.  A5-532–33, 535–

---

[2] "Hashing" refers to the process of transforming data into an alphanumeric code, such that the underlying information is not apparent from the hashed value.  A7-1629-30.

4

Gibson, Dunn & Crutcher LLP

36.   To better communicate with its target audiences, the DMV used Meta's Pixel code. A6-1221, 1223–26. It first implemented Pixel code on its website on August 14, 2019, and removed it on August 25, 2023. Mot. 1; A6-1306–15. The DMV configured the code to transmit certain information to Meta, including the URLs of the webpages people visited. Dkt. 142-4 ("Egelman Rpt.") at 5; A5-498; A7-1669. It used this data to send ads to raise public awareness about certain services, including one campaign to promote REAL ID adoption and another to inform drivers, caregivers, advocacy groups, senior living communities, and others about a change in the law regarding disabled person parking placards. A5-530–31, 537. While some of the data transmitted reflected visits to webpages with information about disabled person parking placards, the data does not reveal whether the person who visited the page is actually disabled—including because not everyone who visits a page about parking placards submits any application, and because survey results show that ███████████████ ████████████████████████████████████████████ A7-1408, 1543–47.

**D.      Plaintiffs sued Meta and now seek certification of two classes.**

Mikhail Gershzon filed this action against Meta in January 2023 and asserted claims under the DPPA and CIPA based on Meta's alleged receipt of his data. *See* Dkt. 1. In the complaint, Gershzon alleged the DMV had sent personal information revealing his disability status. *Id.* ¶¶ 1–4, 44, 51. The basis for that allegation was that Gershzon had supposedly started an online application for a disabled person parking placard in 2020 and that the DMV supposedly sent data about that activity to Meta. *Id.* ¶ 62. This Court relied on those allegations in its order denying Meta's motion to dismiss. *Gershzon v. Meta Platforms, Inc.*, 2023 WL 5420234, at *7–8 (N.D. Cal. Aug. 22, 2023). Gershzon's allegations, however, were false. Discovery revealed Gershzon submitted his application by phone, not online. *See* Mot. 8. Gershzon now concedes his allegations were untrue, and instead asserts he created a MyDMV account and renewed his ID card online in August 2020. *Id.*

Anacleto DeLeon was added to the complaint in September 2025. *See* Dkt. 121 ("Am. Compl.") ¶ 5.b. He alleges that he used the DMV website on December 5, 2020, to request a copy of his driving record; on March 10, 2023, to change his address and opt into paperless notices; and on

Gibson, Dunn & Crutcher LLP

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 3:23-CV-00083-SI

March 14, 2023, to apply for a disabled person parking placard. *Id.* ¶ 62.b; Mot. 9.[3]

Plaintiffs now ask this Court to certify two classes: one encompassing applicants for disabled person parking placards (the "Placard Class"), and another encompassing individuals who completed at least one of seven listed transactions on the DMV website (the "MyDMV Class"). Mot. 2.

The Placard Class includes "[a]ll current and former holders of a Permanent, Temporary, or Travel Disabled Person Parking Placard issued by the California Department of Motor Vehicles whose Disabled Person Parking Placard application, replacement or renewal ('Placard Transaction') record is in Meta's records from the DMV website." Mot. 2. Plaintiffs do not define "Meta's records," but seem to rely on five data tables their expert considered: *ads_pixel_traffic*, *offsite_signals*, *offsite_signals_pipe*, *pixel_button_clicks*, and *inferred_website_events*. *See* Dkt. 142-6 ("Olsen Rpt.") ¶¶ 14, 16. They assert DPPA and CIPA claims on behalf of this class, and propose DeLeon as class representative.

The MyDMV Class includes "[a]ll natural persons who held a Validated MyDMV Account and conducted an Authenticated DMV Online Transaction between February 22, 2020 and August 25, 2023 at 11:03 a.m. PT." Mot. 2. A "Validated MyDMV Account" is an account on the DMV's website where the DMV has confirmed certain information about the accountholder. *Id.* at 5. "Authenticated DMV Online Transactions" is not a term defined by the DMV; plaintiffs use it to refer to seven transactions individuals can conduct on the DMV website using a validated MyDMV account: Renew License, Renew ID Card, Replace License, Change Address, Request Vehicle Record, Request Driver Record, and Receive Paperless Notices. *Id.* at 5–6. Plaintiffs assert only DPPA claims on behalf of this class, and propose both Gershzon and DeLeon as class representatives.

## LEGAL STANDARD

Rule 23 "imposes stringent requirements for certification that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). Plaintiffs must "prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc).

---

[3] The amended complaint also included a third plaintiff, Jeff Dietrich. Am. Compl. ¶ 5.c. But he later told plaintiffs' counsel that he no longer wished to be represented or participate in the case. A6-1369.

Gibson, Dunn & Crutcher LLP

## ARGUMENT

**I.    The Proposed Class Representatives Lack Article III Standing.**

Rather than certify a class, the Court must dismiss the action for lack of jurisdiction because the proposed class representatives lack standing. The class representatives' standing is a jurisdictional "threshold issue." *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) (quotation marks omitted). And because it is lacking, the Court need not reach the Rule 23 analysis; the proper course is instead "to dismiss." *Id.* at 1023; *see also Flecha v. Medicredit, Inc.*, 946 F.3d 762, 769 (5th Cir. 2020) (class representatives' standing must be resolved "prior to deciding class certification"); *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 347 (4th Cir. 2017) (similar).

To establish standing, plaintiffs must show a concrete "injury in fact." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiffs' allegations of DPPA and CIPA violations, even if meritorious, are not enough: "Article III standing requires a concrete injury even in the context of a statutory violation," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016), because a legislature cannot "enact an injury into existence." *TransUnion v. Ramirez*, 594 U.S. 413, 426 (2021) (quotation marks omitted). Courts routinely dismiss cases asserting DPPA and wiretapping claims where the plaintiff fails to demonstrate that the violation caused an injury. *See, e.g.*, *Popa v. Microsoft Corp.*, 153 F.4th 784, 794–95 (9th Cir. 2025) (wiretapping); *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 425 (4th Cir. 2025) (DPPA); *Baysal v. Midvale Indem. Co.*, 78 F.4th 976, 980 (7th Cir. 2023) (DPPA).

Neither plaintiff has shown that any DPPA or CIPA violations caused him any concrete injury. Plaintiffs claim they suffered a violation of their privacy, but they fail to identify, as required, any *specific* harm previously recognized at common law. *Popa*, 153 F.4th at 792–93. Only two such torts are conceivably available—intrusion upon seclusion and public disclosure of private facts—and for two independent reasons, plaintiffs cannot show standing based on either.

***No embarrassing information.*** Both intrusion upon seclusion and public disclosure of private facts require proof that the intrusion or disclosure was "highly offensive"—which requires that plaintiffs' "embarrassing, invasive, or otherwise private information" be at stake. *Popa*, 153 F.4th at 791. That is a high bar: the Ninth Circuit's example was using "a telescopic lens" to take "intimate pictures" of a person through their bedroom window for "weeks." *Id.* (quoting Restatement (Second) of Torts).

Gibson, Dunn &
Crutcher LLP

The harm stems from the humiliation inherent in such an act. *See id.* at 790–91 & n.4.

Here, as in *Popa*, the data reflecting Gershzon's and DeLeon's "interactions with [the DMV's] website" does "not implicate a similarly sensitive sphere." *Popa*, 153 F.4th at 791. A person's interactions with the DMV generally are not "embarrassing or intimate." *Baysal*, 78 F.4th at 979. Indeed, the Seventh Circuit found no standing to sue over the disclosure of driver's license numbers (even assuming disclosure violated the DPPA), because such disclosure "is not potentially embarrassing or an intrusion on seclusion." *Id.* at 979–80. The information Meta received about Gershzon and DeLeon is even *less* sensitive—it does not disclose their disability status and does not include their driver's license numbers; it merely reflects innocuous and commonplace activities like opting into paperless notices and renewing an ID card. *See* Dkts. 140-20; 140-23; A6-776–1140. That is hardly akin to the intimate bedroom activity the Ninth Circuit pointed to in *Popa*, and numerous courts have found no standing for claims based on similarly innocuous web-browsing data. 153 F.4th at 791; *see, e.g.*, *Dawidzik v. Tesla, Inc.*, 2025 WL 3786963, at *5 (C.D. Cal. Dec. 29, 2025); *Kishnani v. Royal Caribbean Cruises Ltd.*, 2025 WL 1745726, at *1, *4 (N.D. Cal. June 24, 2025).

Some of the data associated with DeLeon suggests, at most, that he visited the application page for a disabled person parking placard (but does not include any information about his disability status, what disability he has, or whether he even submitted an application). Dkt. 140-23 at 9; A6-1141–66; A7-1545. That is not sensitive, as DeLeon himself agreed. A5-465; *see also Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018). There is no "legitimate expectation of privacy" in information a person "show[s] . . . to strangers on a daily basis." *Rasmusson v. Chisago Cnty.*, 991 F. Supp. 2d 1065, 1076 (D. Minn. 2014) (rejecting privacy claim based on "driver's license information"); *accord Hester-Carrillo v. Pennsylvania*, 2023 WL 6386508, at *11 (E.D. Pa. Sept. 29, 2023). The entire point of applying for a disabled person parking placard is to obtain a bright blue card to hang on the rearview mirror for all to see. ██████████ A6-767, 774. He cannot credibly claim the fact that he visited an application page for such a placard—without any information about his disability or even whether he ultimately applied—is "embarrassing, invasive, or otherwise private," or that its disclosure is "highly offensive." *Popa*, 153 F.4th at 791.

Gibson, Dunn & Crutcher LLP

***No public disclosure or actionable intrusion.***  Setting aside the sensitivity of the information, plaintiffs also fail to show other "key elements that shape the harm proscribed" at common law—specifically, public disclosure (for public disclosure of private facts) or an offensive intrusion (for intrusion upon seclusion).  *Popa*, 153 F.4th at 792.  "[E]ven when sensitive personal information is at issue, actionable harm does not occur any time that information is shared without permission." *Holmes*, 156 F.4th at 424.  Instead, as *Popa* confirms, both of the potential common law analogues require sensitive information *and* some additional harm.  No such harm is present here.

For public disclosure of private facts, the relevant harm occurs only when sensitive information is "disclos[ed] to the public at large." *Am. Fed'n of Teachers v. Bessent*, 152 F.4th 162, 172 (4th Cir. 2025); *see Popa*, 153 F.4th at 791.  Plaintiffs do not allege that happened, and disclosure to Meta "differ[s] in kind" from the large-scale publicity required at common law. *Holmes*, 156 F.4th at 425.

Similarly, intrusion upon seclusion "guard[s] not against the disclosure of sensitive information as such, but against the feeling of unease when and where one should ideally be at peace"—its "harm is felt when a reporter accosts a convalescing patient in the hospital, when a private detective peers through a bedroom window for weeks, and when a photographer snaps an opportunistic photo of a woman's underwear." *Am. Fed'n of Teachers*, 152 F.4th at 172; *see Popa*, 153 F.4th at 791.  That intrusion-based harm is "distinct" from the mere "alleged harm of unauthorized access" to information—and in the DPPA context in particular, it requires some actionable intrusion *beyond* a disclosure of information. *Am. Fed'n of Teachers*, 152 F.4th at 172–73.  Plaintiffs allege no such intrusion here.  They allege that Meta used their data to serve them advertising, but any conceivable harm from seeing online ads while browsing Facebook is "different in kind, not just in degree, from the harm inflicted by reporters, detectives, and paparazzi." *Id.* at 172.  And even if it constituted an injury (it does not), plaintiffs have not established that any ad they saw is "traceable" to data obtained from the DMV (as opposed to other online activity). *Lujan*, 504 U.S. at 560 (brackets omitted).[4]

---

[4] This Court's recent decisions distinguishing *Popa* in cases involving "sensitive information" collected from "interactions across many websites" by "data broker[s]" who sold that information underscore what is missing here.  *Semien v. PubMatic Inc.*, 2026 WL 216333, at *1, *4 (N.D. Cal. Jan. 27, 2026) (Illston, J.); *see also Krzyzek v. OpenX Techs., Inc.*, 2026 WL 206855, at *3–4 (N.D. Cal. Jan. 27, 2026) (Illston, J.).  Unlike in those cases, this case involves *non-sensitive* browsing data from a *single website* that is *not sold* or further disseminated—which puts it squarely under *Popa*.  This case is also at the

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 3:23-CV-00083-SI

Because the class representatives lack Article III standing, this case must be dismissed.

## II.    Individualized Issues Predominate Over Common Issues.

Assuming plaintiffs have standing, they must satisfy Rule 23(b)(3)'s predominance requirement for damages classes.  That requires them to offer evidence for their claims that "is capable of classwide resolution . . . in one stroke." *Olean*, 31 F.4th at 663 (quotation marks omitted).  They have not done so: there are no classwide answers to the most important issues in the case, including each class member's standing; whether each element of CIPA and the DPPA is satisfied; consent; and damages.  These individualized issues preclude class treatment.

### A.    Article III standing is individualized.

The Ninth Circuit made clear in *Popa* that courts must "account[] for the individual circumstances giving rise to the plaintiffs' alleged injuries" and may not simply "greenlight[] a per se rule for privacy statutes"—indeed, the decision repeatedly emphasized that *TransUnion* "contemplates a standing inquiry particularized to a plaintiff's circumstances" and "reject[ed] a one-size-fits-all approach." 153 F.4th at 791–92, 794; *see also, e.g.*, *id.* at 793 (requiring assessment of "whether the *specific* plaintiffs" suffered a concrete injury).  Nor can this individualized showing be delayed until trial or post-trial proceedings; if a class were certified, plaintiffs would have to "present evidence of standing at summary judgment" for every single class member, including "both named and unnamed" ones. *Healy v. Milliman, Inc.*, 164 F.4th 701, 703 (9th Cir. 2026).  That means plaintiffs must prove, for every class member, that (1) Meta received "embarrassing, invasive, or otherwise private" information, and (2) the class member suffered either an actionable intrusion or a public disclosure of their information.  *Popa*, 153 F.4th at 791; *see supra* 7–9.  There is no classwide way to do that.

#### 1.    Whether Meta received embarrassing information about each class member is individualized.

Start with whether the information Meta received about each class member was "embarrassing, invasive, or otherwise private." *Popa*, 153 F.4th at 791.  As *Popa* foreshadowed, that question will turn on "the individual circumstances" of each class member. *Id.* at 794.  Here, those circumstances

class-certification stage, where plaintiffs are put to a higher burden than at the motion-to-dismiss stage. *See Lujan*, 504 U.S. at 561 (plaintiffs must support standing "with the manner and degree of evidence required at the successive stages of the litigation").

10

Gibson, Dunn &
Crutcher LLP

include questions about (1) matching, (2) sensitivity, and (3) class-member conduct.

*Matching.* Data that is not associated with an individual is not sensitive or embarrassing, and cannot confer Article III standing. *See, e.g., Cahen v. Toyota Motor Corp.*, 717 F. App'x 720, 724 (9th Cir. 2017); *Dinerstein v. Google, LLC*, 73 F.4th 502, 513–14 (7th Cir. 2023); *Mikulsky v. Noom, Inc.*, 2024 WL 251171, at *4–5 (S.D. Cal. Jan. 22, 2024). Meta cannot match data for people who do not use its services (like Facebook or Instagram), and cannot always match data even for users. A1-7, 9; A5-421–25, 428–29. Plaintiffs concede that in a data sample their expert reviewed, ███████ Mot. 14, 18; A6-1366–67. ███████ A1-11; *see also* A7-1406—and when data is matched to a person it does not pertain to, it does not harm that person. *See, e.g., Pichler v. UNITE*, 542 F.3d 380, 391 (3d Cir. 2008) (wife lacked standing to assert DPPA claim based on disclosure of husband's information). The DMV testified that anyone can submit information on its website on behalf of anyone else (and that individuals can log into someone else's MyDMV account)—for example, a relative or caregiver could submit an application for a disabled person parking placard on someone else's behalf. A5-489–90; *see also* A5-534. In fact, ███████ A7-1406. When that happens, ███████ A1-10; A7-1639-40. Gershzon himself provides one example: ███████ A5-397. Similarly, ███████. A1-10; A7-1672-73. The class data shows ███████ A7-1672-73. It will take individualized evidence and analysis to figure out whether each data

11

Gibson, Dunn & Crutcher LLP

transmission was matched to the person the information actually pertains to.

Plaintiffs claim they can cure this issue by "compar[ing]" the DMV's data and Meta's data. *See* Mot. 18. But they fail to meet their burden of showing how this could possibly work. Plaintiffs allude to their expert, but his report does not offer any classwide way to carry out this data comparison—in fact, he ██████████████████████████████████████████████████████ A6-1365. Nor is it clear that the data to do so even exists: Meta's event data goes back only to ████████ and plaintiffs never obtained the necessary records from the DMV. A5-383 ¶ 70. The DMV was "not sure" "[w]hat would be in [its] records" and testified that, even if some relevant information is stored, additional steps may be necessary to "track back to who actually . . . performed the . . . transaction." A5-503. And plaintiffs offer no support for their speculative assertion that any data in Meta's systems could be compared with whatever data the DMV may have. A5-504. None of this guesswork comes anywhere close to satisfying plaintiffs' "burden" to "prove the facts necessary" to show their claims can be litigated classwide. *Olean*, 31 F.4th at 665.

*Sensitivity.* Data reflecting a person's activity on the DMV website often reveals nothing sensitive. *See supra* 7–8. Even if this Court concludes that *some* data transmitted by the DMV to Meta reveals information sufficiently sensitive for standing, determining whether the data associated with each class member qualifies would require individualized analysis. Plaintiffs' classes cover many innocuous activities that are unlikely to generate any sensitive information (like signing up for paperless notices). *See* Mot. 5–6. And each class member will have interacted with the DMV's website in different ways and had different data transmitted to Meta. For example, the ██████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ A7-1546-47. Such accidental clicks cannot reveal sensitive information.

*Class-member conduct.* "[C]ertain factors personal to an individual may affect whether that individual maintained a reasonable expectation of privacy," and "courts have found individualized issues to overwhelm common issues at class certification for such claims." *Hart v. TWC Prod. & Tech. LLC*, 2023 WL 3568078, at *9 (N.D. Cal. Mar. 30, 2023) (denying class certification for invasion-of-

Gibson, Dunn & Crutcher LLP

privacy claim). One such factor is that a person who publicizes information cannot maintain a reasonable expectation of privacy in it or claim it is "private." *Popa*, 153 F.4th at 791; *see also, e.g., Davidson v. Hewlett-Packard Co.*, 2021 WL 4222130, at *6–7 (N.D. Cal. Sept. 16, 2021), *aff'd*, 2022 WL 17352186 (9th Cir. Dec. 1, 2022); Restatement (Second) of Torts § 652D cmt. b; A7-1540–41. Similarly, a person who shares information with Meta directly (*e.g.*, by providing it when creating an account or posting it on Facebook) cannot claim an injury when Meta later receives the same information. Many class members voluntarily shared the information at issue.



A6-610–14, and A6-767, 773. (A6-1321–28), (A6-1329–32), or (A6-1333–40). And users provide a range of contact information, including their names and email addresses, when they create a Facebook or Instagram account. A5-394–95; A5-446–49; A7-1541. It will take individualized inquiries to figure out who shared what.

> **2.    Whether each class member suffered any public disclosure or actionable intrusion is individualized.**

To recover, each individual also must have suffered an actionable intrusion or public disclosure of their information. *See supra* 9. Again, there is no evidence that Meta publicized any data it received, so no class member will be able to make that showing. And to the extent plaintiffs suggest that receiving targeted ads qualifies as an intrusion (it does not, *see supra* 9), that would require individualized analyses to determine whether each class member actually saw any such ad and, if so, whether the ad was "traceable" to data obtained from the alleged DPPA and CIPA violations. *Lujan*, 504 U.S. at 560 (brackets omitted); *see supra* 9.

> **B.    Plaintiffs' CIPA claim presents numerous individualized issues.**

Plaintiffs assert a CIPA claim on behalf of the Placard Class (but not the MyDMV Class). For multiple reasons, plaintiffs cannot prove that claim on a classwide basis.

> **1.    Whether data was sent from or received in California is individualized.**

CIPA requires plaintiffs to prove that their data was "sent from, or received at any place within"

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 3:23-CV-00083-SI

California.  Cal. Penal Code. § 631(a).  Courts deny certification where there is "no classwide method of determining whether California resident users" interacted with an online platform "while they were in California."  *Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 586–87 (N.D. Cal. 2025) (denying certification of CIPA § 631 claim in case involving Meta Business Tools).  This Court should do the same.

Plaintiffs' proposed classes are not limited to California residents, putting them in a *worse* position than the class rejected in *Flo*.  Some transactions, like applications for a "Travel" disabled person parking placard by people traveling to California, are particularly likely to have occurred out of state.  *See* Mot. 21 n.3.  And even if plaintiffs' classes were limited to California residents, that would not be enough (just as it was not in *Flo*).  The statute hinges on where data is "sent from" or "received at," not where the sender or recipient resides, and individuals can access the DMV's website from anywhere.  Cal. Penal Code § 631(a); *see also, e.g.*, *Doe v. Call-On DOC, Inc.*, 2025 WL 1677632, at *10–11 (S.D. Cal. June 13, 2025) (dismissing claim by California resident).  There is no classwide way to prove where each class member was when they accessed the DMV's website.  *See Frasco*, 349 F.R.D. at 587.

Plaintiffs offer two responses, but neither solves the problem.  *First*, they say "the State of California [*i.e.*, the DMV] was a party to the communications."  Mot. 21.  But the DMV's location is irrelevant, because what matters is where data is "sent from" or "received at."  Cal. Penal Code § 631(a).  Pixel event data is *sent from* a user's device (not the DMV) and *received at* one of Meta's Points of Presence (which are located around the country, like cell towers).  A5-371–72.  *Second*, plaintiffs argue that Meta is "a California resident."  Mot. 21 n.3.  But again, residency is not what matters; what matters is where data is received, and Meta receives data at Points of Presence all around the country.  A5-371.  Plaintiffs have no classwide evidence to prove this element of their claim.

   **2.**  **Whether class members were parties to a communication is individualized.**

A person may sue under CIPA only if "*his* communications" were intercepted.  *Gonzales v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078, 1086 (N.D. Cal. 2018) (rejecting claim under analogous provision of federal Wiretap Act).  So even if data reflecting online activity is matched to a person's Facebook account, the accountholder has no wiretapping claim unless they were the person who actually engaged in that activity.  Courts deny class certification where answering this question requires individualized inquiries.  *See Byrd v. Aaron's, Inc.*, 2017 WL 4326106, at *14–15 (W.D. Pa. Aug. 4,

Gibson, Dunn & Crutcher LLP

2017) (federal Wiretap Act claim); *McDaniel v. Meta Platforms, Inc.*, No. 21-cv-383231, at 15 (Cal. Super. Ct. Dec. 30, 2024) (CIPA § 631 claim).

Plaintiffs have no classwide way to show each class member was a party to the communications at issue. Data can be matched to someone's Facebook account even if it does not reflect their own browsing activity. For example, if someone uses a shared device (like a family computer) or another person's device to visit the DMV's website, that activity can be matched to the account of whoever *last* used the device and logged into Facebook—not the person who visited the DMV's website. A1-11. Shared devices would be especially common among the individuals likely to need a disabled person parking placard, like people in senior living communities. It would take individualized inquiries to sort all of this out for each class member.

**3.    Whether data reveals information about a class member is individualized.**

Even if a class member was a party to a communication, they cannot sue if it does not reveal any sensitive information *about them*. So when a person visits the DMV's website and conducts a transaction *on behalf of someone else*, they have no injury or CIPA claim. As explained above, plaintiffs cannot make that showing on a classwide basis because (1) not all data can be matched to a Facebook or Instagram account (making it difficult or impossible to determine who the information pertains to); (2) even when data is matched, it is not always matched to the account of the person it pertains to; and (3) matched data may not reflect an intentional visit to a particular DMV webpage. *Supra* 11–12. In addition to presenting a standing problem, this means plaintiffs are unable to prove classwide that each class member was "injured by a violation" of CIPA. Cal. Penal Code § 637.2(a).

**4.    Whether Meta received a communication's "contents" is individualized.**

CIPA also requires plaintiffs to prove Meta intercepted the "contents" of their communications. Cal. Penal Code § 631(a). To show information is "contents," plaintiffs must show it was the "intended message conveyed by the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014); *see Brodsky v. Apple, Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020). This analysis is "contextual with respect to each communication" and does not yield "general answer[s]." *In re Google Inc. Cookie Placement Priv. Litig.*, 806 F.3d 125, 137 (3d Cir. 2015) (quotation marks omitted). URLs reflecting the fact of a website visit, "as opposed to information [plaintiffs] might have entered while

using the website," are not "contents." *Daghaly v. Bloomingdales.com, LLC*, 2024 WL 5134350, at *1 (9th Cir. Dec. 17, 2024) (quotation marks omitted); *see also, e.g.*, *Zynga*, 750 F.3d at 1108–09; *Mikulsky v. Bloomingdale's LLC*, 713 F. Supp. 3d 833, 845 (S.D. Cal. 2024).

As another court recently held in a case challenging TikTok's receipt of web-browsing data from a similar pixel tool, this contextual analysis precludes certification. *Griffith v. TikTok, Inc.*, 2024 WL 4308813, at *6–7 (C.D. Cal. Sept. 9, 2024). In holding that the "contents" element was not "appropriate for classwide resolution," the *Griffith* court distinguished the motion-to-dismiss order in this case as involving "specific information" for the named plaintiff alleged in the complaint (allegations that Gershzon has now conceded were untrue). *Id.* at *7 (quotation marks omitted); *see supra* 5. That distinction does not help plaintiffs at this stage, where the information transmitted for each class member differs. As plaintiffs concede, much of the information at issue is not "contents" at all, but merely a string of alphanumeric codes like session and transaction IDs. Mot. 6–8. And much of the data on which plaintiffs base their claims consists only of URLs revealing, at most, "the fact that [a class member] visited" a particular webpage. *Daghaly*, 2024 WL 5134350, at *1; *see* A6-776–1140. Assessing whether any URLs contain "information [a class member] might have entered while using the website," *Daghaly*, 2024 WL 5134350, at *1, would be impossible to do on a classwide basis.

At the motion-to-dismiss stage, this Court allowed Gershzon's claim to proceed because he alleged the data Meta received showed "that [he] has a disability (or believes that he has a disability) and that he requires a disability parking placard," which the Court deemed "substantive and personal" information. *Gershzon*, 2023 WL 5420234, at *13. That allegation was false: Gershzon never applied for a placard online, so there was no data to send. And as to DeLeon, the data Meta received does not even reveal whether he submitted an application, much less the contents of what (if anything) he entered, whether he identified as disabled, or the nature of any such disability. *See* A6-776–1140. In any event, whether information qualifies as "contents" does not turn on whether it reveals substantive or personal information; it turns on whether the information was the "intended message conveyed by the communication." *Zynga*, 750 F.3d at 1106 (quotation marks omitted); *see id.* at 1108 (even data revealing visit to "the Facebook page of a gay support group" is not "contents"). To prevail on this element, plaintiffs need to show that a particular event data transmission included the contents of a

16

Gibson, Dunn & Crutcher LLP

class member's message to the DMV.  They cannot make that showing classwide.

**C.      Plaintiffs' DPPA claims present numerous individualized issues.**

Plaintiffs assert DPPA claims on behalf of both putative classes.  The DPPA provides that "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains."  18 U.S.C. § 2724(a).  To make out a claim, each class member will need to prove (among other things) that (1) any "personal information" Meta received came "from a motor vehicle record"; (2) Meta "obtained" or "used" the information; and (3) the information "pertains" to the class member. *Id.*  Plaintiffs cannot make any of those showings on a classwide basis.

**1.      Whether a class member's "personal information" came "from a motor ve-hicle record" is, at best, individualized.**

To serve as the basis for a DPPA claim, "personal information" must come "from a motor vehicle record."  18 U.S.C. § 2724(a).  "Personal information" is defined as "information that identifies an individual." *Id.* § 2725(3) (listing examples).  And to come "from a motor vehicle record," personal information must come "from" "any record that pertains to a motor vehicle operator's *permit*, motor vehicle *title*, motor vehicle *registration*, or *identification card* issued by a department of motor vehi-cles." *Id.* § 2725(1) (emphases added).  It is not enough for the information to simply overlap with what happens *also* to be in a motor vehicle record (like a name or address, which may appear in a motor vehicle record and countless other places).  That is why, for example, information obtained from "a driver's license in the possession of its owner" is not "from a motor vehicle record"—that information is "obtained independently of any records," "even if identical information is contained in the records." *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1259–60 (9th Cir. 2019) (quotation marks omitted).  Put differently, the statute applies to "a defendant who obtains such information directly '*from* a motor vehicle record,'" "not a defendant who obtains information that, at some point in time, appeared in a motor vehicle record." *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 926 (4th Cir. 2022).

Numerous courts have recently held that information a person inputs while browsing the DMV's website does not satisfy this requirement. *Wilson v. Google LLC*, 2025 WL 901941, at *4–5 (N.D. Cal. Mar. 25, 2025) (dismissing DPPA claim against Google where "the personal information at

17

Gibson, Dunn &
Crutcher LLP

issue came from Plaintiff herself when she entered it into the DMV's website"); *Jackson*, 2025 WL 28643, at *3–5 (similar). Similarly, four different courts have dismissed DPPA claims against Meta and held that users' Facebook ID cookies transmitted using Pixel code are not "from a motor vehicle record." *Knight*, No. 2:23-cv-13347, Dkt. 19 at 3–4; *Davis*, 2024 WL 3293644, at *3–5; *Dye*, 2024 WL 2125602, at *3–4; *Keogh*, 680 F. Supp. 3d at 609–12.

At the motion-to-dismiss stage, Gershzon survived dismissal by alleging that personal information sent to Meta about his disabled person parking placard application came from "the DMV database" and had been "maintained" there "after Gershzon provided it to the DMV through his 'MyDMV' online account." *Gershzon*, 2023 WL 5420234, at *7–8. At summary judgment, Meta will show that is false, and that neither Gershzon nor DeLeon has any claim. But insofar as plaintiffs attempt to show otherwise, they will necessarily confront individualized questions for each piece of asserted personal information—*i.e.*, whether it was pulled from some underlying record, and (if so) whether that record "pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. § 2725(1); *see also* A5-496–502 (DMV testifying that different information is pulled from different sources).

Trying to get around this problem, plaintiffs posit four alternative (and convoluted) theories for why this element is provable classwide. None works.

***"Made available."*** Plaintiffs' first theory is that information is "from a motor vehicle record" whenever it is "made available" by the DMV. Mot. 15–16. That is plainly incorrect. A motor vehicle record is a narrowly defined term; it does not cover all information in the DMV's possession. *Jackson*, 2025 WL 28643, at *4 ("[W]hile maintenance by an agency is a necessary condition for any DPPA claim, it is not sufficient because not all information maintained by an agency falls within the definition of motor vehicle record."). It refers only to records that pertain to four specific documents (permit, title, registration, and ID), 18 U.S.C. § 2725(1)—not everything "made available" by the DMV.

***Event data.*** Plaintiffs' next theory is that "[e]very record" in Meta's event data pertaining to placard or MyDMV transactions "is a motor vehicle record in itself" because "[b]oth the DMV and Meta maintained 'web logs'" with that information. Mot. 16 (emphasis omitted). In other words: because Meta and the DMV allegedly store the same information (event data), it *all* qualifies as motor

18

Gibson, Dunn & Crutcher LLP

vehicle records.  Plaintiffs cite no authority for this theory, and it is flawed for several distinct reasons.

For one, the premise is wrong: Meta and the DMV do not store the same data.  Meta receives event data, which does not necessarily correspond to whatever information the DMV maintains in its "web logs." A5-496–97; *see also* A5-513–15 (plaintiffs' expert conceding event data differed from DMV data).  Determining the extent of any overlap would require individualized analysis:  Some data may overlap, and other data would not— ███████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████ A5-513–18; A1-6; A7-1651–61, 1685–86; *see also* A6-1167– ██████████ ████████ A6-1066–1140 █████████████ Egelman Rpt. ¶ 129 (plaintiffs' expert conceding ad-blockers can prevent data from being sent to Meta); *see supra* 3–4.

Plaintiffs' theory also has multiple legal problems.  It again ignores the definition of "motor vehicle record"—which, again, is limited to records pertaining to four specific documents, not every piece of data the DMV stores.  It also flouts the Ninth Circuit's holding that the DPPA does not apply where "the initial source of personal information" is an "individual, rather than a state DMV," because event data is generated based on users' web activity (not pulled from pre-existing DMV records).  *Andrews*, 932 F.3d at 1260; *see also, e.g.*, *Siegler v. Best Buy Co. of Minn., Inc.*, 519 F. App'x 604, 605 (11th Cir. 2013) ("A plain reading of the DPPA makes clear that the Act was intended to prohibit only the disclosure or redisclosure of information *originating* from [DMV] records.").  Event data, by definition, does not originate from a motor vehicle record; it is created when a person browses the DMV's website.  *See Wilson*, 2025 WL 901941, at *4–5; *Jackson*, 2025 WL 28643, at *3–5.

***Validated MyDMV accounts.***  Plaintiffs' third theory is that "a Validated MyDMV account is a motor vehicle record" because it "pertains to an individual's license and registration"—so, plaintiffs say, "[a]ny record pertaining to that [MyDMV] account" is also a motor vehicle record.  Mot. 16.  That theory is relevant only to the MyDMV Class, not the Placard Class, because placard transactions are not conducted through a MyDMV account.  A5-483–85, 489.  In any event, it is riddled with holes.  To start, a MyDMV account does not "pertain" to a license or registration.  It is not enough (as plaintiffs assert) that the account is used to "manag[e]" those documents or that certain information in the account

is "validated against [the] DMV's other records," Mot. 16; the word "pertain" means "to belong as a part, member, accessory, or product," and a MyDMV account is not a part of a license or registration. *Lake v. Neal*, 585 F.3d 1059, 1061 (7th Cir. 2009) (quoting Merriam-Webster's Collegiate Dictionary (11th ed. 2004)). And even if a MyDMV account *itself* pertained to a license or registration, it does not follow that all records "pertaining to that [MyDMV] account," Mot. 16—a step removed—*also* pertain to the license or registration. *See Jackson*, 2025 WL 28643, at *4 (dismissing claim because plaintiff "fail[ed] to allege that any personal information transmitted to LinkedIn via the Insight Tag—whether from her MyDMV account or otherwise—was obtained from [a motor vehicle] record"). Indeed, many of the transactions that a person can conduct through a MyDMV account—like signing up for paperless notices—clearly have nothing to do with a license or registration. Any attempt to show otherwise would necessarily depend on the specific data at issue, requiring individualized inquiries.

**"Original source."** Last, plaintiffs argue that "the DMV was the 'original' source of the data." Mot. 16. Like plaintiffs' first argument, this ignores the definition of "motor vehicle record" and the fact that not all data from the DMV is from such a record. Plaintiffs' main example—"the first-party cookie that Meta used to identify individuals"—proves the point: every court to consider that theory has rejected it, holding that Facebook ID cookies are not "from" any motor vehicle record. *Knight*, No. 2:23-cv-13347, Dkt. 19 at 3–4; *Davis*, 2024 WL 3293644, at *3–5; *Dye*, 2024 WL 2125602, at *3–4; *Keogh*, 680 F. Supp. 3d at 609–12. Nor, for similar reasons, do "hyperlinks and URLs" that "[t]he DMV provided," Mot. 16, come from any motor vehicle record—indeed, another court expressly rejected the argument that "the full text of a URL revealing that [the plaintiff] was going through the placard renewal process" came "from a motor vehicle record." *Jackson*, 2025 WL 28643, at *3.

In sum, plaintiffs lack any viable theory that would allow them to prove this element classwide.

      **2.**      **Whether Meta "obtained" or "used" a class member's personal information is individualized.**

Plaintiffs must also show that Meta "obtain[ed]" or "use[d]" each class member's personal information. 18 U.S.C. § 2724(a). But that will be an individualized, "fact-intensive inquiry." *Myers v. Aitkin Cnty*, 2014 WL 7399182, at *11 (D. Minn. Dec. 29, 2014) (interpreting DPPA).

Gibson, Dunn & Crutcher LLP

20

██████████ A7-1651–58; *see also* Egelman Rpt. ¶¶ 125–33, 143–47; A5-516–18 (plaintiffs' expert conceding this). So even if a person conducted a transaction on the MyDMV website, it would take individualized analysis to determine whether any data was sent to Meta. Other courts have denied class certification given individual users' ability to "deploy[] a setting or other software" that could "block the Pixel." *Martinez v. D2C, LLC*, 2024 WL 4367406, at *6, *8 (S.D. Fla. Oct. 1, 2024); *see also, e.g., In re Hulu Priv. Litig.*, 2014 WL 2758598, at *22 (N.D. Cal. June 17, 2014) (denying certification given individualized inquiries about whether users cleared or blocked browser cookies).

Even if any data was sent to Meta, it would take *further* individualized analysis to determine whether Meta "obtained" or "used" it. 18 U.S.C. § 2724(a). ████████████████████ ███████████████████████████████████████████████████████ ██████ A7-1685–86; A1-6. This is true for data the DMV sent about DeLeon, A6-1167–1203, and plaintiffs concede this occurred ████████████████ in the sample their expert reviewed. Olsen Rpt. ¶¶ 34, 36, 38, 42. Most filtered information was never received by Meta at all, because ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████ A1-6; A7-1685–86. And to the extent any data did reach Meta's servers before it was filtered out, it is not enough under the DPPA to merely access or view information; a person who "view[s] and ignore[s]" the information, or views it "and then promptly forg[ets] it," has not "obtain[ed] or acquir[ed]" it under the statute. *Myers*, 2014 WL 7399182, at *11. Determining whether each class member's personal information was filtered out will require individualized analysis.

**3.    Determining who personal information "pertains" to is individualized.**

Recovery under the DPPA is limited to "the individual to whom the information pertains." 18 U.S.C. § 2724(a); *see also Pichler*, 542 F.3d at 391 (wife cannot assert DPPA claim based on disclosure of husband's information). But, as discussed above, plaintiffs have no classwide way to prove that data reflects a class member's own information. *See supra* 11–12, 15. So this element, too, will require individualized analyses to determine who the information Meta received "pertains" to.

**D.    Consent cannot be litigated on a classwide basis.**

Class members cannot recover under the DPPA or CIPA if they consented to Meta's receipt of

data. *See* 18 U.S.C. § 2721(b)(13); Cal. Penal Code § 631(a); Cal. Civ. Code § 3515. That poses a fatal merits problem for Facebook and Instagram users—including both proposed class representatives—because Meta's policies clearly disclose that it "maintains the practices of (a) collecting its users' data from third-party sites and (b) later using the data for advertising purposes," and users' agreement to those policies establishes consent. *Smith*, 745 F. App'x at 9; *see* A1-34 (all users must agree to Meta's policies); A6-650–51, 717–718 (Gershzon and DeLeon are Facebook users). For two reasons, it also poses a class-certification problem.

*First*, this issue cannot be litigated classwide because it will differ for users (who expressly agreed to Meta's policies) and non-users (who did not). "The Ninth Circuit has suggested that a single class should not be certified when it is comprised of members who both are and are not subject to contractual agreements requiring mandatory arbitration and waiver of class action rights," and "[t]he same reasoning applies to an affirmative defense like express consent here." *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 987 (N.D. Cal. 2019). Nor can this be fixed by creating subclasses, because plaintiffs have no class representative for a non-user subclass. *See Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981) (each subclass needs an adequate representative).

*Second*, even for users, plaintiffs' lack-of-consent argument does not apply classwide. Plaintiffs argue that Meta's policies do not cover data from the DMV because the Privacy Policy stated that "[g]overnment authorities" "don't use our Products." Mot. 4. To be clear, that argument takes the relevant language out of context: the section plaintiffs quote described *additional* ways certain third parties could share information with Meta, other than using Pixel code to send data. *See* Dkt. 31-4 at 17. But assuming plaintiffs' argument has merit, the language plaintiffs rely on appeared in Meta's Privacy Policy only for a brief slice of the class period—January 1, 2023 through June 15, 2023. Before that, the language was entirely absent. A3-147–93. After that, the relevant provision was revised to say that government authorities "don't *necessarily* use our Products." A4-267 (emphasis added). And during that narrow window, not all class members will have performed any authenticated transaction— for example ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███ A6-1204–20. So plaintiffs' attempt to show they did not consent will not apply classwide,

Gibson, Dunn & Crutcher LLP

requiring different analyses depending on when each class member's data was sent to Meta. *Cf. In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *18 (N.D. Cal. Mar. 18, 2014) (denying class certification where factfinder would have to evaluate different disclosures for different class members).

### E.    Plaintiffs cannot obtain statutory damages on a classwide basis.

Plaintiffs seek statutory damages under the DPPA and CIPA. Mot. 19–20, 22. But they have no classwide way to prove entitlement to those damages.

The DPPA says a court "*may* award" actual damages (and, if it does so, it must award "not less than liquidated damages in the amount of $2,500"). 18 U.S.C. § 2724(b)(1) (emphasis added). "The use of the word 'may' suggests that the award of any damages is permissive and discretionary." *Kehoe v. Fidelity Fed. Bank & Trust*, 421 F.3d 1209, 1216 (11th Cir. 2005); *see also Pichler*, 542 F.3d at 394 ("The language of the DPPA indicates a certain degree of discretion granted to the court in awarding damages."). In similar statutory contexts, to determine whether to award a minimum statutory damages amount or not, courts apply a multi-factor test that accounts for (among other things) the degree of harm to the plaintiff. *See DirecTV, Inc. v. Huynh*, 2005 WL 5864467, at *8 (N.D. Cal. May 31, 2005), *aff'd*, 503 F.3d 847 (9th Cir. 2007). The same test has been applied under CIPA. *See Campbell v. Facebook Inc.*, 315 F.R.D. 250, 268–69 (N.D. Cal. 2016). And where application of that test varies from class member to class member, courts deny class certification. *Id.*; *see also, e.g., Bliss v. Core-Civic, Inc.*, 711 F. Supp. 3d 1233, 1242–44 (D. Nev. 2024).

Plaintiffs propose no way to deal with this multi-factor analysis; instead, they simply assert that every class member should receive statutory damages automatically. *See* Mot. 19–20, 22; *see also* Dkt. 140-42 at 4. But "statutory damages are not to be awarded mechanically." *Campbell*, 315 F.R.D. at 268. And here, as in *Campbell* and *Bliss*, "[d]etermining whether to award damages" will "necessitate a customized review" for each class member. *Bliss*, 711 F. Supp. 3d at 1243.

For example, "whether or not there was actual damage to the plaintiff would vary between class members, and would be answered in the negative for many class members." *Campbell*, 315 F.R.D. at 268 (quotation marks omitted). So too would "the extent of any intrusion into the plaintiff's privacy." *Id*. Gershzon and DeLeon exemplify the problem: ▮▮▮▮▮▮▮▮▮▮

23

Gibson, Dunn & Crutcher LLP

███████████████████    A5-393–96, 403–04, 444, 446–47, 449, 451, 455–56; A6-767–72; A7-1522–23, 1541. ██████████████████████████████████████████████ A6-610– 14. ███████████████████████████████████████████████ ███████████████ A5-390–91, 410. The "severity of the violation," *Campbell*, 315 F.R.D. at 268, will also vary—a class member who applied for a disabled person parking placard is arguably differ- ently situated than a class member whose data revealed only that he signed up for paperless notices.

**III.    The Proposed Class Representatives Are Atypical and Inadequate.**

Rule 23 imposes requirements on proposed class representatives: (1) their claims must be typ- ical of the class's claims, and (2) they must fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(3)–(4). Gershzon and DeLeon do not satisfy these requirements.

*First*, as Facebook users, Gershzon and DeLeon face a key consent hurdle that non-users would not face. *See supra* 22. A "named plaintiff is not typical or adequate if the jury could realistically rule against them on a basis that wouldn't apply to the rest of the class." *Lineberry v. AddShoppers, Inc.*, 2025 WL 1533136, at *6 (N.D. Cal. May 29, 2025); *see also Berman*, 400 F. Supp. 3d at 987–88 (proposed representative inadequate where he did not agree to same contracts as class members). Plus, for plaintiffs' argument that Meta's policies suggested the DMV would not use Pixel code, ██████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████    *See supra* 22–23; Mot. 8–9.

*Second*, Gershzon and DeLeon have serious "honesty and credibility" problems. *Lineberry*, 2025 WL 1533136, at *7 (quotation marks omitted). Gershzon's complaint survived dismissal in this case based on allegations that he applied for a disabled person parking placard on the DMV's website. Dkt. 1 ¶ 62; *see Gershzon*, 2023 WL 5420234, at *7–8. But discovery revealed no such data, and Gershzon now concedes those allegations were false—he applied by phone, not online. Mot. 8. That backtracking makes him inadequate to represent the class (and demonstrates why relying on class mem- bers' testimony about their online activity would be inherently individualized and factbound).

DeLeon is an even poorer representative. He has made multiple demonstrably false statements in this litigation, and his testimony reflects a lack of reliable, good-faith engagement:

Gibson, Dunn & Crutcher LLP

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 3:23-CV-00083-SI

- ████████████████████████████████████████████████ A5-467–75.

- ████████████████████████████████████████████████ A5-450, 454, 459–63.

- ████████████████████████████████████████ A7-1372–89. This documented antipathy toward likely class members makes DeLeon an inadequate representative.

- ████████████████████████████████████████████████ A5-466. That disengagement is disqualifying. *See, e.g., In re Monster World-wide, Inc. Sec. Litig.*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008).

These inadequacies prevent both Gershzon and DeLeon from serving as suitable representatives.

## IV.    The Court Should Not Certify an Injunctive-Relief Class.

Plaintiffs tack on a perfunctory request for injunctive-relief classes under Rule 23(b)(2). Mot. 23–24. In addition to the typicality and adequacy problems above, the Court should not certify any injunctive-relief class for two reasons.

*First*, as the drive-by treatment in plaintiffs' motion betrays, injunctive relief is an afterthought. "Rule 23(b)(2) certification is inappropriate where the primary relief sought is monetary." *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir. 2001); *see also Rabin v. Google LLC*, 787 F. Supp. 3d 934, 954 (N.D. Cal. 2025). There is little doubt that plaintiffs are focused on money.

*Second*, plaintiffs lack standing to seek injunctive relief because they are not subject to any imminent or ongoing harm. *See Holmes*, 156 F.4th at 428–33 (no standing for injunctive relief in DPPA case); *Garey*, 35 F.4th at 922–24 (same). The DMV stopped using Pixel code on August 25, 2023. A6-1306–15; *see* Mot. 1 (conceding this). And to the extent plaintiffs seek deletion of the data the DMV sent to Meta, no injunction is necessary: that ████████████████████████ ████████████████████████████ A1-4.

## CONCLUSION

Plaintiffs' motion for class certification should be denied and the complaint dismissed.

Gibson, Dunn & Crutcher LLP

DATED: February 27, 2026

**GIBSON, DUNN & CRUTCHER LLP**

By: */s/ Lauren R. Goldman*
Lauren R. Goldman

*Attorneys for Meta Platforms, Inc.*

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
CASE NO. 3:23-CV-00083-SI

Gibson, Dunn &
Crutcher LLP