United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MIKHAIL GERSHZON, *et al.*,

Plaintiffs,

v.

META PLATFORMS, INC.,

Defendant.

Case No. 23-cv-00083-SI

**ORDER DISMISSING CASE FOR LACK OF STANDING AND DENYING AS MOOT MOTIONS FOR CLASS CERTIFICATION AND MOTIONS TO EXCLUDE EXPERTS**

Re: Dkt. Nos. 139, 158, 183

On September 15, 2026, the Court held a hearing on plaintiffs' motion for class certification and the parties' motions to exclude certain opinions offered by each other's experts. For the reasons set forth below, the Court concludes that the named plaintiffs lack Article III standing, and thus the Court DISMISSES this case. The Court DENIES AS MOOT plaintiffs' motion for class certification and the parties' motions to exclude expert opinions.

**BACKGROUND**

On January 6, 2023, plaintiff Mikhail Gershzon filed this consumer privacy class action against Meta Platforms, Inc. ("Meta," formerly known as Facebook), asserting claims under the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721 *et seq.*, and California's Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631(a). Plaintiff Anacleto DeLeon was added as a putative class representative in September 2025. Plaintiffs allege that Meta is a data aggregator and online

advertising company, and that Meta "obtain[ed] statutorily protected personal information, including names, disability information, and e-mail addresses, as well as confidential communications" from the California Department of Motor Vehicles ("DMV") website through a "hidden tracking code" developed by Meta called the Meta Pixel. Compl. ¶¶ 1-2 (Dkt. No. 1). Plaintiffs claim that the Meta Pixel tracked their activities and personal data when they visited the DMV website and transmitted that information to Meta, and that Meta used that information to identify personalized "audiences" that Meta sold to its advertising clients. *Id.* ¶ 15.

The Meta Pixel is a "Business Tool" offered by Meta to businesses and other third parties. The Pixel is JavaScript computer code that a website developer can install on a website to track web visitor actions on the website. The DMV installed Meta's JavaScript Pixel code snippet on all pages of its website on August 14, 2019. Egelman Report ¶ 57 (Dkt. No. 142-4); Pls' Ex. 3 (Dkt. No. 140-2).[1] The record shows that the DMV installed the Meta Pixel on its website to gather information about users' activity on the website in support of public education campaigns about the REAL ID and a change in the law regarding disabled person parking placards. The DMV used the Pixel data to advertise to target audiences, such as advertising to website visitors who started but did not complete a REAL ID application, as well advertising to drivers, caregivers, advocacy groups, and senior living communities about the disabled parking placard renewal process. A5-530-31 (Dkt. No. 163); A6-1221-29 (Dkt. No. 157-6).[2]

When an individual visited the DMV's website, the Pixel instructed the individual's browser to contact Meta's servers to request further instructions in the form of more JavaScript code. Egelman Report ¶¶ 60-62 (Dkt. No. 142-4). When a browser made contact with Meta's servers, Meta sent more JavaScript code to the browser, which instructed the browser to compile information known as "event data" about what the user did on the DMV website and transmit that event data to Meta. *Id.* at ¶¶ 63-84. When Meta received event data, it attempted to match that data to a Facebook

---

[1] Meta moved to strike certain portions of Dr. Egelman's report as irrelevant and/or unreliable. This order does not cite any of the challenged paragraphs.

[2] Citations to "A____" are to the seven volumes of appendices filed by Meta in opposition to plaintiffs' motion for class certification.

or Instagram account. The DMV stopped transmitting information to Meta through the Meta Pixel on August 25, 2023, after the DMV learned of this lawsuit. Pls' Ex. 5 (Dkt. No. 140-4).

Named plaintiffs Gershzon and DeLeon have Facebook accounts, and both individuals visited the DMV website during the class period. The specific data about plaintiffs' activity on the DMV website that was transmitted to Meta via the Pixel is discussed below.

Plaintiffs seek to represent two different classes:

> **Placard Class:** All current and former holders of a Permanent, Temporary, or Travel Disabled Person Parking Placard issued by the California Department of Motor Vehicles whose Disabled Person Parking Placard application, replacement or renewal ("Placard Transaction") record is in Meta's records from the DMV website.

Plaintiffs assert DPPA and CIPA claims on behalf of the Placard Class and propose DeLeon as the class representative.

> **MyDMV Class:** All natural persons who held a Validated MyDMV Account and conducted an Authenticated DMV Online Transaction between February 22, 2020 and August 25, 2023 at 11:03 a.m. PT.

A "Validated MyDMV Account" is an account that a user has created on the DMV's website and that the DMV validated by confirming that personal information in the MyDMV Account matched the applicant's DMV-issued ID. Motion at 5 (Dkt. No. 139). Plaintiffs define an "Authenticated DMV Online Transaction" as the following seven transactions: Renew License, Renew ID Card, Replace License, Change Address, Request Vehicle Record, Request Driver Record, and Receive Paperless Notices. *Id*. at 5-6.

During the class period, the DMV's Conditions of Use stated that "if you access our online applications, we automatically collect and store your interaction with the application including the following . . . [i]nformation you input into form fields, including personal and confidential information," "[l]inks you select," and "[e]rror messages you may receive." Dkt. No. 31-8 at 2. The Conditions of Use specify this information is "used for customer service, and to provide statistical analysis for the improvement of the content and quality of our web services and applications." *Id*. The Conditions of Use also stated that the DMV "make[s] no attempt to link other websites with the individuals who browse the state's website" and that the DMV "makes every attempt to avoid the use of cookies." *Id*. at 2, 4. In addition, the Conditions of Use stated that the law "prohibits all state

United States District Court
Northern District of California

agencies from distributing or selling any electronically collected personal information [] about users to any third party without [permission] . . . Any distribution [] will be solely for the purposes for which it was provided to use" and "private information . . . will not be shared with another entity except as prescribed by law." *Id*. at 2.

Plaintiffs assert DPPA claims on behalf of the MyDMV Class and propose Gershzon and DeLeon as class representatives.

**I. Gershzon**

Gershzon created and validated his MyDMV account on August 23, 2020, and he claims that he renewed his ID card the same day, but Meta does not have data reflecting this transaction. Pls' Ex. 14, 20 (Dkt. Nos. 140-13, 140-19); Gershzon Depo. at 132 (A5-400) (Dkt. No. 163). Gershzon also claims that his ID was delivered to an old address and that in March 2021, he logged back into his MyDMV account and changed his address, but Meta does not have data reflecting this transaction. Gershzon Depo. at 131-132. The ID renewal and change of address are the Authenticated DMV Online Transactions that plaintiffs have identified for Gershzon. Motion at 8.

Meta's records do reflect the following: (1) on December 22, 2021, Gershzon visited the DMV website to look for information related to a title transfer, Pls' Ex. 21 (Dkt. No. 140-20); at his deposition Gershzon testified that he was researching information about title transfers for his ex-wife, Gershzon Depo. at 130-31 (A5-398-99) (Dkt. No. 163); (2) on August 12 and 15, 2022, Gershzon visited the DMV website and went to the dmv.ca.gov homepage, appointments page, and informational pages about driver education, disabled parking placards, and appointments, Pls' Ex. 21 (Dkt. No. 140-20); (3) on June 12, 2023, Gershzon visited the DMV website and went to pages about contacting the DMV and appointments, *id*.; and (4) on July 23, 2023, Gershzon visited the DMV informational page about renewing a disabled parking placard. *Id*. Although Gershzon initially alleged that he applied for disabled parking placard on the DMV website, discovery revealed that he submitted his application over the phone.

For all of Gershzon's visits to the DMV website, the information transmitted to Meta reflected the page visited (*e.g.*, https://www.dmv.ca.gov/portal/mydmv,

https://www.dmv.ca.gov/portal/dmv-virtual-office/title-transfers/title-transfer-form, https://www.dmv.ca.gov/portal/vehicle-registration/license-plates-decals-and-placards/disabled-person-parking-placards-plates/) but did not include data about whether transactions were completed or the contents of transactions. For example, the fact that Gershzon visited the appointments page was transmitted to Meta, but the Pixel did not transmit to Meta information showing whether he actually made an appointment, or any details about any scheduled appointments.

Gershzon has had a Facebook account since approximately 2010, and he shared a scan of his DMV identification card with Facebook in order to validate his account. A6-610-614.

## II. DeLeon

DeLeon claims that he engaged in several Authenticated DMV Online Transactions, and that he applied online for his disability parking placard. DeLeon claims that he visited the DMV website on December 5, 2020, to request a copy of his driving record, Pls' Ex. 23 (Dkt. No. 140-22). Meta does not have data reflecting that transmission. On March 10, 2023, DeLeon changed his address and opted into paperless notices. Pls' Ex. 24 (Dkt. No. 140-23), A6-838, 844 (Dkt. No. 161-6). On March 14, 2023, DeLeon submitted an online application for a Disabled Person Parking Placard. Pls' Ex. 24 (Dkt. No. 140-23), A6-964, A6-1145-47 (Dkt. No. 161-6). Meta's records also show that DeLeon visited the DMV website a number of times between 2021 and 2023, and that on those occasions he visited the DMV homepage, informational pages, and other pages to check the status of transactions. Pls' Ex. 24 (Dkt. No. 140-23).

As with Gershzon's information that was transmitted through the Meta Pixel, the information received by Meta reflected the webpage visited (*e.g.*, https://www.dmv.ca.gov/portal/online-change-of-address-coa-system/, https://www.dmv.ca.gov/portal/dmv-virtual-office/dpp-application/, and https://www.dmv.ca.gov/portal/paperless-notices/), but did not show the completion or contents of any transaction. For example, the fact that DeLeon visited the DMV page containing information about applying for a disabled parking placard was transmitted to Meta, but Meta did not receive any

information about whether DeLeon completed the application or if the DMV issued him a placard, nor did the Pixel transmit any substantive information from DeLeon's placard applications, such as information about DeLeon's disability.

DeLeon has had a Facebook account since approximately 2015, and in April 2025 he posted a picture of his car with his disabled parking placard on his Facebook page as well as on X. A6-767, A6-773 (Dkt. No. 161-6). DeLeon also posted information about his medical diagnoses and surgeries to his Facebook page during the class period.

**LEGAL STANDARD**

At the class certification stage, plaintiffs must demonstrate that the named plaintiffs have Article III standing. *See Healy v. Milliman, Inc.*, 164 F.4th 701, 706 (9th Cir. 2026). "Because the preponderance of the evidence standard applies at the class certification stage, standing at the time of class certification must be established by a preponderance of the evidence." *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1240 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1051 (2025). "[S]tanding is the threshold issue in any suit. If the individual plaintiff lacks standing, the court need never reach the class action issue." *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) (quoting 3 HERBERT B. NEWBERG ON CLASS ACTIONS § 3:19 (4th ed. 2002)); *see also NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 532 (9th Cir. 2019).

Article III of the United States Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). To establish Article III standing, a plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id*. (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

**DISCUSSION**

In order to establish Article III standing, plaintiffs must show that they have suffered an

"injury in fact" that is "concrete." The Supreme Court has instructed that when a plaintiff alleges an intangible harm, such as an invasion of privacy, alleging a statutory violation is not sufficient to confer constitutional standing. *TransUnion*, 594 U.S. at 425-26. "Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 427. For intangible harms, "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts[,]" and "[t]hat inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* at 424 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). Applying that framework, the Court in *TransUnion* held that individuals alleging violations of the Fair Credit Reporting Act whose inaccurate credit reports had been disseminated to third parties had Article III standing because the injury suffered by those individuals bore a close relationship to the reputational harm associated with the tort of defamation. *Id.* at 432. However, class members whose credit reports were not disseminated lacked Article III standing because there was no historical or common law analogue where the mere existence of inaccurate information, absent dissemination, provided the basis for a lawsuit, and the risk of future harm was too speculative to support Article III standing. *Id.* at 434, 437.

The Ninth Circuit recently applied *TransUnion*'s standing analysis in *Popa v. Microsoft*, 153 F.4th 784 (9th Cir. 2025), to conclude that a website user alleging claims for statutory wiretapping and common law invasion of privacy-intrusion upon seclusion lacked standing to challenge a pet supplies website's use of "session-replay technology." The plaintiff alleged that the technology collected information about what pet supplies she browsed and some information about her address, "creat[ing] a video replay of [her] behavior on the website and provid[ing] it to [the website owner] for analysis." *Id*. at 786-87. The Ninth Circuit stated that "*TransUnion* requires a court to assess whether an individual plaintiff has suffered a harm that has traditionally been actionable in our nation's legal system[,]" by looking to the "*specific* underlying harm experienced by the plaintiff and compar[ing] it in detail, to a *specific* common-law tort." *Id.* at 791 (emphasis in original). The Ninth Circuit examined whether Popa's injury was analogous to the common-law privacy torts of

intrusion upon seclusion and public disclosure of private facts:

> To show intrusion upon seclusion, a plaintiff must show "an intentional interference with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, *of a kind that would be highly offensive to a reasonable man*." *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 491 (9th Cir. 2019) (emphasis added) (quoting Restatement (Second) of Torts § 652B cmt. a (Am. Law Inst. 1977)). Similarly, a claim for public disclosure of private facts requires that a defendant "gives publicity" to a matter that concerns "the private life of another," that the information is "highly offensive to a reasonable person," and that the information is not of legitimate public concern. Restatement (Second) of Torts § 652D (emphasis added).
>
> Popa does not explain how the tracking of her interactions with the PSP website caused her to experience any kind of harm that is remotely similar to the "highly offensive" interferences or disclosures that were actionable at common law. Of course, an "exact duplicate" is not required, and many courts require a match only in the kind of harm and not the degree. But Popa identifies no embarrassing, invasive, or otherwise private information collected by Clarity. Indeed, the monitoring of Popa's interactions with PSP's website seems most similar to a store clerk's observing shoppers in order to identify aisles that are particularly popular or to spot problems that disrupt potential sales.
>
> This is quite different from the hypotheticals set out in the Restatement. Consider, for example, the following scenario for intrusion upon seclusion: "A . . . rents a room in a house adjoining B's residence, and for two weeks looks into the windows of B's upstairs bedroom through a telescope taking intimate pictures with a telescopic lens." Restatement (Second) of Torts § 652B cmt. b, illus. 2. Or, to take an example for public disclosure of private facts: "A publishes, without B's consent, a picture of B nursing her child." Restatement (Second) of Torts § 652D cmt. c, illus. 10. Microsoft's conduct in this case does not implicate a similarly sensitive sphere. At most, Popa alleges that Clarity gathered her pet-store preferences and her street name. To the extent Microsoft's tracking software could be offensive in particular circumstances (e.g., involving sensitive medical or financial information), Popa does not plausibly allege the infringement of any such privacy interest.

*Id.*; *see also id.* at 791-92 (stating that after *TransUnion*, a plaintiff cannot assert privacy rights at "high level of generality" and instead must identify a harm similar to those protected by "discrete torts that protected specific kinds of privacy-related harms").

Applying the analysis of *TransUnion* and *Popa* to this case, the Court concludes that Gershzon and DeLeon lack Article III standing because neither plaintiff has suffered a concrete injury as a result of the Pixel's transmission of information about their activities on the DMV website to Meta. Plaintiffs assert that their injury is similar to the common law tort of intrusion upon seclusion, which as *Popa* stated, requires plaintiffs to show "an intentional interference with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, *of a kind that would be highly offensive to a reasonable man*." *Id.* at 791 (emphasis added in *Popa*).

Viewing the record in the light most favorable to plaintiffs, the record shows the Pixel transmitted to Meta data showing that Gershzon and DeLeon visited the DMV webpages about topics such as changing an address, opting into paperless notices, renewing an ID card, purchasing a copy of a driver's record, and application pages for a disabled parking placard. The Pixel did not transmit information about whether any of these transactions were actually completed, nor did the Pixel transmit any substantive information about any transaction, such as plaintiffs' addresses, driver's license numbers, or disability status. None of the information transmitted is "embarrassing, invasive, or otherwise private," and instead it is similar to the non-sensitive information collected in *Popa*.

Plaintiffs contend that they have Article III standing because even if the transmitted information is not particularly private or embarrassing, it is the context of the intrusion that renders it highly offensive. Plaintiffs argue that "Meta exploited the State's coercive authority to obtain Plaintiffs' information concurrently with the State" by using the invisible, undisclosed Pixel technology on the DMV website, a government website that citizens are required to use in order to transact business with the State. Reply at 2 (Dkt. No. 184). Plaintiffs assert that Meta exploited the State's coercive authority in order to "gather information for Meta's data systems, advertising, research, and host of other pursuits that are unrelated to the governmental exercise of power that brought people to the DMV," and thus that they have demonstrated an "(1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." *Shulman v. Group W Prods., Inc.*, 18 Cal. 4th 200, 231 (1998) (discussing intrusion into seclusion).

Plaintiffs' counsel also asserted that the Pixel tracking on the DMV website was akin to a Meta employee standing next to Gershzon or DeLeon at the DMV counter and surreptitiously listening and recording their transactions. The Court recognizes that the context of an intrusion is relevant to determining whether an intrusion is highly offensive, and the Court is troubled about the use of an invisible, undisclosed tracking technology on a government website.[3] However, the

[3] The parties debate how to interpret the DMV's Conditions of Use as well as different versions of Meta's Privacy Policy in effect during the class period, as well as other Meta terms and conditions that plaintiffs "agreed" to when they created their Facebook accounts, and Meta contends that these policies alerted consumers to the fact that third parties, including governmental

United States District Court
Northern District of California

problem with plaintiffs' analogy of a Meta employee eavesdropping at the DMV counter is that the Pixel did not transmit to Meta any sensitive or substantive information about plaintiffs' transactions on the DMV website.[4] Instead, the way the Pixel operated on the DMV website is more similar to a Meta employee watching Gershzon or DeLeon at a DMV office from a distance and seeing them pick up informational fliers or forms to change an address, renew an ID, or apply for a disabled parking placard. Plaintiffs have not articulated how this type of harm is similar to the highly offensive intrusions actionable at common law. The Restatement discusses when intrusions into public spaces (like a DMV office) or public matters is actionable, and none are comparable what occurred here:

> c. The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs. Thus is no liability for the examination of a public record concerning the plaintiff, or of documents that the plaintiff is required to keep and make available for public inspection. Nor is there liability for observing him or even taking his photograph while he is walking on the public highway, since he is not then in seclusion, and his appearance is public and open to the public eye. Even in a public place, however, there may be some matters about the plaintiff, such as his underwear or lack of it, that are not exhibited to the public gaze; and there may still be invasion of privacy when there is intrusion upon these matters.
>
> Illustrations:
>
> 6. A is drunk on the public street. B takes his photograph in that condition. B has not invaded A's privacy.
>
> 7. A, a young woman, attends a "Fun House," a public place of amusement where various tricks are played upon visitors. While she is there a concealed jet of compressed air blows her skirts over her head, and reveals her underwear. B takes a photograph of her in that position. B has invaded A's privacy.

---

authorities, used Meta's Business Tools and shared data with Meta. Regardless, it is undisputed that neither the DMV nor Meta ever explicitly disclosed that the DMV website contained the Meta Pixel.

[4] At the hearing, plaintiffs' counsel argued that *Popa* is factually distinguishable because that case involved session-replay technology in which the information that was tracked was provided to the website owner and not to a third party data aggregator for advertising purposes. The Court is not persuaded that this is a meaningful distinction. The district court opinion in *Popa* noted that the plaintiff alleged that the "use of Session Replay Code [w]as 'the electronic equivalent of 'looking over the shoulder' of each visitor to the PSP website" and that the "'[d]ata collected by Clarity is . . . stored in the Microsoft Azure cloud service, and Microsoft has access to that information." *Popa v. PSP Grp., LLC*, Case No. C23-0294JLR, 2023 WL 7001456, at *1 (W.D. Wash. Oct. 24, 2023) (quoting amended complaint).

> d. There is likewise no liability unless the interference with the plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reasonable man would strongly object. Thus there is no liability for knocking at the plaintiff's door, or calling him to the telephone on one occasion or even two or three, to demand payment of a debt. It is only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff, that becomes a substantial burden to his existence, that his privacy is invaded.

Rest. 2d of Torts §652B, Comments c, d. Here, unlike the woman in the Fun House example, there is nothing private or embarrassing about the plaintiffs' information that was transmitted to Meta. Nor do plaintiffs claim that as a result of the Pixel tracking they experienced anything that amounted to "a course of hounding" or anything that was a "substantial burden" to their existence.

The Court also finds it significant that both named plaintiffs voluntarily shared the same – or more private – information with Meta, further undercutting their claims that they have suffered an intrusion to their seclusion. Gershzon provided a scan of his DMV ID to Meta, and DeLeon posted pictures to his Facebook page of his vehicle with his disability parking placard, as well as information about his medical diagnoses and health status. It is difficult to argue that the transmission to Meta of anodyne information about visits to DMV webpages is highly offensive when the plaintiffs themselves have provided more detailed private information directly to Meta. *Cf. Baysal v. Midvale Indem. Co*., 78 F.4th 976, 980 (7th Cir. 2023) (in case where plaintiffs alleged insurance company violated the DPPA by disclosing their driver's license numbers, affirming dismissal for lack of Article III standing because "a driver's-license number is not potentially embarrassing or an intrusion on seclusion. It is a neutral fact derived from a public records system, a fact legitimately known to many private actors and freely revealed to banks, insurers, hotels, and others. Plaintiffs have not plausibly alleged that Midvale's disclosure of their numbers caused them any injury, and the disclosure of a number in common use by both public and private actors does not correspond to any tort.").

**CONCLUSION**

For the reasons stated above, the Court concludes that Gershzon and DeLeon lack Article III standing. The Court DISMISSES this case for lack of standing and does not reach the class certification issues. *See Lierboe*, 350 F.3d at 1022. The Court DENIES the class certification and

*Daubert* motions as moot.

**IT IS SO ORDERED**.

Dated: September 30, 2026

SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California